**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MISSOURI
CENTRAL DIVISION**

| | | |
|---|---|---|
| HARPER GLASSCOCK, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No.: 2:24-cv-4036 |
| | ) | |
| ACTIVISION BLIZZARD, INC., | ) | |
| INFINITY WARD, INC., | ) | |
| SLEDGEHAMMER GAMES, INC., | ) | |
| BLIZZARD ENTERTAINMENT, INC., | ) | |
| MICROSOFT CORPORATION, | ) | |
| MSI COMPUTER CORPORATION, | ) | |
| BLUESTACKS BY NOW.GG, INC. | ) | |
| d/b/a BLUESTACKS | ) | |
| and JANE & JOHN DOE I-XX, | ) | |
| | ) | |
| Defendants. | ) | |

## COMPLAINT

Plaintiff Harper Glasscock hereby files her *Complaint* against the Defendants—Activision Blizzard, Inc., Infinity Ward, Inc., Sledgehammer Games, Inc., Blizzard Entertainment, Inc., Microsoft Corporation, MSI Computer Corporation, BlueStacks by now.gg, Inc. d/b/a BlueStacks, and Jane & John Doe I-XX—notifying each Defendant of Plaintiff's claims for relief as available under Missouri law. In support thereof, Plaintiff alleges and states:

### I.  NATURE OF THE ACTION

1.     Video game addiction, also called internet gaming disorder, is a condition characterized by severely reduced control over gaming habits and increasing priority given to gaming over other activities, resulting in negative consequences in many aspects of a person's life, including self-care, relationships, school, and work.

2.     Video game addiction has negative consequences on cognitive processes, including multi-second time perception, inhibition, and decision-making. Those suffering stop interacting

with friends and/or family, exhibit excessive rage, and no longer enjoy other hobbies or activities outside of their video games.

3.    Video game addiction causes rifts between minors and young adults with gaming-addiction and their loved ones—rifts beyond that normally experienced between children and their parents or other family members.

4.    Video game addiction and its harmful consequences are only expanding due to the advent of online gaming, cloud gaming, and streaming of games on any device at any time—giving minors unfettered access to "free" games that target those consumers to purchase products within the game to keep playing or for other game perks.

5.    Video game addiction is a world-wide epidemic harming our nation's youth and young adults.

6.    The rapid spread of video game addiction is a proximate result of Defendants' concerted effort to get consumers (*e.g.*, minor and young adult game players) addicted to the Defendants' video game products in order to maximize Defendants' profits.

7.    Defendants manufactured, published, marketed, and sold video games and gaming products, including those played by Harper Glasscock, which Defendants had specifically developed and designed to cause the addiction experienced by Harper Glasscock and other users.

8.    Defendants use traditional game tactics such as feedback loops and reward systems, along with patented designs containing addictive features and technology to ensure its users keep playing longer and spending more on "microtransactions" within the game.

9.    Defendants rely on microtransactions to increase their profits from individual games.

10.    Defendants design their games to keep consumers playing—and spending—by enlisting the help of behavioral psychologists and neuroscientists to conduct state-of-the-art

2

research and to collect data that Defendants use to develop and design their games to be as addictive as possible—especially to minors, young adults, and neurodivergent individuals.

11.    Defendants make their games addictive, in part, by encouraging long-term, extended game play despite knowledge that such extended play causes physical harm to the human brain – and particularly to a minor's developing brain.

12.    Defendants' motive in developing, designing, manufacturing, publishing, and selling addictive video game products is their own bottom line.

13.    By making their games addictive, Defendants are able to maximize profits after the original purchase or free download. Within their games, Defendants offer significant opportunity to purchase downloadable game products or in-game transactions, known as "microtransactions," to allegedly give players an advantage in the game.

14.    "Microtransactions" often occur as a result of Defendants' use of "friends," targeted advertisements, or other deceptive tactics built into Defendants' video games. Thus, the more times a player comes back to play a game, the more times they are subjected to Defendants' deceptive and harmful conduct and more likely to spend more money within the game in order to keep playing, thereby increasing Defendants' bottom line.

15.    By keeping minors and young adults playing longer—and spending more money in the game in the process—Defendants are causing physical and mental harm to users while consistently increasing their revenue.

16.    By acquiring—and addicting—users when they are young, Defendants are securing their profit stream by ensuring future engagement and monetization as these young users age.

17.    Defendants are exploiting consumers, particularly minors and young adults, through the use of unfair, unconscionable, and deceptive trade practices and conduct that prioritizes gamer engagement and spending over gamer safety.

3

18. Video game addiction impacts thousands of individuals and their families across the country, including in Missouri.

19. Harper Glasscock is one of those individuals who have been negatively impacted by the addiction and harm caused by each of Defendants' products.

20. Defendants' intentional, negligent, deceptive, fraudulent, willful, immoral, reckless, and unlawful acts proximately caused Harper Glasscock's brain damage and gaming addiction, along with her other damages as described herein.

21. As a result of that gaming addiction and harm caused by Defendants' products, Harper Glasscock specifically has experienced brain damage, cognitive impairment, lost job opportunities and unemployment, depression, anxiety, withdrawal symptoms when not using Defendants' products, withdrawal from life activities and social isolation, poor hygiene, changes in eating and sleeping patterns, distress, and anger.

22. Harper Glasscock has been diagnosed with depression and anxiety, and has been advised by mental health professionals that she needs to stop playing video games as it is damaging her mental health.

23. As a result of the gaming addiction and harm proximately caused by Defendants' misconduct, Harper Glasscock requires treatment, including but not limited to outpatient counseling from mental health professionals.

24. Harper Glasscock has been injured and harmed as a proximate result of Defendants' actions and misconduct; for that she is entitled to compensation and other damages under Missouri law.

25. Defendants, individually and collectively, have willfully and knowingly engaged in fraudulent, deceptive, unfair, immoral, outrageous, wanton, and reckless behavior that damaged and continues to harm not only Plaintiff, but countless other Missourians and citizens of the world.

4

For this they should be punished and punitive damages should be assessed against each Defendant for their respective misdeeds and unlawful conduct.

## II. PARTIES

26.     Harper Glasscock is, and at all times relevant to this action, was a citizen and resident of the State of Missouri whose principal place of residence being in Boone County, Missouri.

27.     Harper Glasscock is 24 years old at the time of filing of this lawsuit.

28.     Harper Glasscock began playing video games at 4 years old.

29.     Harper Glasscock has continued to play video games at an increasing and uncontrollable pace since that time.

30.     Harper Glasscock specifically played Call of Duty-Modern Warfare and Call of Duty: Modern Warfare 3 on Xbox 360 (approximately age 11 to 16), and plays World of Warcraft (began at age 14), and Overwatch (began at age 15) on her MSI GP65 Leopard gaming laptop through Battle.net.

31.     Defendant Activision Blizzard, Inc. ("Activision") is a Delaware corporation with its principal place of business at 2701 Olympic Boulevard Building B, Santa Monica, CA 90404.

32.     At all times material hereto, Activision developed, tested, patented, assembled, manufactured, published, packaged, labeled, prepared, distributed, marketed, supplied, and/or sold the Call of Duty video game series, either directly or indirectly, to members of the general public within the State of Missouri, including to Plaintiff.

33.     At all times material hereto, Activision developed, tested, patented, assembled, manufactured, published, packaged, labeled, prepared, distributed, marketed, supplied, and/or sold the WOW video game series, either directly or indirectly, to members of the general public within the State of Missouri, including to Plaintiff.

5

34.     At all times material hereto, Activision developed, tested, patented, assembled, manufactured, published, packaged, labeled, prepared, distributed, marketed, supplied, and/or sold the Overwatch video game series, either directly or indirectly, to members of the general public within the State of Missouri, including to Plaintiff.

35.     At all times material hereto, Activision developed, tested, patented, assembled, manufactured, published, packaged, labeled, prepared, distributed, marketed, supplied, and/or sold Battle.net, either directly or indirectly, to members of the general public within the State of Missouri, including to Plaintiff.

36.     Defendant Infinity Ward, Inc. ("Infinity Ward") is a Delaware corporation with its principal place of business at 21255 Burbank Blvd, Ste 600, Woodland Hills, CA 91367.

37.     Infinity Ward is a wholly owned subsidiary of Activision and the only products it develops and produces are the Call of Duty video games.

38.     At all times material hereto, Infinity Ward developed, tested, patented, assembled, manufactured, published, packaged, labeled, prepared, distributed, marketed, supplied, and/or sold the Call of Duty video game series, either directly or indirectly, to members of the general public within the State of Missouri, including to Plaintiff.

39.     Defendant Sledgehammer Games, Inc. ("Sledgehammer Games") is a Delaware corporation with its principal place of business at 1001 E Hillsdale Blvd., Ste 610, Foster City, CA 94404.

40.     Sledgehammer Games is a wholly owned subsidiary of Activision and the primary product it develops and produces are the Call of Duty video game series.

41.     At all times material hereto, Sledgehammer Games developed, tested, patented, assembled, manufactured, published, packaged, labeled, prepared, distributed, marketed, supplied, and/or sold the video gaming Call of Duty series either directly or indirectly, to members of the

general public within the State of Missouri, including to Plaintiff.

42.    As parent company of Infinity Ward and Sledgehammer Games, Activision is responsible for any damages that may be assessed against those subsidiaries.

43.    Activision, Infinity Ward, Treyarch, Raven, and Sledgehammer Games (collectively, "COD Defendants") acted in concert in developing, testing, patenting, assembling, manufacturing, publishing, packaging, labeling, preparing, distributing, marketing, suppling, and/or selling the video gaming Call of Duty series with all the addictive features and technologies contained therein.

44.    Blizzard Entertainment, Inc. ("Blizzard") is a Delaware corporation with its principal place of business at 1 Blizzard Way, Irvine, CA 92618.

45.    At all times material hereto, Blizzard developed, tested, patented, assembled, manufactured, published, packaged, labeled, prepared, distributed, marketed, supplied, and/or sold the WOW video game series, either directly or indirectly, to members of the general public within the State of Missouri, including to Plaintiff.

46.    At all times material hereto, Blizzard developed, tested, patented, assembled, manufactured, published, packaged, labeled, prepared, distributed, marketed, supplied, and/or sold the Overwatch video game series, either directly or indirectly, to members of the general public within the State of Missouri, including to Plaintiff.

47.    At all times material hereto, Blizzard developed, tested, patented, assembled, manufactured, published, packaged, labeled, prepared, distributed, marketed, supplied, and/or sold Battle.net, either directly or indirectly, to members of the general public within the State of Missouri, including to Plaintiff.

48.    Blizzard is a wholly owned subsidiary of Activision.

49.     As parent company of Blizzard, Activision is responsible for any damages that may be assessed against Blizzard.

50.     Blizzard and Activision acted in concert in designing, developing, testing, patenting, assembling, manufacturing, publishing, packaging, labeling, preparing, distributing, marketing, supplying, and/or selling the WOW video game series, the Overwatch video game series, and Battle.net.

51.     Defendant Microsoft Corporation ("Microsoft") is a Washington corporation with its principal place of business at 1 Microsoft Way, Redmond, WA, 98052.

52.     Microsoft is authorized to and does business in the State of Missouri, and its registered agent for service of process in Missouri is CSC-Lawyers Incorporating Service Company, 221 Bolivar St., Jefferson City, MO 65101.

53.     On October 13, 2023, Microsoft acquired Activision (and all its subsidiaries, including Infinity Ward, Sledgehammer Games, and Blizzard) for $68.7 billion, and has consolidated and combined the company within Microsoft's gaming division or department.

54.     Microsoft's acquisition has no impact on Activision's, Infinity Ward's, Sledgehammer Games's, and/or Blizzard's liability for the harm they caused Plaintiff, and Microsoft is responsible for any damages that may be assessed against Activision, Infinity Ward, Sledgehammer Games, and/or Blizzard.

55.     Since its acquisition of Activision and the video game studios operating as subsidiaries of Activision, Microsoft has acted in concert with the COD Defendants in developing, testing, patenting, assembling, manufacturing, publishing, packaging, labeling, preparing, distributing, marketing, suppling, and/or selling the video gaming Call of Duty series with all the addictive features and technologies contained therein.

56.    Since October 13, 2023, Microsoft has acted in concert with Activision, and Blizzard in designing, developing, testing, patenting, assembling, manufacturing, publishing, packaging, labeling, preparing, distributing, marketing, supplying, and/or selling the WOW video game series and Battle.net.

57.    At all times material hereto, Microsoft designed, developed, tested, patented, assembled, manufactured, published, packaged, labeled, prepared, distributed, marketed, supplied, and/or sold the Xbox video game consoles, including Xbox 360, either directly or indirectly, to members of the general public within the State of Missouri, including to Plaintiff.

58.    At all times material hereto, Microsoft designed, developed, tested, patented, assembled, manufactured, packaged, labeled, prepared, distributed, marketed, and/or supplied the Xbox Network (formerly known as Xbox Live), which are available product features designed for use with the Xbox gaming console system, including to members of the general public within the State of Missouri, including to Plaintiff.

59.    Microsoft acted in concert with the COD Defendants to distribute, market, supply, and/or sell COD video games—and all in-game downloadable content and in-game purchases contained therein—in an effort to increase Defendants' revenue at the expense of consumers, including Plaintiff.

60.    Microsoft acted in concert with Activision and Blizzard to distribute, market, supply, and/or sell WOW and Overwatch video games—and all in-game downloadable product upgrades and in-game microtransactions—in an effort to increase Defendants' revenue at the expense of consumers, including Plaintiff.

61.    Defendant MSI Computer Corporation, also known as MSI USA ("MSI"), is a California corporation with its principal place of business located at 901 Canada Court, City of Industry, CA 91748.

9

62.　　At all times material hereto, MSI designed, developed, tested, patented, assembled, manufactured, published, packaged, labeled, prepared, distributed, marketed, supplied, and/or sold gaming desktop and notebook personal computers, including the GP65 Leopard model, either directly or indirectly, to members of the general public within the State of Missouri, including to Plaintiff.

63.　　Defendant BlueStacks by now.gg, Inc. d/b/a BlueStacks ("BlueStacks") is a Delaware corporation with its principal place of business located at 2105 South Bascom Ave., Suite 380, Campbell, CA 95008.

64.　　At all times material hereto, BlueStacks designed, developed, tested, patented, assembled, manufactured, published, packaged, labeled, prepared, distributed, marketed, supplied, and/or sold its BlueStacks App Player and other cross-platform video game products for personal gaming desktop and notebook computers, including on MSI's GP65 Leopard gaming laptop, either directly or indirectly, to members of the general public within the State of Missouri, including to Plaintiff.

65.　　MSI acted in concert with BlueStacks and Microsoft to design, develop, distribute, market, supply, and/or sell notebook and desktop personal computers to be specifically used for video game play—and to be able to access and purchase all in-game downloadable product upgrades and in-game microtransactions contained in those video games—in an effort to increase Defendants' revenue at the expense of consumers, including Plaintiff.

66.　　Defendants Jane & John Doe I-XX are individuals, corporations, or entities as yet unidentified to Plaintiff who were engaged in the research, development, manufacture, design, testing, sale, marketing, and promotion of gaming devices, software, hardware, products and transactions—and who introduced such products into interstate commerce or marketed such products with knowledge and intent that such products be sold in the State of Missouri—and who

10

also may be liable for some or all of Plaintiff's injuries and damages as described herein. Despite reasonable and diligent inquiries by Plaintiff, the identity of said tortfeasor(s) has not been determined as of this date and it is necessary to conduct discovery in order to determine the identity of said tortfeasor(s). If a John Doe Tortfeasor is identified for one or more causes of action, Plaintiff will amend this *Complaint* accordingly.

67. Upon information and belief, each Defendant was aware—or should have been aware—that game designers, developers, publishers, and suppliers, including the other Defendants named herein, were engaging in the unlawful, deceptive, negligent, outrageous, immoral, and reckless behavior identified herein.

68. Upon information and belief, Activision, Infinity Ward, Sledgehammer Games, Blizzard, Microsoft, MSI, BlueStacks, and Jane & John Doe I-XX acted in concert and entered into licensing agreements to utilize the same patents to keep users, including Harper Glasscock, playing longer and dependent on (i.e., addicted) to Defendants' products.

69. At all times material hereto, each Defendant targeted consumers/purchasers, including Harper Glasscock, to (1) purchase and/or play its video games and (2) to purchase in-game items or perks in exchange for real money, known as "microtransactions," through in-game advertising and "fake" avatar friends.

70. At all times material hereto, each Defendant—with knowledge of Harper Glasscock's age and Missouri residency—targeted Harper Glasscock and induced Harper Glasscock to enter into microtransactions.

71. Upon information and belief, each Defendant—with knowledge of Harper Glasscock's age and Missouri residency, allowed third parties to target Harper Glasscock and induce Harper Glasscock into microtransactions within Defendants' products.

### III. JURISDICTION AND VENUE

72.    Plaintiff realleges and incorporates by reference each of the preceding paragraphs of the *Complaint*.

73.    This *Complaint* brings forth claims for relief arising under the laws of the State of Missouri, including but not limited to allegations that as a direct and proximate result of Defendants placing the defective gaming products into the stream of commerce, Plaintiff has suffered and continue to suffer injuries and damages, as described herein, within the State of Missouri that exceed the sum or value of $75,000, exclusive of interest and costs..

74.    This Court has original subject matter jurisdiction over the claims pursuant to 28 U.S.C. § 1332 because the controversy is between citizens of different states.

75.    This Court has personal jurisdiction over each Defendant because each routinely conducts business in Missouri and has sufficient minimum contacts in Missouri to have intentionally availed itself to this jurisdiction by marketing video game products and transacting business in the State of Missouri.

76.    At all relevant times, each Defendant was present and transacted, solicited, and conducted business in the State of Missouri through their employees, agents and/or sales representatives, and derived substantial revenue from such business.

77.    Defendants are conclusively presumed to have been doing business in this State and are subject to Missouri's long arm jurisdiction.

78.    At all relevant times, Defendants expected or should have expected that their acts and omissions would have consequences within Missouri and throughout the United States.

79.    Venue is proper in this District pursuant to 28 U.S.C. § 1391 because, among other things: (a) Plaintiff is a residents of this District and citizens of this State; (b) each Defendant directed its activities at residents in this District; (c) each Defendant conducted substantial business

12

in this District; (d) each Defendant directed its activities and services at residents in this District; and (e) many of the acts and omissions that give rise to this action took place in this District.

## IV.  <u>GENERAL ALLEGATIONS</u>

### A.  The Rise of Video Games

80.     A "game" is a closed, formal system that engages players in structured conflict and resolves its uncertainty in unequal outcome.

81.     Video games are closed in the fact that once engaged in the game, the player sets aside their rules for daily life and accepts the rules of the game as the status quo.

82.     A "video game" specifically is an object or device that stores recorded data or instructions generated by a person who uses it, and by processing the data or instructions creates an interactive game capable of being played, viewed, or experienced on or through a computer, gaming system, game console, or other technology.

83.     Unlike traditional arcade-style games, online video games require active, lengthy participation, during which players are exposed to psychological techniques designed to control, manipulate and exploit minors' developing brains to increase game playing time and encourage in-game purchases.

84.     Such manipulation and exploitation are possible—and common—because video games have little regulation beyond the Entertainment Software Ratings Board.

85.     The first video games were sold in the 1970s, and by the mid-1980s, many video game franchises were released that are still in production today.

86.     The industry is yet young, and in a short period of time has rapidly evolved from gaming machines to games on virtual and augmented reality gaming consoles.

87.     Early video game companies would create games and sell them mostly through physical cartridges or discs and the costs of developing the game, and profits, were realized

13

through the sale of their games over a period of time which resulted in a long and slow method of earning profits.

88.     A new revenue model based on in-game purchases was created that would allow the publishing companies to earn more profits over a very short period of time. This model is driven by increasing a minor's game play time and keeping them engaged to assure addiction and increase in-game purchases.

89.     Today's technology enables video games on a scale unimaginable 20 years ago. From open-world games with hundreds of square miles to explore to role playing games that can take hundreds of hours to beat, there is a staggering amount of gameplay available to users in modern video games.

90.     The video gaming market grew slowly, taking more than 35 years to reach $35 billion; however, between 2007 and 2018, the industry has grown by more than $100 billion to $137.9 billion.

91.     The global video game industry occupies a special place in the entertainment and media market, now being one of the fastest-growing segments.

92.     In 2023, the video game industry's revenue was $365.6 billion globally.

93.     With the advent of in-game purchasing systems, video games as a consumer product have thrived from in-game purchases. Most of these purchases have been made by minors, including D.G.

94.     The explosive growth of the video game industry has been fueled by patented "monetization schemes" that target minors who are induced to make several in-game purchases, or "microtransactions," of downloadable products.

95.     Often, there is no meaningful disclosure of the inclusion of microtransactions in the game at the time of download or the use of psychological mechanisms employed within the games

14

for consumers or parents to make informed decisions about the appropriateness of games.

96.     In order to entice minors to make such in-game purchases, video game developers and publishers, like Defendants, rely on minors and young adults becoming addicted to their video games so they play for more hours and spend more money on microtransactions.

**B. Microtransactions**

97.     Instances where players are able to spend real money for in-game items or perks are known as "microtransactions" (sometimes abbreviated "mtx").

98.     The gaming industry calls such purchases "microtransactions" because a single virtual item is often relatively low in price, but often they are bundled together in "value" packs, or games require players to purchase them repeatedly in order to meaningfully advance the game.

99.     Some games allow players to purchase items that can be acquired through normal means; players may opt to make such purchases if they lack the skill or available time to earn the items through regular game play.

100.     Some games, however, heighten exclusivity by including items that can only be obtained through microtransactions.

101.     Microtransactions are often used in free-to-play games to provide a revenue source for the developers and publishers. Such free-to-play games that include a microtransaction model are sometimes referred to as a "freemium."

102.     While microtransactions are a staple of mobile app games, they are also seen on PC software and console gaming.

103.     Microtransactions first appeared in 2006 but did not prove to be a good profit-making model for developers and publishers until smartphones started to get more powerful and more players started switching to mobile gaming.

104.    In 2012, there was a huge rise of microtransactions mostly because of mobile gaming titles, and they became the normal model across the video gaming industry by 2014.

105.    Microtransactions are most commonly provided through a custom store interface placed inside the app or game for which the items are being sold.

106.    Developers, publishers, and suppliers can also use microtransactions to lock potentially significant product upgrades and "easter eggs" designed to extend gameplay and increase a player's dopamine levels behind paywalls.

107.    Unlike patches or updates, which are essential to remove bugs and enhance in-game experiences, microtransactions are non-essential components of the game and are planned in advance by companies.

108.    The market strategy for the game developers and publishers is that in the long term, the revenue from a microtransaction system will outweigh the revenue from a one-time-purchase game.

109.    This is because microtransaction spending can easily—and quickly—add up to hundreds, or even thousands, of dollars.

110.    This new model heavily relies on patented algorithms built into the game, yet concealed from users, to ensure revenues earned by a video game are recurring for as long as the game is available and players are playing it.

111.    Microtransactions were designed to use operant conditioning to ensure the impulsive behavior of players and the gaming environment and peer pressure to drive purchases.

112.    For instance, placing a time limitation on a microtransaction offer may push a user to impulsively buy a particular item. Similarly, a player's desire to be the first among a group of friends to buy an in-game premium item or achieve a higher-ranking will drive a player to make microtransaction purchases.

113.    Today, microtransactions make up 30% of the total gaming revenue earned across the industry.

114.    Microtransactions are not only benefiting the gaming industry publishers and developers; the console manufacturers and suppliers-owners of online video game stores that allow the microtransactions in video games made available to consumers take a cut of the revenue from each purchase—typically about 30% depending on the size of the app developer. For example, Google, Apple, and Steam all receive revenue for in-game purchases made on games downloaded through their products.

115.    While these corporate industries are benefiting from the microtransaction model, the most vulnerable to these manipulative monetization schemes are America's youth and young adults.

116.    Each Defendant knows this, or should be aware of this, because they have purposefully designed their video games to be addictive and rely on microtransactions to make money from this vulnerable population.

**C.  The Monetization Schemes Built into Video Games**

117.    Predatory monetization schemes in video games are essentially purchasing systems within the games that disguise or withhold the long-term cost of an activity until players are already committed, both psychologically and financially.

118.    The schemes use psychological mechanisms, behavioral psychology, and neuroscience to encourage repeated play and increased spending among users, especially among vulnerable populations like minors.

119.    Specifically, such tactics may involve, either singularly or in combination: limited disclosure of the product, intrusive and unavoidable solicitations, and systems that manipulate reward outcomes to reinforce purchasing behaviors over skillful or strategic play.

120.     Game developers and publishers utilize many strategies to enhance the predatory monetization tactics in their games. Such strategies include:

   a.   The "near miss": convincing players via exciting animation, for instance, that they were very close to winning;

   b.   "Chasing": encouraging players to keep playing to get back any money they just lost;

   c.   "Fear of missing out": suggesting that a special prize is only available for a short amount of time and must be obtained within the small window;

   d.   "Exclusivity": suggesting that only a small number of a special prize are available so it must be obtained immediately;

   e.   "Entrapment": convincing players they are about to win, or they have invested enough to win, but if they stop playing they will miss out on the win; or

   f.   The "sunk cost effect": justifying continued expenditures in the game because of the amount a player has already spent.

121.     The psychological tactics described in the foregoing paragraph are only one part of the predatory monetization schemes.

122.     Some games also permit a player limited or temporary possession of a certain item to encourage urgent use and/or additional purchasing. Others give only limited disclosure or misrepresentation of important conditions of the purchase, including the long-term value or utility of a purchased item.

123.     Another noteworthy aspect of predatory monetization is the collection and use of individual player data to manipulate the nature and presentation of purchasing offers in ways that maximize the likelihood of the player spending money. Specifically, the games are capable of tracking various player metrics and adjusting their design in automated ways to elicit in-game

18

purchasing.

124.    Such schemes exploit an information asymmetry between purchaser and provider, in that the game system knows more about the player than the player can know about the game. This allows the gaming industry to use its knowledge of the player's game-related preferences, available funds, and/or playing and spending habits to present offers predetermined to maximize the likelihood of eliciting player spending.

125.    Games linked to a game player's social network pages also gather information about players and Defendants use this information to target products and microtransactions to users based on that player's unique interests and preferences.

126.    As the game system gathers more data on how various types of players behave under certain conditions, the game becomes better equipped to present in-game events and purchasing situations that will elicit the desired behavioral outcome (*i.e.,* spending or playing longer).

127.    The prices of in-game items may be determined by factors that are not disclosed to the player because the algorithm considers the player's available funds and cost sensitivity to certain items. This allows the game to incentivize continuous spending, while offering limited or no guarantees or protections.

128.    As the playing population as a collective invest more and more time in the game, the game system may become more adept at "knowing" each player, both individually and as part of its group.

129.    Such systems that dynamically adjust in-game item prices and value based on individual player analytics, which were primarily implemented by developers to serve monetary goals and which lack basic transparency to the player, may have the potential to exploit certain types of vulnerable players under certain conditions.

130.    These continued schemes with little to no restriction on the amount of spending in the payment interface also makes it easy for children to stop understanding the value of the actual money being spent and continue spending more and more.

131.    A few specific examples of predatory monetization schemes include Defendants' sale of loot boxes, pay-to-win models, and rubber-banding.

**i.    Loot Boxes**

132.    A "loot box" is an in-game reward system that can be purchased repeatedly—with real money—to obtain a random selection of virtual items. Loot boxes could contain items that give players an advantage in the game, or cosmetic items that can be used to customize characters or weapons.

133.    Through purchasing a loot box, the player acquires a seemingly random assortment of items.

134.    The low probability of obtaining a desired item in a loot box means that the player will have to purchase an indeterminate number of loot boxes to obtain the item.

135.    Loot boxes require no player skill and have a randomly determined outcome (*i.e.,* prize).

136.    Loot boxes are essentially a lottery that provide a way for gaming developers, publishers, suppliers, and even console manufacturers to increase revenue through underage gambling.

137.    It is common knowledge that gambling addiction is a severe issue and a big risk when playing lottery-style games, so combining these aspects with the psychologically addictive traits of video games is highly dangerous for players.

138.    After being compared to gambling, many games started adding probability to earn respective items in their loot boxes. However, the odds are still extremely against the players; rare

20

items have incredibly low probabilities such as 0.08%.

139.    Loot boxes still have the same designs, opening of animations, and more features to release dopamine leading to players purchasing more microtransactions—much like the tactics used in gambling.

140.    Loot boxes are also ultimately controlled by the gaming developers and publishers, meaning that the "prizes" obtained from such boxes are likely to be determined by algorithms and other factors considered in the game design.

141.    Loot boxes result in high revenues for the gaming developers and publishers, like Defendants, because instead of a one-time purchase for the desired item, users may have to buy multiple boxes.

**ii. Rubber-Banding**

142.    Another example of a monetization scheme is "rubber-banding."

143.    Games have long employed rubber-banding to ensure dynamic difficulty, or a consistently challenging experience, irrespective of the player's skill level. For instance, matching computer opponents to a player's skill level.

144.    Game developers and publishers also use this same principle of rubber-banding with microtransactions to ensure that the game's financial requirements are adjusted to match the player's desire and capacity to pay.

145.    In this sense, the "difficulty" of a monetized game may be considered analogous to the player's cost sensitivity or the willingness of the player to make continued in-game purchases.

146.    If an item costs too much, then the players of monetized games cannot strategize to win, but instead must decide between making in-game purchases or not playing at all, or potentially playing without paying, but doing so with significantly diminished in-game capability that generate regular feelings of frustration.

21

147.    Such technical sophistication in these purchasing systems aims to reduce the player's uncertainty or reluctance regarding purchasing decisions.

**iii. Pay-To-Win**

148.    Some games operate on a "pay-to-win" model, a type of predatory monetization scheme that incentives players who pay more.

149.    Players who are willing to shell out more money get a disproportionate advantage over other players, particularly if the items cannot be obtained through free means.

150.    For example, paying players may get access to certain capabilities such as access to shortcuts, special characters with unique skills, or even special items. Such capabilities may make the games impossible to beat by ordinary, non-paying players.

151.    Games with such imbalances may prevent the non-paying players from progressing or remaining competitive.

**D.  Patents Target Minors to Increase In-Game Spending**

152.    Several video game developers and publishers have incorporated these design strategies into gaming patents that contribute to higher risk consumer behavior.

153.    Game companies often seek to keep their intellectual property confidential. As such, there are very few objective, transparent, or complete accounts on the precise nature of monetization in their games.

154.    Several patents shed light on the innovative video game monetization invented to nudge users into making in-game purchases, including:

   a.   U.S. Patent No. 8,360,866 B2, assigned to Leviathan Entertainment, LLC, describes an invention that encourages users to make in-game purchases when they face a difficult scenario, such as "kill[ing] a particular monster . . . or player character." Such an offer is referred to by Luchene as an "upsell message" and

"can be, for example, for an item that is useful in overcoming the difficulty the player has encountered."

b. U.S. Patent No. 10,099,140 B2, assigned to Activision Publishing, Inc., similarly describes a "customized messaging campaign for [a game] player" and allows messages to be "customized for a gamer based on his or her behavioral data" such as "level of interest or satisfaction with a game." Triggers for such messages may include "a player winning or losing a predetermined number of games in a row" and may include "promotions relating to microtransactions or downloadable content."

c. U.S. Patent No. 9,789,406 B2, assigned to Activision Publishing, Inc., modifies the difficulty of multiplayer matches to encourage microtransaction purchases. Specifically, the game identifies "an in-game item that may be relevant for (*i.e.*, of interest to) a first player," then locates "a second user that has acquired (*i.e.*, purchased), used, or otherwise possesses the in-game item." Matchmaking variables are then tuned such that the first player and second user are matched in a gameplay session.

d. U.S. Patent No. 9,623,335 B1, assigned to Kabam, Inc., utilizes a "user spend parameter value" to "determine which users should be provided with access to an exclusive virtual section of the online game." This prevents the game from losing the opportunity "to extract additional value from users inclined to spend money."

e. U.S. Patent No. 9,138,639 B1, assigned to Kabam, Inc., describes a system which modifies the "pricing of in-game virtual items associated with [players'] experience and their progress in the game." In this way, "while all players may

receive a message for a particular item, the cost for each player may be more or less than other players based on the individual's in-game statistics."

f. U.S. Patent No. 8,702,523 B2, assigned to Microsoft Corporation, was created to capitalize on a player's tendency to commit to a purchase after investing significant time into a trial version of a game. In short, a user is made "aware of an opportunity to add an achievement to their collection by downloading and playing a demo or trial version of a particular game," but "[i]nstead of recording the achievement" upon completion, the game "initiates a notification to the user . . . that the achievement will not be recorded unless they purchase the full version of the game at that time." More specifically, with the patent:

   i. Game play achievements for a free trial version are tracked and maintained even if the console is not connected via a network to the server so that when, and if, the console is eventually connected to the server, the achievements saved locally (e.g., on the console hard drive, on an associated memory unit, etc.) are uploaded and become automatically discoverable to other online users playing the game on different consoles.

   ii. The machine license, a component of the patent, allows any user on the console access to the downloaded game product, including all game components and product-content, regardless of the console's connection to the internet or the existence of parental controls.

g. U.S. Patent No. 9,795,886 B1, assigned to Electronic Arts, Inc., allows new users to purchase in-game support more cheaply than experienced users. Particularly, the system determines "prices for a protection extension in an

online game" based on "the user's power and/or strength in a game." This allows a less experienced player to "build up their strength in a game, thus promoting further player engagement."

h.   U.S. Patent No. 10,252,170 B2, assigned to Hasbro, Inc., encourages players to make purchases outside of a game to receive in-game benefits and allows players can earn in-game points for scanning codes that come with separately purchased physical toys. For instance, the patent allows the developer using the patent in their video game design to stay connected with the user by requiring a player to keep their "avatar" charged by earning points by scanning codes on toys, through continued game play, or engaging in real world activities, thereby creating an endless video game running on a mobile electronic device that allows a player to play continuously as long as the player earns points playing the game, which is enhanced to allow the player to earn points by creating input from real environment activities, such as by scanning a code on a physical object or by producing activity related data from athletic activity.

i.   U.S. Patent No. 10,569,171 B2, assigned to Disney Enterprises, Inc., associates a gaming device with a "video game application that is associated with media content, such as a television show broadcast by a television network and displayed on a television." Such device "captures, e.g., from a microphone of the gaming device, an audio signal from the media content being played concurrently with the video game application" and "uses content recognition techniques to identify the media content, unlocks 'premium' in-game content that augment gameplay of the video game application."

j.   U.S. Patent No. 9,582,965 B1, assigned to Kabam, Inc., incentivizes users to alter virtual item balances in an online game. A game may specify "target balances of virtual items to be reached in user inventories" and may specify "a time by which such target balances must be reached." For instance, the player may be given a goal of reaching a target balance of 3,000 gems within 48 hours to receive a premium virtual item. The player has the option to use real-world money to buy gems to earn that goal. After the 48-hour time period passes, another goal may be set that specifies a target maximum balance of 1,000 gems, encouraging users to spend the newly acquired gems that were just purchased.

k.   U.S. Patent No. 9,403,093 B2, assigned to Kabam, Inc., encourages users to make purchases on multiple game platforms by providing incentives for such "cross platform game play." In particular, "[t]he system may monitor the player's performance on a particular console and provide incentives to accomplish tasks through game play on a different platform than the player is currently operating the play the game."

l.   U.S. Patent No. 9,626,475 B1, assigned to Kabam, Inc., facilitates a time-limited event-based currency. During such an event, players may acquire a second type of virtual currency in addition to other forms of virtual currency. The event-based currency may be purchased with real-world money, and after the event, the event-based currency may become unusable by or unavailable to the users.

m.   U.S. Patent No. 9,666,026 B1, assigned to Aftershock Services, Inc., provides offers that "decrease in value based on previous acceptances of the offers" in order to create a sense of urgency in relation to the virtual items. Offers

26

provided "may include a first offer having a first value that progressively decreases based on an amount of users that have previously accepted the first offer in order to incentivize early acceptance of the offer."

n. U.S. Patent No. 9,808,708 B1, assigned to Kabam, Inc., adjusts "virtual item bundles made available to users of an online game based on user gameplay information." This allows the game to increase the price of an item bundle for a user with less cost sensitivity associated with items that the user enjoys.

o. U.S. Patent App. No. 20160346677 A1, assigned to Electronic Arts, Inc., but currently abandoned, describes a system which provides "[a]pproaches to facilitating chance-based wait time reductions." Essentially, such a system would allow users to spend money to reduce waiting periods that may or may not be disclosed at the time of sale.

p. International Application No. PCT/US2019/042697, a pending patent application filed by Sony Interactive Entertainment, LLC, would patent technology that suggests microtransactions to players who are stuck in the game to keep them engaging and playing the video game. More specifically, this patent would collect and "process[] game data of the player for determining a current state and process[] game data of other players that have completed the objective" in order to suggest to the player what "downloadable content (DLC), add-ons, upgrades, items, tips, strategy, communal data" or otherwise would be useful to the player to complete their objective. The patented method further includes operations for identifying successful attempts of completing the objective by other players and the resources used in doing so, and send selects a resource that is usable by the player to complete the objective based on those

27

resources by the other players in the successful attempts and presents the resource to the player for immediate use. *See also* US 202000030702A1, filed July 24, 2020.

155.    There was once a time when such lopsided consumer video game monetization-related inventions would have been patent ineligible. However, because of the introduction of these patents, game developers and publishers can further deceive and harm society's most vulnerable—minor children—while lining their own pockets.

156.    The mere fact that one video game publisher or developer holds a patent on certain monetized technology does not mean that similar schemes are not in other companies' games.

157.    It is common practice for developers and publishers, like Defendants, to utilize technology patented by other companies by entering into licensing agreements with the company holding the patent—or buy the rights to the patent outright.

### E. These Predatory Monetization Schemes Attract "Whales" to Defendants' Games

158.    What players and parents, including Plaintiff, often do not understand is that their gaming experience is not accidental, but rather carefully engineered by the game's manufacturers.

159.    In every game, there are several hundred, or maybe even thousands, of heavy players who spend much more money in the game than the other players.

160.     Companies employ tactics specifically to gain heavy users—or "whales" or "VIPs."—and to induce them into spending more money. For instance, when "whales" get stuck in the game, they are given a bonus to continue because it is better for the gaming companies to give them occasional free things than for the players to get fed up and stop paying.

161.    Gaming companies, like Defendants, have specialized departments within their companies to focus on these "whales" or "VIPs," to stay in contact with them, and to form relationships with them.

162.    To target those who may be likely to spend additional money in the game, game developers and publishers, like Defendants, will monitor players and collect user information, from their game play to their social networks. Companies can then further target these users with advertisements or offers in an effort to increase their revenue at the expense of the player.

163.    The gaming industry is built on those consumers who "maintain the game" and in turn create the revenue for the game companies. The proportion of heavy users significantly increases revenue numbers for these companies. By monetizing player addiction, game companies notably increase their bottom line.

## F.  Defendants Include Specific Features in their Games to Keep Players Engaged – and Addicted

164.    In addition to microtransactions, video games include several additional features to keep players engaged and playing longer, including the use of algorithms, feedback loops, continuously adding new product content, and using tactics to ensure users are creating habits in their gameplay.

165.    Many gaming features now are based on algorithms within the game to manipulate the type of play that users are experiencing.

166.    For instance, Activision Blizzard, Inc. holds numerous patents that provide a framework of artificial intelligence to monitor, analyze, and control users' game time to increase game play time and fuel additional purchases.[1]

167.    Upon information and belief, video game developers and publishers, including but not limited to the COD Defendants and Blizzard, and video game product suppliers and

---

[1]    *See* Patents assigned to Activision publishing, JUSITIA, https://patents.justia.com/assignee/activision-publishing-inc (last accessed Oct. 29, 2023).

manufacturers, including but not limited to Microsoft, MSI, and BlueStacks, license this patented technology from Activision, which allows the licensee, including all Defendants, to control users' experiences within the game.

168.    Defendants are also utilizing several psychological tools to increase game play time, such as the use of feedback loops.

169.    Feedback loops are systems where the game reacts to how well the player is doing in order to make the games more rewarding, or for tougher games, more challenging.

170.    Feedback loops are a core part of video games because developers and publishers have a vested interest in making players want to play their games for as long as possible.

171.    There are two kinds of feedback loops: positive and negative.

172.    Positive feedback loops mean that when you're doing well, the game rewards you with things to help you do even better.

173.    Negative feedback loops, on the other hand, add a challenge to a game when you are doing too well.

174.    Feedback loops are used to bring balance to games that would otherwise get too difficult or too boring.

175.    By introducing both positive and negative feedback loops into a game, designers can build a dynamic level of difficulty control.

176.    A player's successes are reinforced through positive feedback loops, while their increasing ability to overcome the core game's challenges is curtailed by the use of negative feedback loops.

177.    When done well, feedback loops enhance the player's experience by maintaining a consistent level of challenge throughout a game, while still rewarding the player for their achievements.

30

178.    In theory, this creates the holy grail of the games design world, a game that maintains the feeling of challenge and achievement for the entirety of the game and keeps players playing longer.

179.    Gaming companies, like Defendants, also know that the best way to get a player to come back to the game and spend money is to make the game a habit or part of their life.

180.    Creating a habit consists of a cycle of three things: reminder, routine, and reward. The specific purpose of these rewards is to create a daily routine, and ultimately a habit, of playing the game for the user.

181.    Gaming companies, like Defendants, know this and use deceptive and unfair tactics to keep players coming back multiple times a day to play. For instance, gaming companies, like Defendants, try to addict players to their games by providing daily rewards or time-released rewards to keep players consistently coming back.

182.    Another tactic gaming companies, like Defendants, use to addict players is to add more game content over time thereby keeping users playing over a longer period of time.

183.    By constantly adding downloadable content or product upgrades to their video game products, *e.g.*, expansion packs and microtransactions, Defendants make it hard for players to finish a game while simultaneously keeping them hooked in the game.

### G. Dark Patterns and Drip Pricing Have Allowed Defendants to Further Exploit Users

184.    For decades, unscrupulous direct mail marketers and brick-and-mortar retailers have relied on design tricks and psychological tactics, such as pre-checked boxes, hard-to-find-and-read disclosures, and confusing cancellation policies, to get consumers to part with their money or data.

31

185.    The term "dark patterns" was coined in 2010 by user design specialist Harry Brignull to describe the deceptive and manipulative design practices used to trick consumers into making choices that could or may cause them harm—and that they would or may not have otherwise made.

186.    The purpose behind "dark patterns' is to take advantage of consumers' cognitive biases and steer their conduct or delay access to information needed to make fully informed decisions.

187.    Research shows that "dark patterns" are highly effective at influencing consumer behavior.

188.    The use of these manipulative design practices, or "dark patterns," has only grown in scale and sophistication as more and more commerce has moved online, thereby creating ever greater challenges for consumers.

189.    Further challenging consumers is the common practice of using multiple "dark patterns" in combination, rather than in isolation.

190.    "Dark patterns" tend to have even stronger effects when they are combined, so they are rarely used in isolation.

191.    "Dark patterns" have a compounding effect, thereby increasing the impact of each and exacerbating the harm to the consumer.

192.    The use of manipulative design techniques, including "dark patterns," in the digital world can pose heightened risks to consumers. For example, the pervasive nature of data collection techniques, allows companies to gather massive amounts of information about consumers' identities and online behavior, enabling businesses to adapt and leverage advertisements to target a particular demographic or even a particular consumer's interests.

193.     Companies that market online can experiment with digital dark patterns more easily, frequently, and at a much larger scale than traditional brick-and-mortar retailers, to determine which design features most effectively influence consumer behavior. For example, online a company can easily and quickly rearrange products to mimic the consumers' behaviors, but also can easily test new marketing practices and digital dark patterns on consumers, deceiving consumers or manipulating them into taking unwitting or detrimental actions.

194.     Some dark patterns manipulate consumer choice by inducing false beliefs- such as a minor's belief that a skin or other in-game purchase means the child will actually obtain the desired object or game skill level.

195.     Other dark patterns operate by hiding or obscuring material information from consumers, such as burying key limitations of the product or service in dense Terms of Service documents that consumers do not see before purchase.

196.     Free-to-play or "freemium" games are an example of games that fail to disclose to a minor that a game they purchase is not the entire game.

197.     Another variation on the hidden-fee dark pattern is "drip pricing," in which companies advertise only part of a product's total price to lure in consumers, and do not mention other mandatory charges until late in the buying process.

198.     Drip pricing interferes with consumers' ability to price-compare and manipulates them into paying fees that are either hidden entirely or not presented until late in the transaction.

199.     Microtransactions built into many video games by design are a form of drip-pricing.

200.     Each Defendant uses, or has used at relevant times, "dark patterns in the design, development, manufacture, advertising, marketing, promotion, supply, and sale of their respective gaming products.

### H. Cloud Gaming Enhances Defendants' Predatory Activities

201.    Not only do individual games have predatory strategies built in to encourage users' spending and continued play, but several games are also now available on cloud-based systems.

202.    Cloud gaming, or gaming on demand, is a type of online gaming that runs video games on remote servers and streams them directly to a user's device.

203.    Traditionally, games would run locally on a user's video game console, personal computer, or mobile device.

204.    Cloud gaming products allow users to stream any game available on the product at any time.

205.    Cloud gaming eliminates the need for users to purchase expensive computer hardware or install games directly onto a local game system.

206.    This means players have easy access to hundreds or even thousands of games at one time.

207.    What's more, the catalogue of games available online through video game streaming is ever-changing and evolving.

208.    The never-ending availability of a wide variety of games encourages users to stay engaged with the streaming product, by ensuring they always have something new and different to play.

### I. Defendants' Predatory Schemes Created a Generation of Gaming Addicts

209.    The feedback loops, other psychological properties, and cloud gaming products are designed to keep players continuously engaged, while the game patents are designed to study the skill level and behavior of the minor, even across social media platforms outside the game, so the game can bombard the minor with solicitations to purchase additional downloadable game content and/or loot boxes based upon psychological behavioral analyses that employ addiction

34

methodology to seduce the minor to increase playing time and remain in the game. Essentially, the feedback loops, online video game products, and predatory monetization schemes work together to addict players to the games.

210. During the last three decades, video games have become one of the major pastimes and one of the most growing industries worldwide. Today, 67% of all Americans play video games.[2]

211. In 2008, the American National Purchase Diary ("NPD") group reported that 3% of the 174 million players using PC, MAC, or game consoles were extreme gamers who are playing an average of 45 hours a week. NPD reported that the percentage of extreme gamers had increased to 4% by 2010.[3]

212. Gaming addiction, also known as gaming disorder or internet gaming disorder ("IGD"), is characterized by severely reduced control over gaming habits, resulting in negative impacts on daily functioning, including personal, social, educational, and occupational responsibilities.

213. IGD addiction is a process involves a three-stage cycle akin to substance abuse: binge/intoxication, withdrawal/negative affect, and preoccupation/anticipation. This cycle becomes more severe as a person continues to use, causing dramatic changes in brain function that reduce a person's ability to control his or her substance use.

214. Well-supported scientific evidence shows that disruptions in three areas of the brain are particularly important in the onset, development, and maintenance of addiction disorders: the basal ganglia, the extended amygdala, and the prefrontal cortex. These disruptions: (1) enable

---

[2] Hosseini et al., *Computer Gaming and Physiological Changes in the Brain: An Insight from QEEG Complexity Analysis*. 46(3) APPLIED PSYCHOPHYSIOLOGY AND Biofeedback 301 (2021).
[3] *Id.*

substance-associated cues to trigger substance seeking (i.e., they increase incentive salience); (2) reduce sensitivity of brain systems involved in the experience of pleasure or reward and heighten activation of brain stress systems; and (3) reduce functioning of brain executive control systems, which are involved in the ability to make decisions and regulate one's actions, emotions, and impulses.

215.    IGD is a growing and prolonged behavioral pattern of gaming, leading to behavioral and cognitive syndromes. Those affected not only experience increased loss of control over gaming, but also increased tolerance and the presence of withdrawal syndrome if unable to play at increasing periods of time.

216.    Gaming addicts are usually 12 to 20 years of age and spend a minimum of 8-10 hours playing video games. Preventing them from playing can lead to tension and anger and they may spend long stretches of time playing—without food or sleep.

217.    IGD can be diagnosed when an individual engages in gaming activities at the cost of fulfilling daily responsibilities or pursuing other interests without regard for the negative consequences.

218.    The main features of gaming disorder are impaired control over gaming, increasing priority given to gaming over other activities, and continuation or escalation of gaming despite negative consequences.

219.    The Diagnostic and Statistical Manual of Mental Disorders ("DSM-5"), the manual used by clinicians and researchers to diagnose and classify mental disorders, recognizes gaming disorder as a condition for further study that warrants more clinical research and experience.

220.    Gaming disorder is the only behavioral addiction recognized in the DSM-5.

221.    The DSM-5 acknowledges that several consequences from gaming disorder arise within only 5 to 12 weeks of beginning to play.

222. Likewise, gaming disorder, with both online and offline variants, has been included in the International Classification of Diseases ("ICD-11"), the global categorization system for physical and mental illnesses published by the World Health Organization.

223. The American Psychiatric Association ("APA") suggests the effects or symptoms of IGD may be similar to those of other proposed psychological addictions.

224. For instance, IGD may be an impulse control disorder like compulsive gambling.

225. The APA has developed nine criteria for characterizing internet gaming disorder: (1) preoccupation with internet games; (2) withdrawal symptoms when internet gaming is taken away; (3) tolerance, resulting in the need to spend increasing amounts of time engaged in internet games; (4) unsuccessful attempts to control participation in internet games; (5) loss of interests in previous hobbies and entertainment as a result of, and with the exception of, internet games; (6) continued excessive use of internet games and despite knowledge of psychosocial problems; (7) deceiving family members, therapists, or others regarding the amount of internet gaming; (8) use of internet games to escape or relieve negative moods; and (9) jeopardizing or losing a significant relationship, job, or education or career opportunity because of participation in internet games.

226. These nine criteria are also outlined in the DSM-5.

227. Using these nine criteria, the IGD-20 Test was developed and was the first standardized psychometric tool to assess internet gaming disorder.

228. The IGD-20 Test includes twenty (20) questions designed to assess the extent of problems caused by disordered gaming and the degree of symptoms experienced by gamers.

229. The IGD-20 Test conceptualized disordered gaming according to the six first-order latent components well-established in behavioral addictions: salience, mood modification, tolerance, withdrawal symptoms, conflict, and relapse.

230. The Internet Gaming Disorder Scale-Short-Form ("IGDS9-SF") was then created, as a brief standardized psychometric tool to assess gaming disorder.

231. The IGDS9-SF includes a total of nine items reflecting the nine clinical criteria identified by the APA.

232. Another commonly used instrument for the measurement of addiction is the Problem Video Game Playing ("PVP") Questionnaire, which is a scale measured by using a survey containing nine yes-or-no questions.

233. The PVP Questionnaire's survey questions are based on the DSM criteria for substance dependence and for pathological gambling, as well as the literature on addictions.

234. Approximately 3-4% of gamers are addicted to video games. In a 2021 systematic review and meta-analysis, the global prevalence of gaming disorder was found to be 3.05%, meaning as many as 60 million people (or more) are suffering from gaming disorder.

235. These statistics are even higher for minors: 8.5% of youths aged between 8 and 18 suffer from gaming disorder.

236. Comorbidity studies also indicate that individuals with ADHD may have an increased susceptibility to developing gaming disorder.

**J. Effects of Video Games on Adolescent Brains**

237. Research has shown prolonged gaming damages the prefrontal cortex, causing a loss of grey matter, lower cognitive function, and inability to regulate impulse control.

238. Researchers have concluded that excessive use of video games may lead to negative effects like stress, aggressive behavior, verbal memory deficiency, depression, lowered cognitive abilities, sleeping disorders, anxiety, and behavioral addiction.

239. Clinical evidence has shown that subjects addicted to online games experience biopsychological symptoms and complications. These symptoms may include the traditional

38

symptoms of drug addiction, such as hangover, changes in mood, adaptability, withdrawal, conflict, and recurrence symptoms.

240.     In 2008, the United States Federal Communications Commissioner said that online gaming addiction is one of the top reasons for college dropouts in the U.S.

241.     Empirical studies indicate that internet gaming disorder is associated with detrimental health-related outcomes.

242.     Brain imaging studies have shown that long-term video game playing affects the brain regions responsible for reward, impulse control, and sensory-motor coordination.

243.     Other studies have shown excessive use of videogames leads to more negative consequences on cognitive processes, including multi-second time perception, inhibition, and decision-making.

244.     The prefrontal cortex—the locus of judgment, decision-making, and impulse control—is still developing and undergoing major reorganization during adolescence. This region of the brain does not reach maximum capacity until the age of 25 or 30.

245.     The executive control center of the prefrontal cortex is essential for weighing risks and rewards and for pausing the pursuit of immediate rewards in favor of more adaptive longer-term goals.

246.     This may explain why young people are more likely to engage in hours of play while ignoring basic needs like food, sleep, and hygiene. Without mature frontal lobes to draw on, minors and young adults are less able to weigh negative consequences and curb potentially harmful behavior like excessive video gaming, continuing to impact frontal lobe development.

247.     Brain imaging studies have also shown structural changes in the brain, particularly a reduction in and white-matter density (consisting mostly of cells and axons that transmit signals from the cerebellum to other brain regions) and gray-matter volume (associated with emotions,

perception, memory, and motor control). Specifically, several regions of the brain showed reduction in gray-matter volume:



Regions that showed reduced gray-matter volume in IGD participants in more than two studies.[4]

248.    Brain activation studies have shown that videogame playing involved changes in reward and loss of control, and that gaming pictures activate regions similar to those activated by cue-exposure to drugs.

249.    Activation studies also show evidence that individuals with IGD have impaired inhibition, and that video game cues activate craving, attention, and executive function areas of the brain. These cognitive, sensory-motor, and emotional processes may be associated with long-term changes to the brain as a result of prolonged exposure.



Regions that showed activation in response to internet and video game cues in IGD participants in more than two studies.[5]

[4] Aviv Weinstein et al., *Neurobiological mechanisms underlying internet gaming disorder*, 22(2) DIALOGUES CLIN. NEUROSCI. (2020).
[5] *Id.*

250. Structural studies have shown alterations in the volume of the ventral striatum (a critical component of motor and reward systems in the brain) are possible as a result of changes in reward.

251. One comparison study of young adults with a mean age of 24 also revealed that individuals who engage in excessive internet gaming tend to have lower cognitive function, especially in terms of verbal ability and working memory.

252. Research has shown that a minor with a diagnosis of ADHD, autism, or ODD is at a higher risk of video game addiction, worsening of ability to control impulsivity, and brain damage.

253. Research has shown that while video games may foster creativity in children, such benefits are outweighed by the negative aspects of addiction, which develop quickly in children and neurodivergent individuals exposed to video games for extended periods of time.

254. Video game play is associated with dopamine release similar in magnitude to that of drug abuse and gambling.

255. These increased dopamine releases in the brain can lead to withdrawal symptoms, including anger, irritability, or physical outbursts when the game is taken away or is unavailable to play.

256. As the APA has explained, gaming disorder specifically leads to the need to spend more time gaming, an inability to reduce time spent gaming, and unsuccessful attempts to quit gaming.

257. As concern over video game addiction grows, the use of psychopharmacology, psychotherapy, twelve-step programs, and use of continually developing treatment enhancements have been proposed to treat this disorder.

258. By designing and distributing these games with addictive technologies, Defendants ensured that they could increase and extend profits by addicting their most vulnerable users. They created, then exploited, an addiction among this country's most vulnerable, and Plaintiff seeks to hold them accountable.

**K. Harper Glasscock's Addiction, Injuries, and Damages**

259. Harper Glasscock is a 24-year-old individual addicted to video games; specifically, Harper Glasscock is addicted to playing WoW and compulsively played other video games, including Overwatch and Call of Duty: Modern Warfare.

260. Harper Glasscock spends approximately 10 hours per day using Defendants' products to play video games.

261. Harper Glasscock cannot refrain from gameplay and/or spending money while using Defendants' products.

262. As a result of her video gaming addiction, Harper Glasscock is unemployed and unable to function as a normal member of society.

263. Harper Glasscock has spent thousands of hours, in total or collectively, using Defendants' products and playing video games.

264. Harper Glasscock has spent thousands of dollars and/or used gift cards to purchase in-game transactions and downloadable products available in and accessible through Defendants' products. These funds do not include Plaintiff's expenditures on the required Battle.net subscription, gaming consoles, personal computers, or copies of Defendants' video games.

265. Harper Glasscock has experienced the following as a result of the brain damage, gaming addiction and harm caused by Defendants' products: lost job opportunities and unemployment, depression, anxiety, withdrawal symptoms when not using Defendants' products, withdrawal from life activities and social isolation, poor hygiene, changes in eating and sleeping

42

patterns, distress, and anger.

266.    As a result, Harper Glasscock requires and has undergone outpatient counseling from mental health professionals.

**L.  Defendants' Conduct Specifically Led to Plaintiff's Damages**

267.    Each Defendant is aware that its video games are harmful to minors and young adults because each Defendant specifically designed its products to addict and prey upon those users' developing brains.

268.    To this avail, each Defendant employs behavioral psychologists and/or neuroscientists to develop games that will best utilize psychological tactics to keep players engaged for longer periods of time.

269.    Due to the psychological aspects of the games, many of Defendants' products have been banned in other countries to avoid the harm to children that all Defendants are causing daily in the United States.

270.    No bans are in place here, and Defendants continue their pattern of addicting and harming our Nation's youth, young adults, and their families, including Plaintiff.

**M. Defendants' Products Used by Harper Glasscock**

**Call of Duty: Modern Warfare and Call of Duty: Modern Warfare 3**

271.    Call of Duty is a first-person shooter game series that simulates infantry and combined arms warfare.

272.    Call of Duty was first released in 2003; however, the COD Defendants release annual versions of the game.

273.    Currently, there are 22 mainline versions of the Call of Duty video game available for play on Microsoft's Xbox game consoles, Sony's PlayStation game consoles, Android and iOs based mobile devices, personal computers, and Nintendo's game consoles (excluding the Nintendo

43

Switch).

274. Each Call of Duty version has been published by Activision, with design and development coming from Infinity Ward (2003 to present), Treyarch (2005-present), Sledgehammer Games (2011 to present), and Raven (2016 to present).

275. Call of Duty is the most successful video game franchise created in the United States, and the fourth best-selling video game franchise of all time.

276. As of April 2021, the series has sold over 400 million copies.

277. Each version of Call of Duty is based on the same design and incorporate largely similar product components, varying mostly with respect to the version's storyline, guns, and abilities.

278. Call of Duty offers both single-player and multiplayer modes.

279. While there are several multiplayer shooter games on the market, Call of Duty is popular because it is designed and developed with specific, addictive features.

280. For instance, Call of Duty involves unlock progression, wherein each kill, assist, or win all seep into a feedback loop that unlocks new equipment as players progress.

281. Similarly, each gun used gets better the more a player uses it, with new attachments becoming available with more points scored.

282. The rewards built into the Call of Duty games are immediate and are a constant stream of progression, or feedback loop, that allows players to feel they are making constant progress toward unlocking everything in the whole game.

283. The COD Defendants designed the Call of Duty games with these feedback loops— a form of operant conditioning that is harmful to youth and neurodivergent individuals—to target the chemical reward receptors of game user's brains.

284.    With operant conditioning like feedback loops, players are reinforced to enact the correct behavior: in this case, making "kills" to earn extra game content.

285.    Combining these addictive feedback loops with fast-paced play, satisfying graphics, sounds, and other dopamine lifts make the Call of Duty franchise extremely addicting to players, particularly minors and neurodivergent individuals.

286.    The COD Defendants and Microsoft were aware that the Call of Duty games included significant psychological aspects to encourage continuous game play and eventually lead to the addiction of its plays—especially minors and neurodivergent individuals.

287.    The COD Defendants specifically designed the Call of Duty games in concert with psychologists and neuroscientists to discover the best addictive aspects to include in the design of their video game.

288.    Activision patented several of these addictive technological features used in the Call of Duty games.

289.    Upon information and belief, the COD Defendants and Microsoft have also licensed patented addictive technologies from other video game developers and publishers to include additional addictive features in the Call of Duty games.

290.    The COD Defendants also utilize several schemes to increase game time, consequently increasing in-game spending on downloadable content and microtransactions.

291.    Several of the Call of Duty versions include loot box schemes, and others include "battle passes" which allow users to unlock additional tiers of game play for a certain price:

If you've already experienced the full version of *Call of Duty®: Black Ops Cold War* or *Modern Warfare®*, you are probably familiar with the Battle Pass system. For those that aren't, here's how it works:

The Battle Pass has 100 tiers of content for you to progress through and earn once you've purchased the Battle Pass.

To advance through these tiers, you simply play the game (either *Warzone, Black Ops Cold War*, or *Modern Warfare*). The longer you play, the more Tier progress you get. Sometimes, there are events where Double Tier progress can be gained, and it does exactly what you'd expect; double the rate at which you get Battle Pass Tiers through time played.

Through the Battle Pass system, everyone can unlock and enjoy tiers of free content, and all functional content that has an impact on game balance, including base weapons and attachments, can be unlocked simply by playing the game.

So, to recap: you play the game, you get Battle Pass Progress which unlocks Tiers, and then you get rewards from Tiers. Yes, it's that simple.

292.    While users can play 20 of the 100 levels for free, to continue gameplay through additional "tiers," a user has to pay 1,000 "Call of Duty Points" which equates to $9.99 in real-world funds:

**Free Tiers (of the Battle Pass system):** Everyone can earn over 20 free tiers of content, including two functional weapons just by playing.

**Wartracks:** Among the rewards that can be earned at specific Free Tiers are Wartracks, packs of popular songs from the *Call of Duty* universe and in the real world! Equip a track to a specific vehicle in the Vehicle Customization menu (like Battle Horns), then as soon you hop in, the music gets turned up. Your entire squad can listen to the beat while you drive, and let the song guide you to your primary objective – survival.

**Battle Pass:** Players looking for the ultimate customization can purchase the Battle Pass for 1,000 *Call of Duty®* Points and get access to unlock up to 100 tiers of content. These Tiers include scores of Rare, Epic, Legendary, and occasionally Ultra weapon blueprints, Operator skins, Operator Missions, and more, including a new Operator at Tier 0 in most, if not all, seasons.

**Dual Reward Tiers:** Some tiers within the Battle Pass include two rewards: one for *Black Ops Cold War* and one for *Warzone*. These are marked within the Battle Pass, offering those who own *Black Ops Cold War* with their own special item in addition to one they can use in *Warzone*.

**Battle Pass Bundle:** Purchase the Battle Pass Bundle and get access to everything you get with the Battle Pass, plus 20 Tier skips which grant instant access to your next 20 tiers of content.

**Tier Skips:** Buy individual Tier skips for 150 COD Points.

You can purchase at any time without missing any content. If you choose to purchase the Battle Pass after already ranking up a few tiers, no problem: You'll immediately be awarded everything from the Tiers you have already unlocked through gameplay.

293.    The COD Defendants have designed the game to include microtransactions, which include loot box microtransactions known as "Advanced Supply Drops," that are earned through gameplay or are purchasable through in-game stores.

294.    The COD Defendants first introduced microtransaction as part of their Call of Duty video games in 2018, but with the release of *Call of Duty: Modern Warfare* in 2019,

---

[6] https://www.callofduty.com/content/atvi/callofduty/warzone/web/fr_ca/strategyguide/pre-game-preparation/wz-battle-pass.html
[7] https://www.callofduty.com/content/atvi/callofduty/warzone/web/fr_ca/strategyguide/pre-game-preparation/wz-battle-pass.html

microtransactions—and specifically Advanced Supply Drops—became a key design component of the Call of Duty video game series.

295. The COD Defendants target players with Advanced Supply Drops and other microtransactions utilizing patented technology and undisclosed trackers embedded in the game.

296. Advanced Supply Drops encourage players to bolster their Armory and customize their Operator. More specifically, the COD Defendants use Advanced Supply Drops to keep players, particularly minors, engaged and spending Call of Duty Points[8] on these microtransactions.

297. Each Advanced Supply Drop microtransaction includes three random loot items, with a guarantee of at least one weapon variant and at least one item of Professional rarity or greater.

298. Items purchased during an Advanced Supply Drop can either be used to upgrade loadouts and personalize an Operator or can be redeemed for experience points, or "XP."

299. The COD Defendants and Microsoft include Advanced Supply Drops in the game was because they want players to be engaged and spending money in the game for a long time, and they knew that these impulse and "special' prizes would play on users' psyche and mental stage of development.

300. Though the COD Defendants and Microsoft knew of the addictive features and technology included in the Call of Duty games, such as those features and technologies described herein, they do not inform their users of the risks inherent with playing this game.

301. The COD Defendants and Microsoft do not adequately inform users of the inherent risks involved with using and playing Call of Duty or that the game was designed to addict and

---

[8] Call of Duty Points are a form of in-game currency that have been purchased using real world money, a gift card, a rewards code, or Depot Credits (which are points earned by playing the game).

harm users.

**World of Warcraft**

302.    WOW is a massive multiplayer online role-playing game ("MMORPG"), originally released in 2004 by Blizzard and Activision.

303.    Since launching, the Activision and Blizzard have released nine major expansion packs for the video game: The Burning Crusade (2007), Wrath of the Lich King (2008), Cataclysm (2010), Mists of Pandaria (2012), Warlords of Draenor (2014), Legion (2016), Battle for Azeroth (2018), Shadowlands (2020), and Dragonflight (2022).

304.    Activision, Blizzard, and Microsoft have also announced the release of three additional expansion packs for WOW: The War Within (planned for 2024), Midnight (release date unknown), The Last Titan (release date unknown).

305.    Similar to other MMORPGs, WOW is designed to allow players to create a character avatar and to explore an open game world, in either first- or third-person view, while fighting various monsters, completing quests, and interacting with non-player characters or other players.

306.    A non-player character (NPC) is any character in WOW that is computer generated and not controlled by an actual person, such that the NPC has a predetermined set of behaviors that potentially will impact gameplay,

307.    NPCs are allies, bystanders or competitors to the actual game player.

308.    NPCs can also be traders that trade currency for in-game products such as equipment or gear.

309.    NPC behavior is part of the product design; it is usually scripted and automatic, triggered by certain actions or dialogue with the real player's characters.

48

310.    In MMORG video games, like WOW, NPCs may be entirely unscripted and are essentially regular character avatars controlled by the product itself based on algorithms and other technologies, or Activision and Blizzard's employees.

311.    Activision and Blizzard designed WOW for users to work in teams to complete quests and engage in player versus player (PvP) combat.

312.    WOW is one of the highest-grossing video game franchises of all time, having amassed over one hundred million registered user accounts by 2014 and had grossed over $9.23 billion in revenue by 2017.

313.    WOW is profitable for Activision, Blizzard, and Microsoft because it was designed to keep players engaged and addicted to playing the video game, and in order to play the video game, product users are required to pay for a Battle.net subscription using a credit or debit card, prepaid Blizzard game cards, or using a WOW Token purchased during gameplay.

314.    WOW can only be played on personal computers running Microsoft Windows or Apple's MacOs operating systems, or on mobile devices using an Android or Apple's iOS operating systems, using the Activision and Blizzard's Battle.net product.

315.    WOW can be purchased directly from Activision and Blizzard using their Battle.net product.

316.    Activision and Blizzard also distribute and sell World of Warcraft via retail software packages.

317.    The retail software package includes 30 days of WOW gameplay for no additional cost.

318.    To continue using the product after the initial 30 days, the user must purchase additional play time using a credit card or prepaid game card.

49

319. Activision and Blizzard provide users seeking additional gameplay and use of their WOW product with limited options. For instance, the minimum gameplay duration that a player can purchase using a credit card is 30 days, but if using a prepaid game card the player can purchase an additional 60 days to use WOW. Another option available to product users is to purchase 3 or 6 months of gameplay at once for a 6–15% discount.

320. Users can only access and play WOW through Battle.net.

321. To enter the game through Battle.net, the player must select a server, referred to in-game as a "realm."

322. Each realm acts as an individual copy of the game world and falls into one of two categories. Available realm types are:

    a. Normal – a regular type realm where the gameplay is mostly focused on defeating monsters and completing quests, with player-versus-player fights and any roleplay as optional features.

    b. RP (roleplay) – Similar to "Normal" realm, but the focus of the game in this realm is one of character roleplaying.

323. Realms are also categorized by language, with in-game support in the language available.

324. It is also possible for players to move established characters between realms for a fee.

325. Again, WOW is mostly designed for users to play in "normal" realm and involves the completion of quests as a team.

326. WOW users are usually given quests from NPCs, and those quests usually reward the player with some combination of experience points, items, and in-game money.

327. Team Raids, or raid groups, are another aspect of the WOW game design.

328.    Raid groups are a way to have teams of more than 5 users and up to 40 people, divided into up to 8 groups.

329.    The term "raid" and "raiding" require playing as a team.

330.    As a party leader, a player can convert their group into a raid group by accessing the "Social Panel" selecting "Raid" and choosing "Convert Group to Raid" or by clicking your character portrait and selecting the same.

331.    While in a raid group, players do not receive credit for completing quest objectives unless the quest calls for a raid.

332.    WOW players also receive an experience reduction for any mob killed while in a raid group.

333.    Players need to be at least a level 10 to join a raid group, but actual raid instances begin at level 30.

334.    Another aspect of the WOW game design is that while playing WOW, users are able to purchase a WOW Token through the in-game shop using real money, and then sell it on the WOW Auction House for gold at the current market price.

335.    Blizzard and Activision began allowing WOW users to sell in-game gold for real money in April of 2015.

336.    When a player visits the Auction House, the player is provided with the current market price for a WoW Token in the player's game region.

337.    A player may spend $20 on a one-month "game time token" that can be sold for in-game gold on the auction house.

338.    Activision and Blizzard charge WOW users living and playing in the United States more for WOW gold than their European counterparts.

339.    Users can also purchase tokens from other players. If a player purchases a token from another player, the token is delivered to the purchaser's email and the token can then be immediately redeemed for game time.

340.    These in-game tokens allow players to exchange real money for game time or in-game gold.

341.    WOW Tokens alone make over $30 million per year in profit for Activision and Blizzard.

342.    When a player sells a WOW token from the Auction House for gold, the WOW Token becomes Soulbound, and the player can then redeem it for 30 days of game time.

343.    The WOW Token was created to give players with lots of extra gold the option to use their gold to help cover their subscription cost and give players an option of purchasing gold from other players:



344.     This means virtual gold can be valued in USD based on Token prices.

345.     The practice of amassing gold and in-game items for financial profit is frequently referred to as gold farming.

346.     At current rates, the exchange rate for WOW gold to U.S. Dollars is 1 million WoW gold equals about $120.

347.     Top WOW players accumulate vast gold fortunes worth thousands, which they can slowly cash out via Tokens.

348.     Through this WOW economy, Activision and Blizzard have created a currency exchange for product users that can add up to more than $150 million "virtual gold" is cashed out or exits the game economy each year.

349.     By including the WOW virtual gold exchange as part of the game design, Activision and Blizzard encourage and reward players who spend more time playing WOW.

350.     Further, it takes WOW users thousands of hours to perfect a character and, therefore, makes those accounts incredibly valuable as highly coveted status symbols.

351.     Activision, Blizzard, and Microsoft are also aware that a black market exists where WOW accounts are illegally bought and sold for real money.

352.     Some all-time most expensive WoW accounts sales include:

a.     $9,000 – Level 70 night elf rogue with extremely rare Twin Blades of Azzinoth in 2007.

b.     $7,000 – Account with multiple level 60 characters back when that was the level cap.

c.     $5,200 – Max level mage with rare items in 2020.

353.     Even WOW accounts with no special achievements can sell for hundreds of dollars to shortcut the leveling process supposedly existing in the product.

354.    Despite knowing that WOW products are traded and sold between users, Activision and Blizzard do not do anything to protect minors or young adults from being exploited or taken advantage of while playing WOW.

355.    Blizzard and Activision designed WOW to allow for social networking and commodities trading in order to keep users playing and spending money on WOW products.

356.    Blizzard and Activision designed WOW to target the chemical reward receptors of user's brains to create addictive engagement.

357.    Blizzard, Activision, and Microsoft are aware that WOW is a highly addictive video game product.

358.    Blizzard and Activision specifically designed WOW video games in concert with psychologists and neuroscientists to discover the best addictive aspects to include in the design of their video game.

359.    Activision, Blizzard, and Microsoft were aware that WOW video games included significant psychological aspects to encourage continuous game play and eventually lead to the addiction of its plays—especially minors and neurodivergent individuals.

360.    WOW is so addictive because of its community team aspects, daily quests, gold farming, and raids. These game features are designed by software developers to create a stimulus in game that causes a response in the player triggering a Dopamine release, which allows player to derive pleasure from gaming, an increased need to play and inability to cease play.

361.    WOW Tokens further the addictive design of WOW and are inappropriate player retention techniques including the use of gambling mechanics to generate revenue and increase customer engagement.

362.    WOW is quite possibly the most addictive video game product ever made, often referred to as "digital crack."

363. Because of the addictive design of WOW, users cannot quit playing and have sought community help through twelve-step programs, counseling, and other treatment to stop playing the game and using Defendants' products.

364. Activision, Blizzard, and Microsoft are aware that the more time a user plays WOW, the more likely they are to continue purchasing WOW tokens, buying extended gameplay, and purchasing other in-game product upgrades.

365. Activision, Blizzard and Microsoft intend to introduce and addict as many users as possible to increase their own profits as these users continue playing—and spending—as they grow.

366. Blizzard, Activision, and Microsoft do not adequately inform users of the inherent risks involved with using and playing WOW, or that the video game was designed to addict and harm users.

367. Activision, Blizzard, and Microsoft have profited from the release of their addictive video game products—WOW and Battle.net—to the public.

368. Another aspect of the WOW design is the "Warden" system, which detects third-party programs and analyzes other software running on the WOW user's personal computer and file system. For instance, "Warden" collects the title of every window open on the WOW user's personal computer while they are playing WOW.

369. The built-in "Warden" system acts as spyware and sends a portion of this information back to Activision and Blizzard, in violation of the user's privacy rights.

370. Activision, Blizzard, and Microsoft do not adequately inform users that its "Warden" program will be collecting personal and private information directly from the user's personal computer while that user is playing WOW.

## **Overwatch**

371.     Overwatch is a two-part online multiplayer first-person shooter video game series featuring hero-based combat between two teams of players vying over various objectives, along with other traditional gameplay modes.

372.      The Overwatch video games are designed developed, published, supplied, and sold by Blizzard and Activision.

373.     Overwatch can be played on PC and various gaming consoles, including PlayStation, Xbox, and Nintendo Switch; however, to play Overwatch on a personal computer, consumers must use Activision's and Blizzard's Battle.net product.

374.     Activision and Blizzard first released Overwatch in 2016.

375.     In designing and developing Overwatch, Activision and Blizzard utilized a premium monetization model.

376.     In the first year of Overwatch's release, Blizzard reported over $1 billion in revenue.

377.     After releasing Overwatch, Activision, and Blizzard continued to add to the game through free and paid updates, which introduce new characters, maps, game modes, and cosmetic products.

378.     On October 3, 2022, Activision and Blizzard cut off users' access to the Overwatch video game and all previously purchased product upgrades.

379.     On October 4, 2022, Activision and Blizzard released an upgraded version of the video game, Overwatch 2.

380.     Overwatch 2 is free-to-play on personal computers through Battle.net, and may also be played on Sony's PlayStation 5 and Microsoft's Xbox Series S/X gaming consoles.

56

381.    Overwatch 2 is designed to operate and run on an upgraded version of the original game's engine, thereby allowing for larger map support.

382.    Activision and Blizzard designed Overwatch 2 to allow full cross-platform play, meaning a user can play Overwatch 2, purchase in-game updates and save their progress whether playing on a personal computer or video game console.

383.    Overwatch 2 currently averages 1.7 million players a day.

384.    Overwatch 2 garnered over 35 million active users in the first month of its release.

385.    Overwatch 2 earned over $100 million in the first three months after its release.

386.    Activision and Blizzard designed Overwatch to foster addictive engagement, including but not limited to designing Overwatch with an inclusive multiplayer atmosphere, targeting all types of users, including minors and young adults, and encouraging social interaction and competition while playing Overwatch.

387.    Unlike most other video games, Blizzard and Activision designed Overwatch's gameplay to be a transmedia storytelling strategy to disseminate lore regarding the game's characters through comics, other literary media, and animated media including short films as part of the gameplay. This game design fosters addictive engagement and uncontrollable in-game spending.

388.    Further, to draw in new users (particularly minors, young adults, and neurodivergent people), Activision and Blizzard designed Overwatch to be a vibrant, ever-changing world,.

389.    Each Overwatch video game combines quick-fix, objective-based gameplay with a deep tactical core to form a game that is perfect for players to engage with in short bursts or for hours at a time.

390.    Because of the game design, a minor or young adult with only a short amount of free time may turn to Overwatch to play a little each day, forming addictive habits, and eventually playing for hours on end.

391.    In order to draw players each day, Overwatch offers periodic login rewards for users who play consistently, as well as seasonal events in the game:



392.    Product users are also drawn to the game through comics, animated shorts, and other media describing the characters' backstories; in turn, the game is recognizable to even new players, but with varied and interesting gameplay aspects that keep users engaged.

393.    The initial Overwatch game included loot boxes for players to purchase.

394.    Overwatch 2 replaced loot boxes with a Battle Pass and in-game microtransactions:



395.    Both Overwatch games are designed with in-game cosmetic product that can be purchased or unlocked by earning in-game currency (Overwatch League Token).

396.    Because it can take a tremendous amount of play to earn enough Overwatch League Tokens to purchase these in-game product upgrades, Activision and Blizzard encourage users to spend their own money to advance in the video game.

397.    Activision, Blizzard, and Microsoft know that all of these product features work together to addict users and further abuse and compulsive use of video games, including Overwatch.

398.    Activision and Blizzard specifically developed Overwatch with the help of psychologists and neuroscientists to include the addictive psychological traits and technological features described herein.

399.    Upon information and belief, Activision and Blizzard also licensed patented addictive technologies from other video game developers and publishers to include additional addictive features in the Overwatch games.

400.    By encouraging users to keep playing the game and build habits around it, Activision and Blizzard know that players are more likely to spend real-world funds within the game.

401.    At the expense of users' mental and physical well-being, Activision, Blizzard, and Microsoft fail to inform the public, users, or parents that Overwatch was designed to addict and harm users or of the inherent risks or negative consequences that can arise from playing their game.

402.    Instead, the Overwatch Defendants intend to introduce and addict as many users as possible in order to increase their own profits as these users continue playing—and spending.

403.    Battle.net

404.    Battle.net is an Internet-based online video game store, gaming platform, and social networking product, designed and developed by Blizzard for use with WOW, Overwatch, and other video games designed, developed, and supplied by Activision and Blizzard.

405.    Blizzard released Battle.net in 1996 as a necessary product to be used by consumers who have purchased Blizzard's video games for play on personal computers.

406.    Battle.net is incorporated directly into some of Blizzard's video games, including WOW and Overwatch.

407.    Battle.net supports storefront actions, social interactions (including cross-game instant messaging and voice chat service, and matching making for all of Blizzard's personal computer video games and some of Activision's video games (including various Call of Duty games).

408.    In 2017, Blizzard released Battle.net for use with mobile phones, thereby making it possible for a user to chat with and add friends in addition to seeing what games they are currently playing, while away from the user's personal computer.

409.    Blizzard specifically designed Battle.net with addictive features to attract users to purchase video games and spend money on in-game microtransactions contained in those games.

410.    For instance, upon information and belief, Blizzard hires behavioral psychologists and neuroscientists to design its Battle.net product, its video games, and marketing in the best way possible to attract and addict users, especially minors, young adults, and neurodivergent individuals.

411.    Blizzard and Activision are aware that the majority of the video games available for purchase, download, and play on Battle.net, including WOW and Overwatch, are designed to continuously encourage users to play the video game for extended periods of time, to purchase in-game products, and to be addictive such that these video games pose unreasonable risk of harm to

60

users, particularly minors, young adults, and neurodivergent individuals.

412.     Blizzard and Activision do not adequately inform users of the inherent risks involved with using its Battle.net product—along with the video games available thereon—were designed to addict and harm users.

## Xbox and Xbox Network: Xbox 360 and Xbox Live

413.     Xbox is a video gaming brand, owned and operated by Microsoft, that consists of Xbox gaming consoles, as well as video games and online video gaming through the Xbox Network (formerly Xbox Live).

414.     Microsoft designs, develops, manufactures, produces, supplies, and sells Xbox video game consoles—and markets all Microsoft video game products—to consumers across the world, and specifically in Missouri and to Plaintiff.

415.     Microsoft has manufactured and released five versions of its Xbox consoles: Xbox (1st Generation), Xbox 360 (2nd Generation), Xbox One (3rd Generation), Xbox Series X (4th Generation), and Xbox Series S (4th Generation).

416.     Microsoft released the original Xbox was released in North America in 2001, and a year later launched its integrated Xbox Live product to allow players to play video games online.

417.     When it was released in 2002, Xbox Live required a subscription for use but was a wild success due to features, including but not limited to, a "buddy list" and access to popular online video games like Halo 2.

418.     Microsoft released Xbox 360 in 2005, and with that release, launched an upgraded Xbox Live product that included, inter alia, a limited "Free" or "Silver" tier that allows users to play online video games for free.

419.     Each Xbox console, including Xbox 360, provides users the ability to play video games using a hard copy of the video game, a digital copy downloaded from Microsoft Store (also

known as Xbox Games Store, hereinafter "Xbox Store"), using the Xbox Network (formerly known as Xbox Live) and/or using Xbox Game Pass Cloud Gaming.

420.    When a user purchases and downloads a game from either store, regardless of whether that is a first-party video game or third-party video game, all design elements and downloadable content for said games is stored on the users' Xbox console and, if connected to the Internet, will receive product updates released by the game developer.

421.    Xbox Live is an online multiplayer gaming product, created and operated by Microsoft for use with Xbox 360, and includes the Xbox Store and Xbox Cloud Gaming.

422.    Xbox Live is a paid, subscription based product upgrade for Xbox users offered by Microsoft that provides users access to online games, multiplayer abilities, and other addictive features.

423.    Once a game is downloaded to the user's Xbox console or made available on the Xbox Live, Microsoft provides video game developers and publishers a framework to initiate and process in-game purchases and microtransactions through the Xbox Store and Xbox Cloud Gaming.

424.    This framework enables game developers to sell microtransactions and/or loot boxes through Microsoft's video game products, described herein.

425.    In exchange, Microsoft keeps a percentage of all revenue generated by these microtransactions and in-app purchases.

426.    Microsoft specifically designed its Xbox video game products to attract users to purchase games and in-game products therein—regardless of the content such games may include.

427.    Xbox Live, including but not limited to Xbox Cloud Gaming, is designed to allow Xbox users and video game players to chat with each other individually or in groups.

62

428. To find friends, users are encouraged to link to other social media accounts with their Xbox subscription.

429. Minors and young adults are therefore encouraged to log-in more often and for longer periods to keep up with their friends, engage and play with friends, and compete with friends within the games.

430. Upon information and belief, Microsoft hires behavioral psychologists and neuroscientists to design its Xbox consoles, Xbox Network (and all products and features thereof), its video games, and marketing in the best way possible to attract users, especially minors, young adults, and neurodivergent individuals.

431. Microsoft is aware that several of the video games available for play on the Xbox 360 and available for download in the Xbox Store and Xbox Cloud Streaming, including but not limited to Call of Duty: Modern Warfare, are designed to continuously encourage users to purchase in-game products, to be addictive, and pose unreasonable risk of harm to users, particularly minors and neurodivergent individuals.

432. Microsoft does not adequately inform users of the inherent risks involved with using its products or that the products—along with the games being played thereon---were designed to addict and harm users.

**MSI GP65 Leopard Gaming Laptop**

433. MSI is one of the leading designers and manufacturers of gaming personal computers across the globe.

434. MSI is dedicated to pushing the limits of innovations and exceeding industry standards in performance, design & user experience.

435. MSI also offers a reward program to keep gamers, including Plaintiff, using and purchasing MSI video gaming products and to continue engaging with MSI:

63



436. MSI gaming computers, including its GP65 Leopard laptop model, are designed to work with Microsoft Windows operating system and are distributed with this operating system preinstalled.

437. MSI gaming computers, including its GP65 Leopard laptop model, are designed to work with BlueStacks' App Player.

438. BlueStacks designed the App player and other cloud-based and cross-platform products which enable the execution of Android game application on computers running on Microsoft Windows or macOS specifically for use with MSI gaming computers:



439. BlueStacks' App Player, also known as MSI App Player, is a video game product that enables consumers to play millions of games on MSI's gaming computers.

440. Upon purchase of a MSI gaming computer, including a GP65 Leopard laptop model, consumers are forced to download the MSI App Player:



441.     Once installed, the MSI App are provides consumers with a UTC time converter and automatically informs the user, including minors and young adults of live video games and events that are not in the same time zone of the user.

442.     The UTC time converter automatically puts the event on the user's Google calendar to keep them from missing a game or event.

443.     Once installed, the MSI App Player provides support and controls the mouse, keyboard, and external touch-pad or game controllers consumers use to play video games on their MSI laptop.

444.     Consumers who purchased MSI gaming laptops, including Plaintiff, must use the MSI App Player and cannot uninstall the product.

445.     There are millions of games available to minors, consumers, including Plaintiff on the MSI App Player.

446.     Once a game is downloaded, BlueStacks provides a framework to initiate and process in-game purchases and microtransactions through the MSI App Player.

447.     This framework enables game developers to sell microtransactions and/or loot boxes through the MSI App Player, including the crypto wallet.

448.     The MSI App Player also allows consumers to play multiple games simultaneously.

65

449.     The MSI App Player is designed with social media-esque features to encourage users to add friends to a "Friends" list and then see what video games those friends are playing and/or invite them to join a game.

450.     The MSI App Player also has a feature that allows users, including minors and young adults, to record their greatest gaming moments so they can post the video to social media platforms.

451.     BlueStacks intentionally designed its MSI App Player, described above, to attract users to purchase and play video games—regardless of the age, content or subject matter such games may include.

452.     Upon information and belief, MSI and BlueStacks hires behavioral psychologists and neuroscientists to design its consoles, games, products, and marketing in such a way to attract users, especially minors and young adults, and to keep them playing.

453.     MSI and BlueStacks are aware that its gaming computers and app player products and the games playable thereon, that it sells and encourages users to continually purchase in-game product upgrades and microtransactions are addictive and pose unreasonable risk of harm to users, particularly minors.

454.     MSI and BlueStacks do not adequately inform users of the inherent risks involved with using its products or that the products—along with the games being played thereon—were designed to addict and harm users.

**N.  Minors' and Young Adults' Access to Defendants' Products**

455.     Defendants market their gaming products, including Xbox 360, MSI's GP65 Leopard, Call of Duty: Modern Warfare, WOW, Overwatch, Battle.net, and their respective in-game transactions, to foreseeable users like minors and young adults.

66

456.     Harper Glasscock is such a foreseeable user to whom Defendants directed their marketing efforts and to whom Defendants sold their gaming products.

457.     Harper Glasscock—a minor when she began using Defendants' video game products—lacked the capacity to contract, and thus Plaintiff expressly disaffirms any contract she may have made with any of the Defendants, or that Defendants may claim Harper Glasscock made with them before reaching the age of majority.

458.     Harper Glasscock's continued use of Defendants' products is compulsive and due to addiction and in no way was an affirmation of any contract.

459.     After consumers purchase Defendants' gaming products, Defendants condition users' access to their gaming products on accepting terms and conditions—and failure by users to accept and to continue to accept any new terms and conditions results in a loss of access to the purchased product. Each Defendant's terms of services or terms and conditions document is a contract of adhesion that has no variation or negotiable terms prior to signing between the parties. Accordingly, any terms to which Plaintiff agreed prior to utilizing each Defendant's product, or while using such product, are void and unenforceable.

460.     Defendants' products were designed to addict Harper Glasscock to the products, which proximately caused Harper Glasscock's mental and physical health issues; therefore, Defendants' terms and conditions and any other purported contracts are void as against public policy as an individual cannot consent to harming a minor or consent to being exposed to addictive products without warning.

## V.     TOLLING OF STATUTE OF LIMITATIONS

461.     Plaintiff realleges and incorporates by reference each of the preceding paragraphs as though fully set forth herein.

67

462.     Through the exercise of reasonable diligence, Plaintiff could not have discovered that Defendants' products caused their injuries because, at the time of their injuries, the cause was unknown to Plaintiff.

463.     Plaintiff did not suspect and had no reason to suspect Defendants' products caused their injuries until within the last year.

464.     Due to the highly technical nature of the Defendants' products, Plaintiff was unable to independently discover that Defendants' products caused their injuries until within the last year.

465.     Defendants had exclusive knowledge of the material defects designed and implemented into their products, and they have at all times through the present failed to disclose these designs.

466.     Defendants' fraudulent concealment has tolled the running of any statute of limitations.

467.     Defendants had a duty to disclose dangerous and defective features of their products that cause foreseeable harm to users—especially children and teens.

468.     Defendants knowingly, affirmatively, and actively concealed from Plaintiff the risks associated with the defects of their products and that these products caused their injuries.

469.     Defendants' tortious and fraudulent acts continue to this day; as of the date of this Complaint, Defendants have not disclosed, and continue to conceal, that they designed and implemented dangerous features into their products.

470.     Despite their knowledge of the defects and their attendant safety risks, Defendants continue to market their products to children and young adults—and even their educators—while simultaneously omitting the disclosure of known and foreseeable harms.

471.     Plaintiff was unaware and could not have reasonably known or learned through reasonable diligence that they had been exposed to the defects and risks alleged herein and that

68

those defects and risks were the direct and proximate result of Defendants' acts and omissions.

472.    For the foregoing reasons, Defendants are estopped from relying on any statutes of limitations or repose as a defense in this action. All applicable statutes of limitation and repose have been tolled by operation of the discovery rule and by Defendants' active concealment with respect to all claims against Defendants.

## VI.    CAUSES OF ACTION

### COUNT I
### STRICT LIABILITY – DESIGN DEFECT
### (Against all Defendants)

473.    Plaintiff realleges and incorporates by reference each of the preceding paragraphs above as though set forth fully herein.

474.    At all relevant times, each Defendant was engaged in the business of designing, developing, managing, operating, testing, producing, manufacturing, labeling, marketing, advertising, promoting, controlling, suppling, leasing, selling, and otherwise distributing the video game products used by Harper Glasscock: Call of Duty: Modern Warfare, Call of Duty: Modern Warfare 3, WOW, Overwatch, Battle.net, Xbox 360, Xbox Live, and MSI's GP65 Leopard gaming laptop.

475.    Each of the Defendant's products are designed and intended to be gaming products and are marketed and advertised to the public for the personal use of the end-user/consumer.

476.    Each of the Defendant's respective products are marketed and advertised to minors and young adults.

477.    Each Defendant defectively designed its respective products to addict minors and young adults who were particularly unable to appreciate the risks posed by the products and were particularly susceptible to harm from those products. More specifically:

a. The Call of Duty Defendants designed the Call of Duty games with psychologically addictive features, including but not limited to feedback loops, fast-paced play, and dopamine lifts from satisfying graphics and sounds;

b. Activision and Blizzard designed WOW and Battle.net with psychologically addictive features, including but not limited to requiring players to continue to remain "in the game" with their team thereby extending game play time and exposure to Activision and Blizzard's addictive products, using NPC to control product user's game experience, and requiring players to maintain a "level" to be on team raids, to gold farm, and to sell WOW tokens;

c. Blizzard and Activision designed the Overwatch video games with psychologically addictive features and tactics to ensure players keep playing the game, including but not limited to familiar characters, varied gameplay, an inclusive multiplayer environment, and daily objectives;

d. Microsoft designed its Xbox 360 with addictive features and for use with addictive video game products, and designed Xbox Live with addictive features to be used with its Xbox consoles and as a product to house and to purchase addictive video game products, to take advantage of the chemical reward system of users' brains, and these addictive features include but are not limited to an everchanging, constantly rotating library of games to ensure players keep coming back to finish games before they are removed or check for new and exciting game options to play and social aspects that allow users to play with and view the games played by friends and other users;

e. MSI designed its MSI gaming computers, including Plaintiff's MSI GP65 Leopard, with addictive features and for use with addictive video game

products, and, in an exclusive partnership with BlueStacks designed the MSI App Player with addictive features to be used with its MSI gaming computers and to house, purchase, and use addictive video game products that take advantage of the chemical reward system of users' brains—and these addictive features include but are not limited to engaging graphics, social aspects, and rotating game libraries.

478. The defects in the design of each of the Defendant's respective products existed prior to the release of these products to Harper Glasscock and the public, and there was no substantial change to any of the products between the time of their manufacture (in regard to consoles or physical game copies) and the time of their distribution to Harper Glasscock via download or URL access (in regards to digital game copies and cloud gaming).

479. Harper Glasscock used these products as intended and in a manner reasonably anticipated, and each Defendant knew or, by the exercise of reasonable care, should have known that Harper Glasscock would use these products without Plaintiff inspecting them for their addictive nature.

480. Each Defendant designed its respective products to take advantage of the chemical reward system of a user's brain (especially a minor) to create addictive engagement, compulsive use, and additional mental and physical harm. More specifically:

a. The Call of Duty Defendants designed the Call of Duty games in conjunction with psychologists, neuroscientists, and other behavioral experts to ensure the addiction of minors, young adults, and neurodivergent individuals;

b. Activision and Blizzard designed WOW, Overwatch, and Battle.net in conjunction with psychologists, neuroscientists, and other behavioral experts to ensure the addiction of minors, young adults, and neurodivergent

71

individuals;

    c.   Microsoft designed Xbox 360 and Xbox Live in conjunction with psychologists, neuroscientists, and other behavioral experts to ensure the minor and young adult users continually purchase addictive video game products for play on Xbox consoles; and

    d.   MSI designed Plaintiff's MSI GP65 Leopard and, together with BlueStacks designed the MSI App Player in conjunction with psychologists, neuroscientists, and other behavioral experts to ensure that minors and young adult users continually use its video game products and continually purchase addictive video game products for play on MSI gaming laptops.

481.    Each of the Defendant's respective products are defective in design and unreasonably dangerous when put to a reasonably anticipated use for the reasons set forth herein, because the products fail to meet the safety expectations of ordinary consumers when used in an intended or reasonably foreseeable manner, and because the products are less safe than an ordinary consumer would expect when used in such a manner.

482.    Youth and young adults, including Harper Glasscock, are among the ordinary consumers of each of the Defendant's products.

483.    Minors and young adult consumers, and their parents and guardians, do not expect: (a) Defendants' products to be psychologically and neurologically addictive when the products are used in its intended manner by its intended audience; (b) the patented design strategies and other features embedded by each Defendant in its respective products to make them initially and progressively more stimulative, to maximize young consumers' usage time and consequently addict them; or (c) each of the Defendant's revenues to be directly tied to this addictive mechanism and young consumer spending more time and money in downloadable in-game products and/or

microtransactions.

484.     Each of the Defendant's respective products are likewise defectively designed such that it creates an inherent risk of danger; specifically, a risk of brain damage, abuse, addiction, and compulsive use by youth, young adults, and neurodivergent individuals, which can lead to a cascade of harms. Those harms include, but are not limited to, brain damage, dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects.

485.     Defendants' respective products were defective and unreasonably dangerous when they left the Defendants' respective possession and control. The defects continued to exist through the products' distribution to and use by consumers, including Harper Glasscock, who used the products without any substantial change in the products' condition.

486.     The risks inherent in the design of each of the Defendant's respective products significantly outweigh any benefit of such design.

487.     Each of the Defendants could have utilized cost-effective, reasonably feasible alternative designs including software design changes and changes to the addictive features described above, to minimize the harms described herein, including, but not limited to:

     a.     Choosing not to use "addictive" patents identified herein in the game design;

     b.     Redesigning gaming software to limit rather than promote addictive engagement;

     c.     Implementing robust age verification;

     d.     Implementing effective parental controls;

     e.     Implementing effective parental notifications;

     f.     Warning of health effects of use and extended use upon sign-up or log-in;

73

g.    Implementing default protective limits to the length and frequency of gaming sessions;

h.    Implementing opt-in restrictions to the length and frequency of gaming sessions;

i.    Implementing self-limiting tools, including but not limited to game play time notifications, warnings, or reports;

j.    Implementing blocks to use during certain times of day (such as during school hours or late at night);

k.    Implementing limits on number of games playable per day;

l.    Implementing limits on the strategic timing and clustering of offers and/or assignments and challenges to keep players engaged and playing longer;

m.    Implementing limits on minors' in-game purchases, downloadable content, microtransactions, and total in-game spending per day;

n.    Designing products that did not include the defective features listed in this Complaint while still allowing users to engage with games without addictive engagement; and

o.    Others as set forth herein.

488.    Alternative designs were available that would reduce minors' and young adults' addictive and compulsive engagement with each of the Defendant's respective products, and which would have effectively served the same purpose of Defendants' products while reducing the gravity and severity of danger posed by those products' defects.

489.    Harper Glasscock used Defendants' products as intended or in reasonably foreseeable ways.

490. As a direct and proximate result of their use of Defendants' defectively designed products, Harper Glasscock sustained physical and mental injuries, emotional distress, pain and suffering, mental anguish, and economic injuries and damages.

491. Harper Glasscock's injuries and damages were reasonably foreseeable to each of the Defendants at the time of their respective products' development, design, advertising, marketing, promotion, and distribution, especially considering each of the Defendant's conduct—described herein—of specifically designing their respect products to be addictive.

492. The defective design of the products used by Harper Glasscock was a substantial factor in causing harm to Harper Glasscock.

493. As a direct and proximate result of Defendants' respective products' defective design, Harper Glasscock sustained brain damage, became addicted to video games, loss of cognitive function and ability to regulate impulsivity, decline in ability to learn and be educated, mental harm, emotional distress, pain and suffering, and mental anguish.

494. Harper Glasscock was injured as a direct and proximate result of each of the Defendant's respective defective designs, as described herein, and suffered economic damages as a result thereof.

495. The defective design of Defendants' respective products, as identified and described herein, is a proximate cause of the harm and injuries to Harper Glasscock.

496. Plaintiff's damages proximately caused by Defendants' defective design are all those a jury believes will fairly and justly compensate Plaintiff for any damages Plaintiff sustained, including but not limited to Harper Glasscock's physical and mental injuries (and the permanency thereof); pain and suffering; mental anguish; Harper Glasscock's inability earn, and the present value of any lost income; economic loss related to expenses incurred as a result of using Defendants' products; and necessary medical care, treatment, and service (including

transportation, lodging, and board) expenses related to Harper Glasscock's physical and mental injuries. Harper Glasscock's injuries are permanent and will require more medical care, treatment, and services (including transportation, lodging, and board) in the future.

497.    Defendants are strictly liable due to the defective design of their respective gaming products, as identified herein, and Harper Glasscock is entitled to damages in an amount to be proven at trial as compensation for the injuries, loss, and harm described herein.

498.    Harper Glasscock's injuries cannot be wholly remedied by monetary relief and such remedies at law are inadequate.

499.    The nature of the intentional and fraudulent acts that created safety concerns for Plaintiff are not the type of risks that are immediately apparent from using Defendants' respective products. As a proximate result of Defendants' conduct in making their games addictive, Harper Glasscock continues to use Defendants' respective products. While Harper Glasscock uses Defendants' respective products, Plaintiff will not be able to independently verify whether Defendants' respective products continue to pose an unreasonable risk or rely on Defendants' respective representations in the future.

500.    The conduct of each Defendant, as described above, was intentional, fraudulent, willful, wanton, reckless, malicious, fraudulent, oppressive, extreme, and outrageous. Each Defendant acted with deliberate and flagrant disregard, an entire want of care, and a depraved indifference to the consequences of its conduct, including to the health, safety, and welfare of its customers, and warrants an award of punitive damages in an amount—imposed by the jury at trial—sufficient to punish each Defendant and deter others from like conduct.

# COUNT II
## STRICT LIABILITY – FAILURE TO WARN
### (Against All Defendants)

501. Plaintiff realleges and incorporates by reference each of the preceding paragraphs as though set forth fully herein.

502. At all relevant times, each Defendant was engaged in the business of designing, developing, managing, operating, testing, producing, manufacturing, labeling, marketing, advertising, promoting, controlling, suppling, leasing, selling, and otherwise distributing the video game products used by Harper Glasscock: Call of Duty: Modern Warfare, Call of Duty: Modern Warfare 3, WOW, Overwatch, Battle.net, Xbox 360, Xbox Live, and MSI's GP65 Leopard gaming laptop.

503. Each of the Defendant's products are designed and intended to be gaming products and are marketed and advertised to the public for the personal use of the end-user/consumer.

504. Each of the Defendant's respective products are also marketed and advertised to minors, young adults, and neurodivergent individuals.

505. None of Defendants' products, as identified herein, contain a warning—nor have Defendants ever warned the public—that those products pose an unreasonable risk of harm and addiction to users, particularly minors and young adults.

506. None of Defendants' products, as identified herein, contain a warning—nor have Defendants ever warned the public—that their products pose a higher risk of addiction, worsening of an ability to control impulsivity, and brain damage in neurodivergent individuals, including individuals with a diagnosis of ADHD, autism, or ODD.

507. Each of the Defendants sold and distributed its respective products to Harper Glasscock in a defective and unreasonably dangerous condition by failing to adequately warn about the risk of harm to youth and young adults as described herein, including a risk of abuse,

77

addiction, and compulsive use by youth, young adults, and neurodivergent people, which can lead to a cascade of harms. Those harms include, but are not limited to, brain damage, dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects.

508.    Each of the Defendant's respective products are dangerous, to an extent beyond that contemplated by the ordinary user who used Defendants' products, because they cause brain damage and encourage unhealthy, addictive engagement, and compulsive use.

509.    Each Defendant knew or, by the exercise of reasonable care, should have known that its respective products posed risks of harm to youth and young adults considering its own internal information and knowledge regarding its products at the time of development, design, marketing, promotion, advertising, and distribution.

510.    Defendants' respective products are defective and unreasonably dangerous because, among other reasons described herein, each Defendant failed to exercise reasonable care to inform users that, among other things:

   a.   Defendants' respective products cause addiction, compulsive use, and/or other simultaneous physical and mental injuries;

   b.   Defendants' respective products harvest and utilize user data in such a way that increases a user's risk of addiction to these products and simultaneous physical and mental injuries;

   c.   The feedback loops and strategized patented material in Defendants' respective products are designed to promote increasingly stimulative and alarming gameplay to encourage compulsive engagement by the user, raising the risk of mental health harms, including but not limited to addiction;

d. New users of Defendants' respective products can identify themselves as minors, begin to use the product, and do so indefinitely, without any time or usage limitations, without any spending limitations, without ever receiving a safety warning, and without ever having to provide information so that each Defendant can warn the users' parents or guardians;

e. The likelihood and severity of harms is greater for minors and young adults, especially those who are neurodivergent; and

f. The likelihood and intensity of these harmful effects is exacerbated by the interaction of each product's features with one another and by patented technology and code design, some of which is currently publicly unknown and hidden from users.

511. Ordinary users would not have recognized the potential risks of Defendants' respective products when used in a manner reasonably foreseeable to each of the Defendants.

512. Had Harper Glasscock received proper or adequate warnings or instructions as to the risks of using Defendants' respective products, she would have heeded the warnings and/or instructions.

513. Each Defendant's failure to adequately warn Plaintiff about the risks of its defective products was a proximate cause and a substantial factor in the injuries sustained by Harper Glasscock.

514. As a direct and proximate result of each Defendant's failure to warn, Harper Glasscock has required and will require more healthcare and services and did incur medical, health, incidental, and related expenses, as described herein.

515. Defendants are strictly liable due to each Defendant's failure to warn of the risks, dangers, and harm posed by their respective gaming products, as identified herein, and Plaintiff is

entitled to damages in an amount to be proven at trial as compensation for the injuries, loss, and harm described herein.

516.    Harper Glasscock's injuries cannot be wholly remedied by monetary relief and such remedies at law are inadequate.

517.    The nature of the fraudulent and unlawful acts that created safety concerns for Harper Glasscock are not the type of risks that are immediately apparent from using Defendants' respective products. As a proximate result of Defendants' conduct in making their games addictive, Harper Glasscock continues to use Defendants' respective products. When Harper Glasscock uses Defendants' respective products, she will not be independently able to verify whether Defendants' respective products continue to pose an unreasonable risk or rely on Defendants' respective representations in the future.

518.    The conduct of each Defendant, as described above, was intentional, fraudulent, willful, wanton, reckless, malicious, oppressive, extreme, and outrageous. Each Defendant acted with deliberate and flagrant disregard and displayed an entire want of care and a conscious and depraved indifference to the consequences of its conduct, including to the health, safety, and welfare of its customers, including Harper Glasscock, and warrants an award of punitive damages in an amount—imposed by the jury at trial—sufficient to punish each Defendant and deter others from like conduct.

## COUNT III
## STRICT LIABILITY – FAILURE TO INSTRUCT
### (Pleaded in the Alternative)
### (Against All Defendants)

519.    Plaintiff realleges and incorporates by reference each of the preceding paragraphs as though set forth fully herein.

520.    Plaintiff pleads this claim in the alternative.

80

521.     At all relevant times, each Defendant was engaged in the business of designing, developing, managing, operating, testing, producing, manufacturing, labeling, marketing, advertising, promoting, controlling, suppling, leasing, selling, and otherwise distributing the video game products used by Harper Glasscock: Call of Duty: Modern Warfare, Call of Duty: Modern Warfare 3, WOW, Overwatch, Battle.net, Xbox 360, Xbox Live, and MSI's GP65 Leopard gaming laptop.

522.     Each of the Defendant's products are designed and intended to be gaming products and are marketed and advertised to the public for the personal use of the end-user/consumer.

523.     Each of the Defendant's respective products are also marketed and advertised to minors and young adults.

524.     Each of the Defendants sold and distributed its respective products to Harper Glasscock in a defective and unreasonably dangerous condition by failing to provide reasonable and adequate instructions with respect to the conditions and methods of the product's safe use when a risk of abuse, addiction, and compulsive use by youth and young adults was reasonably foreseeable in its use, unless the danger is known to the user or is reasonably discoverable by them.

525.     Each of the Defendant's respective products are dangerous, to an extent beyond that contemplated by the ordinary user who used Defendants' products, because they encourage unhealthy, addictive engagement, and compulsive use.

526.     Each of the Defendants knew, or by the exercise of reasonable care, should have known, that use of their products was dangerous, harmful, and injurious when used in a reasonably foreseeable manner, particularly by youth, young adults, and neurodivergent people. More specifically:

> a.  The Call of Duty Defendants designed the Call of Duty games to take advantage of the chemical reward system of a user's brain (especially a minor or

neurodivergent person) to create addictive engagement, while knowing that abuse, addiction, and compulsive use by minors and neurodivergent people can lead to injury, including but not limited to brain damage, dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects;

b. Activision and Blizzard designed WOW, Overwatch, and Battle.net to take advantage of the chemical reward system of a user's brain to create addictive engagement, while knowing that abuse, addiction, and compulsive use by minors, young adults, and neurodivergent people can lead to injury, including but not limited to brain damage, dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects;

c. Microsoft designed its Xbox 360 with addictive features and for use with addictive video game products, and designed Xbox Live, with addictive features to be used with its Xbox consoles and as a product to house and to purchase addictive video game products, and Microsoft targeted users to make purchases of addictive video game products, while knowing that abuse, addiction, and compulsive use by youth and young adults can lead to brain damage and injury, including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects; and

d. MSI designed Plaintiff's GP65 Leopard gaming laptop with addictive features and for use with addictive video game products, including the MSI App Player—which also was designed by MSI and BlueStacks using addictive

82

technologies and features—while knowing that abuse, addiction, and compulsive use by youth, young adults, and neurodivergent individuals can lead to injury, including but not limited to brain damage, dissociative behavior, IGD, withdrawal symptoms, social isolation, cognitive impairment, and other harmful effects.

527.    Each Defendant knew or, by the exercise of reasonable care, should have known that its respective products posed risks of harm to youth, young adults, and neurodivergent people. These risks were known and knowable in light of each of the Defendant's own internal information and knowledge regarding its products at the time of the products' development, design, marketing, promotion, advertising, and distribution to Harper Glasscock.

528.    Each of the Defendants knew, or by the exercise of reasonable care, should have known, that ordinary consumers such as Plaintiff would not have realized the potential risks and dangers of the Defendants' products including a risk of abuse, addiction, and compulsive use by youth which can lead to a cascade of negative effects including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects.

529.    Defendants' products are defective and unreasonably dangerous because, among other reasons described herein, each Defendant failed to exercise reasonable care to instruct users with respect to the addictive conditions of their respective products or on methods of its safe use to avoid the risks and harms built into each Defendant's respective products.

530.    Ordinary users would not have recognized the potential risks of Defendants' products when used in a manner reasonably foreseeable to each of the Defendants.

531.    A reasonable company under the same or similar circumstances as each of the Defendants would have used provided adequate instructions to consumers, including but not

limited to minor and young adult users.

532. At all relevant times, each Defendant could have provided adequate instructions to prevent the harm and injuries described herein.

533. Had Harper Glasscock received proper or adequate instructions regarding the risks of Defendants' respective products and the need to alter their game play to avoid such risks, she would have followed such instructions.

534. Each Defendant's failure to adequately instruct Harper Glasscock regarding the risks of each of the Defendant's respective products and the need to alter her game play to avoid such risks was a proximate cause and a substantial factor in the injuries sustained by Plaintiff.

535. As a direct and proximate result of each Defendant's failure to instruct, Harper Glasscock has required and will require more healthcare and services and did incur medical, health, incidental, and related expenses, as described herein.

536. Defendants are strictly liable due to each Defendant's failure to instruct regarding the risks of Defendants' respective products and the need to alter their game play to avoid such risks, as described herein, and Harper Glasscock entitled to damages in an amount to be proven at trial as compensation for the injuries, loss, and harm described herein.

537. Harper Glasscock's injuries cannot be wholly remedied by monetary relief and such remedies at law are inadequate.

538. The nature of the fraudulent and unlawful acts that created safety concerns for Plaintiff are not the type of risks that are immediately apparent from using Defendants' products. As a proximate result of Defendants' conduct in making their games addictive, Harper Glasscock continues to use Defendants' respective products. When Harper Glasscock uses Defendants' respective products, she will not be independently able to verify whether Defendants' respective products continue to pose an unreasonable risk or rely on Defendants' respective representations

in the future.

539.   The conduct of each Defendant, as described above, was intentional, fraudulent, willful, wanton, reckless, malicious, oppressive, extreme, and outrageous. Each Defendant acted with deliberate and flagrant disregard and displayed an entire want of care and a conscious and depraved indifference to the consequences of its conduct, including to the health, safety, and welfare of its customers, including Harper Glasscock, and warrants an award of punitive damages in an amount—imposed by the jury at trial—sufficient to punish each Defendant and deter others from like conduct.

## COUNT IV
## NEGLIGENCE – DESIGN
### (Against All Defendants)

540.   Plaintiff realleges and incorporates by reference each of the preceding paragraphs as though set forth fully herein.

541.   At all relevant times, each Defendant was engaged in the business of designing, developing, managing, operating, testing, producing, manufacturing, labeling, marketing, advertising, promoting, controlling, suppling, leasing, selling, and otherwise distributing the video game products used by Harper Glasscock: Call of Duty: Modern Warfare, Call of Duty: Modern Warfare 3, WOW, Overwatch, Battle.net, Xbox 360, Xbox Live, and MSI's GP65 Leopard gaming laptop.

542.   Each of the Defendant's products are designed and intended to be gaming products and are marketed and advertised to the public for the personal use of the end-user/consumer.

543.   Each of the Defendant's respective products are also marketed and advertised to minors and young adults.

544.   Each Defendant knew or, by the exercise of reasonable care, should have known, that its respective products were dangerous, harmful, and injurious when used by youth and young

85

adults in a reasonably foreseeable manner. More specifically:

a. The COD Defendants designed the Call of Duty games to take advantage of the chemical reward system of a user's brain to create addictive engagement, while knowing that abuse, addiction, and compulsive use by minors, young adults, and neurodivergent people can lead to injury, including but not limited to brain damage, dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects;

b. Blizzard and Activision designed WOW, Overwatch, and Battle.net to take advantage of the chemical reward system of a user's brain to create addictive engagement, while knowing that abuse, addiction, and compulsive use by minors, young adults, and neurodivergent people can lead to injury, including but not limited to brain damage, dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects;

c. Microsoft designed its Xbox 360 with addictive features and for use with addictive video game products, and designed Xbox Live, with addictive features to be used with its Xbox consoles and as a product to house and to purchase addictive video game products, and Microsoft targeted users to make purchases of addictive video game products, while knowing that abuse, addiction, and compulsive use by youth and young adults can lead to brain damage and injury, including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects; and

d. MSI designed Plaintiff's GP65 Leopard gaming laptop with addictive features and for use with addictive video game products, including the MSI App Player—which also was designed by MSI and BlueStacks using addictive technologies and features—while knowing that abuse, addiction, and compulsive use by youth, young adults, and neurodivergent individuals can lead to injury, including but not limited to brain damage, dissociative behavior, IGD, withdrawal symptoms, social isolation, cognitive impairment, and other harmful effects.

545. Each Defendant knew or, by the exercise of reasonable care, should have known that its respective products posed risks of harm to youth, young adults, and neurodivergent people. These risks were known and knowable in light of each of the Defendant's own internal information and knowledge regarding its products at the time of the products' development, design, marketing, promotion, advertising, and distribution to Harper Glasscock.

546. Each of the Defendants knew, or by the exercise of reasonable care, should have known, that ordinary consumers such as Plaintiff would not have realized the potential risks and dangers of the Defendants' respective products. Those risks include brain damage, abuse, addiction, and compulsive use in youth and young adults, which can lead to a cascade of negative effects including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects.

547. Each Defendant knew that minors and young adults, like Harper Glasscock, would use its respective products.

548. Despite this knowledge, each Defendant failed to warn users, including Plaintiff, of their respective product's dangerous propensity.

549. Harper Glasscock was a foreseeable user of the Defendants' respective products.

87

550. Each Defendant had a non-delegable duty to use ordinary care in its design and to package the product in order to protect those who will use it and who are in the area of its use from unreasonable risk of harm while it is being used for its intended purpose or while it is being used for any purpose which should reasonably be expected by the manufacturer.

551. Each Defendant owed this duty to design, publish, supply, and sell reasonably safe products to users, including Harper Glasscock.

552. Each Defendant breached this duty. These breaches include, but are not limited to:

a. Utilizing patented designs and technology for purposes of addicting users to the Defendant's respective products;

b. Failing to use ordinary care in the design of its products by negligently designing them with features and patented technology as described above that specifically are addictive and harmful to youth and young adults, who are particularly unable to appreciate the risks posed by the products;

c. Designing products that were less safe to use than an ordinary consumer would expect when used in an intended and reasonably foreseeable manner;

d. Designing products that were less safe to use than an ordinary consumer would expect when used in an intended and reasonably foreseeable manner;

e. Failing to use ordinary care in the design of its products by negligently designing its products with features and patented technology as described above that created or increased the risk of brain damage, abuse and addiction in youth, young adults, and neurodivergent individuals, which can lead to a cascade of negative effects including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects;

88

f. Failing to use ordinary care to use cost-effective, reasonably feasible alternative designs, including changes to feedback loops and the addictive features described above, and other safety measures, to minimize the harms described herein; and

g. Otherwise failing to use ordinary care in the design of the products.

553.    Alternative designs that would reduce the addictive features of Defendants' respective products were available, would have effectively served the same purpose as each of the Defendant's defectively designed products, and would have reduced the gravity and severity of danger Defendants' respective products posed minors and young adults such as Harper Glasscock.

554.    A reasonable company under the same or similar circumstances as each Defendant would have designed a safer product.

555.    At all relevant times, Harper Glasscock used Defendants' respective products in the manner in which they were intended by Defendants to be used.

556.    As a direct and proximate result of each of the Defendant's breached duties, Harper Glasscock was harmed.

557.    Defendants' design of their respective products was a substantial factor in causing the Plaintiff's harm and injuries, as described herein.

558.    As a direct and proximate result of each of the Defendant's breached duties, Harper Glasscock has required and will require more healthcare and services and did incur medical, health, incidental, and related expenses.

559.    As a direct and proximate result of each of the Defendant's breached duties, Harper Glasscock has suffered—and continues to suffer—economic loss and damages, as described herein.

560.    Defendants negligently designed their respective gaming products, as identified herein, and Harper Glasscock is entitled to damages in an amount to be proven at trial that a jury believes will fairly and justly compensate her for the injuries, loss, and harm described herein.

## COUNT V
## NEGLIGENCE – FAILURE TO WARN
### (Against All Defendants)

561.    Plaintiff realleges and incorporates by reference each of the preceding paragraphs as though set forth fully herein.

562.    At all relevant times, each Defendant was engaged in the business of designing, developing, managing, operating, testing, producing, manufacturing, labeling, marketing, advertising, promoting, controlling, suppling, leasing, selling, and otherwise distributing the video game products used by Harper Glasscock: Call of Duty: Modern Warfare, Call of Duty: Modern Warfare 3, WOW, Overwatch, Battle.net, Xbox 360, Xbox Live, and MSI's GP65 Leopard gaming laptop.

563.    Each of the Defendant's products are designed and intended to be gaming products and are marketed and advertised to the public for the personal use of the end-user/consumer.

564.    Each of the Defendant's respective products are also marketed and advertised to minors and young adults.

565.    Each of the Defendants knew, or by the exercise of reasonable care, should have known, that use of their products was dangerous, harmful, and injurious when used in a reasonably foreseeable manner, particularly by youth, young adults, and neurodivergent people. More specifically:

      e.    The COD Defendants designed the Call of Duty games to take advantage of the chemical reward system of a user's brain (especially a minor or neurodivergent person) to create addictive engagement, while knowing that abuse, addiction,

and compulsive use by minors, young adults, and neurodivergent people can lead to injury, including but not limited to brain damage, dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects;

f. Blizzard and Activision designed WOW, Overwatch, and Battle.net to take advantage of the chemical reward system of a user's brain (especially a minor or neurodivergent person) to create addictive engagement, while knowing that abuse, addiction, and compulsive use by minors and neurodivergent people can lead to injury, including but not limited to brain damage, dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects;

g. Microsoft designed its Xbox 360 with addictive features and for use with addictive video game products, and designed Xbox Live, with addictive features to be used with its Xbox consoles and as a product to house and to purchase addictive video game products, and Microsoft targeted users to make purchases through the product, while knowing that abuse, addiction, and compulsive use by youth and young adults can lead to brain damage and injury, including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects; and

h. MSI designed Plaintiff's GP65 Leopard gaming laptop with addictive features and for use with addictive video game products, including the MSI App Player—which also was designed by MSI and BlueStacks using addictive technologies and features—while knowing that abuse, addiction, and

91

compulsive use by youth, young adults, and neurodivergent individuals can lead to injury, including but not limited to brain damage, dissociative behavior, IGD, withdrawal symptoms, social isolation, cognitive impairment, and other harmful effects.

566.   Each Defendant knew or, by the exercise of reasonable care, should have known that its respective products posed risks of harm to youth. These risks were known and knowable in light of each of the Defendant's own internal information and knowledge regarding its products at the time of the products' development, design, marketing, promotion, advertising, and distribution to Harper Glasscock.

567.   Each of the Defendants knew, or by the exercise of reasonable care, should have known, that ordinary consumers such as Harper Glasscock would not have realized the potential risks and dangers of the Defendants' products including a risk of abuse, addiction, and compulsive use by youth and young adults, which can lead to a cascade of negative effects including but not limited to brain damage, dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects.

568.   Each Defendant knew that minors and young adults, including Harper Glasscock, would use its respective products.

569.   None of Defendants' products, as identified herein, contain a warning—nor have Defendants ever warned the public—that those products pose an unreasonable risk of harm and addiction to users, particularly minors and young adults.

570.   None of Defendants' products, as identified herein, contain a warning—nor have Defendants ever warned the public—that their products pose a higher risk of addiction, worsening of an ability to control impulsivity, and brain damage in neurodivergent individuals, including individuals with a diagnosis of ADHD, autism, or ODD.

571.    Had Harper Glasscock received proper or adequate warnings about the risks of Defendants' respective products, she would have heeded such warnings.

572.    Each Defendant had a duty to give reasonable and adequate warning of dangers inherent or reasonably foreseeable in the use of its product for a purpose and in a manner which the manufacturer should reasonably foresee.

573.    Each Defendant owed this duty to users including Harper Glasscock.

574.    Each Defendant breached this duty owed to Harper Glasscock, a foreseeable user. These breaches include, but are not limited to:

a.    Failing to warn users that Defendants' respective products cause brain damage, addiction, compulsive use, and/or other simultaneous physical and mental injuries; and

b.    Failing to otherwise provide reasonable and adequate warnings to Plaintiff, as set forth above, about the dangers inherent or reasonably foreseeable posed by the use of each Defendant's product.

575.    A reasonable company under the same or similar circumstances as Defendants would have used reasonable care to provide adequate warnings to consumers, including the parents of minor users, as described herein.

576.    At all relevant times, each Defendant could have provided adequate warnings to prevent the harm and injuries described herein.

577.    Had Harper Glasscock received proper or adequate instructions regarding the risks of Defendants' respective products and the need to alter their game play to avoid such risks, she would have heeded such warnings.

578.    As a direct and proximate result of each Defendant's breach of its respective duty to provide adequate warnings, Harper Glasscock was harmed and sustained the injuries set forth

93

herein.

579.    Each Defendant's failure to provide adequate and sufficient warnings was a substantial factor in causing harm to Harper Glasscock.

580.    Each Defendant negligently failed to warn consumers, including Harper Glasscock, of the risks, dangers, and harm posed by their respective gaming products, as identified herein, and she is entitled to damages in an amount to be proven at trial that a jury believes will fairly and justly compensate Harper Glasscock for the injuries, loss, and harm described herein.

**COUNT VI**
**NEGLIGENCE – FAILURE TO INSTRUCT**
**(Against All Defendants)**
**(Pleaded in the Alternative)**

581.    Plaintiff realleges and incorporates by reference each of the preceding paragraphs as though set forth fully herein.

582.    Plaintiff pleads this Count in the alternative.

583.    At all relevant times, each Defendant was engaged in the business of designing, developing, managing, operating, testing, producing, manufacturing, labeling, marketing, advertising, promoting, controlling, suppling, leasing, selling, and otherwise distributing the video game products used by Harper Glasscock: Call of Duty: Modern Warfare, Call of Duty: Modern Warfare 3, WOW, Overwatch, Battle.net, Xbox 360, Xbox Live, and MSI's GP65 Leopard gaming laptop.

584.    Each of the Defendant's products are designed and intended to be gaming products and are marketed and advertised to the public for the personal use of the end-user/consumer.

585.    Each of the Defendant's respective products are also marketed and advertised to minors and young adults.

586.    Each of the Defendants knew, or by the exercise of reasonable care, should have

94

known, that use of their products was dangerous, harmful, and injurious when used in a reasonably foreseeable manner, particularly by youth, young adults, and neurodivergent people. More specifically:

    a.   The COD Defendants designed the Call of Duty games with addictive features to take advantage of the chemical reward system of a user's brain (especially a minor or neurodivergent person) to create addictive engagement, while knowing that abuse, addiction, and compulsive use by minors and neurodivergent people can lead to injury, including but not limited to brain damage, dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects;

    b.   Activision and Blizzard designed WOW, Overwatch, and Battle.net to take advantage of the chemical reward system of a user's brain to create addictive engagement, while knowing that abuse, addiction, and compulsive use by minors, young adults, and neurodivergent people can lead to injury, including but not limited to brain damage, dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects;

    c.   Microsoft designed its Xbox 360 with addictive features and for use with addictive video game products, and designed Xbox Live, with addictive features to be used with its Xbox consoles and as a product to house and to purchase addictive video game products, and Microsoft targeted users to make purchases through the product, while knowing that abuse, addiction, and compulsive use by youth and young adults can lead to brain damage and injury, including but not limited to dissociative behavior, withdrawal symptoms, social

isolation, negative consequences on cognitive processes, and other harmful effects; and

    d.  MSI designed Plaintiff's GP65 Leopard gaming laptop with addictive features and for use with addictive video game products, including the MSI App Player—which also was designed by MSI and BlueStacks using addictive technologies and features—while knowing that abuse, addiction, and compulsive use by youth, young adults, and neurodivergent individuals can lead to injury, including but not limited to brain damage, dissociative behavior, IGD, withdrawal symptoms, social isolation, cognitive impairment, and other harmful effects.

587.    Each Defendant knew or, by the exercise of reasonable care, should have known that its respective products posed risks of harm to youth, young adults, and neurodivergent people. These risks were known and knowable in light of each of the Defendant's own internal information and knowledge regarding its products at the time of the products' development, design, marketing, promotion, advertising, sale, and distribution to Harper Glasscock.

588.    Each Defendant knew or, by the exercise of reasonable care, should have known that its respective products posed risks of harm to youth. These risks were known and knowable in light of each of the Defendant's own internal information and knowledge regarding its products at the time of the products' development, design, marketing, promotion, advertising, and distribution to Harper Glasscock.

589.    Each of the Defendants knew, or by the exercise of reasonable care, should have known, that ordinary consumers such as Plaintiff would not have realized the potential risks and dangers of the Defendants' products including a risk of abuse, addiction, and compulsive use by youth and young adults, which can lead to a cascade of negative effects including but not limited

to brain damage, dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects.

590.    Each Defendant had a duty to give reasonable and adequate instructions with respect to the conditions and methods of its safe use when danger is reasonably foreseeable in its use, as the risks and dangers are unknown and not reasonably discoverable by users.

591.    Each Defendant breached its duty by failing to provide reasonable and adequate instructions to Harper Glasscock, a foreseeable user. More specifically, Defendants did not give any instructions with respect to the addictive conditions of their respective products or on methods of safe use to avoid the risks and harm built into each Defendants' respective gaming products.

592.    A reasonable company under the same or similar circumstances as each Defendant would have provided adequate instructions to consumers, including minor and young adult users and their parents and/or guardians.

593.    At all relevant times, each Defendant could have provided adequate instructions to prevent the harm and injuries described herein.

594.    Had Harper Glasscock received proper or adequate instructions regarding the risks of Defendants' respective products and the need to alter their game play to avoid such risks, she would have followed such instructions.

595.    As a direct and proximate result of each Defendant's breach of its respective duty to provide adequate instructions, Harper Glasscock was harmed and sustained the injuries set forth herein.

596.    Each Defendant's failure to provide adequate and sufficient instructions was a substantial factor in causing harm to Harper Glasscock.

597.    As a direct and proximate result of each Defendant's failure to instruct, Harper Glasscock has required and will require more healthcare and services and did incur medical, health,

97

incidental, and related expenses.

598.    Plaintiff has also incurred economic losses, in the tune of thousands of dollars spent by Harper Glasscock while using Defendants' products that they would not have incurred but for the addictive and harmful propensities of Defendants' gaming products.

599.    Each Defendant negligently failed to instruct consumers, including Harper Glasscock, of the risks, dangers, and harm posed by their respective gaming products, as identified herein, and Harper Glasscock is entitled to damages in an amount to be proven at trial that a jury believes will fairly and justly compensate her for the injuries, loss, and harm described herein.

**COUNT VII**
**NEGLIGENCE PER SE**
**(Against All Defendants)**

600.    Plaintiff realleges and incorporates by reference each of the preceding paragraphs as though set forth fully herein.

601.    At all relevant times, each Defendant was engaged in the business of designing, developing, managing, operating, testing, producing, manufacturing, labeling, marketing, advertising, promoting, controlling, suppling, leasing, selling, and otherwise distributing the video game products used by Harper Glasscock: Call of Duty: Modern Warfare, Call of Duty: Modern Warfare 3, WOW, Overwatch, Battle.net, Xbox 360, Xbox Live, and MSI's GP65 Leopard gaming laptop.

602.    Missouri has enacted the Missouri Merchandising Practices Act ("MMPA"), Mo. Rev. Stat. §§ 407.010 et seq., to protect Missourians from unfair or deceptive acts or practices in connection with the sale or advertisement of any merchandise in trade and commerce.

603.    Each Defendant was required to comply with the MMPA in connection with the sale and advertisement of Defendants' video game products used by Harper Glasscock.

604.     For purposes of the MMPA, "merchandise" is defined as "any objects, wares, goods, commodities, intangibles, real estate, or services." Mo. Rev. Stat. § 407.010(4).

605.     Under the MMPA, "[t]he act, use or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise in trade or commerce …, in or from the state of Missouri, is declared to be an unlawful practice" regardless of whether the unlawful practice was "committed before, during, or after the sale, advertisement or solicitation." Mo. Rev. Stat. § 407.020(1).

606.     Under the MMPA, "any person who willfully and knowingly engages in any act, use, employment or practice declared to be unlawful by [the MMPA] with the intent to defraud shall be guilty of a class E felony." Mo. Rev. Stat. § 407.020(3).

607.     Each Defendant's video game products, as identified and described herein, are "merchandise" under the MMPA.

608.     Each Defendant has violated the MMPA in connection with the sale and advertisement of its video game products, as identified and described herein, including but not limited to the following:

> a. Knowingly making a false representation as to the characteristics, ingredients, uses, benefits, alterations, source, sponsorship, approval, or certification of each Defendant's respective products or services;
>
> b. Advertising the goods or services with the intent not to sell them as advertised;
>
> c. Using and employing deception, fraud, and false pretense in connection with the sale or advertisement of goods or services, particularly "microtransactions" within each Defendant's respective product;

d.  Concealing, suppressing, and omitting material facts regarding the gaming product and intending that others, including Harper Glasscock, rely upon the concealment, suppression, or omission in connection with the sale or advertisement of goods or services;

e.  Using false and misleading representations, while omitting and concealing material facts, relating to the safety of each Defendant's respective products, specifically:

i.  The COD Defendants designed the Call of Duty games with addictive features, while knowing that abuse, addiction, and compulsive use by youth and neurodivergent individuals can lead to brain damage and injury, but failed to inform the public, users, or parents, including Plaintiff, that its products pose significant risk of harm and addiction;

ii. Activision and Blizzard designed WOW, Overwatch, and Battle.net with numerous psychological tricks to be as addictive as possible, while knowing that abuse, addiction, and compulsive use by youth, young adults, and neurodivergent individuals can lead to injury, but failed to inform the public, users, or parents, including Plaintiff, that its products pose significant risk of harm;

iii. Microsoft designed Xbox 360 and Xbox Live as products to house addictive gaming products and pushed users to make purchases of addictive video game products, while knowing that abuse, addiction, and compulsive use by youth, young adults and neurodivergent users—including Harper Glasscock—can lead to injury, but failed to inform the public, users, or parents, including Plaintiff, that its products pose

100

significant risk of harm; and

    iv.  MSI designed Plaintiff's GP65 Leopard gaming laptop with addictive features and for use with addictive video game products, including the MSI App Player—which also was designed by MSI and BlueStacks using addictive technologies and features—while knowing that abuse, addiction, and compulsive use by youth, young adults, and neurodivergent individuals can lead to injury, but failed to inform the public or product users, including Plaintiff, that its products pose significant risk of harm.

f.  Communicating the purported benefits and safety of using its respective products while failing to disclose the serious harms related to use, particularly to youth, specifically:

    i.  The COD Defendants and Microsoft each knew the Call of Duty games contained an inherent risk of abuse, addiction, and compulsive use by youth and neurodivergent individuals, as well as the harms that arise therefrom, but do not disclose such harms anywhere and instead market its games as safe for use by these foreseeable users;

    ii.  Activision, Blizzard, and Microsoft know that WOW, Overwatch, and Battle.net products contained an inherent risk of abuse, addiction, and compulsive use by youth and the harms that arise therefrom, but instead of disclosing such harms, these Defendants marketed WOW and Overwatch in an open world format without regard to age, addiction, or pre-existing neurodivergent issues users may have, and further marketed WOW, Overwatch, and Battle.net as safe for use by minors

101

and young adults;

iii. Microsoft knew that Xbox 360 and Xbox Live contained an inherent risk of abuse, addiction, and compulsive use by youth, young adults, and neurodivergent users—including Harper Glasscock—and the harms that arise therefrom, but do not disclose such harms anywhere and instead market its products for play by such users; and

iv. MSI knew that Plaintiff's GP65 Leopard gaming laptop and the MSI App Player integrated into the computer—as well as the video games played thereon—contained an inherent risk of abuse, addiction, and compulsive use by youth, young adults, and neurodivergent users— including Harper Glasscock—and the harms that arise therefrom, but does not disclose such harms anywhere and instead markets its product as safe for use by minors and young adults.

g. Using dark patterns and other unfair and deceptive practices to entice minors, including Harper Glasscock, into in-game purchases and microtransactions, as described above;

h. Using dark patterns and other unfair and deceptive practices that allow or allowed minors to make in-game purchases and microtransactions without parental consent or account holder consent;

i. Knowingly making a false representation as to the characteristics, components, uses, benefits, alterations, source, sponsorship, approval, or certification of each Defendant's respective products or services as safe for their intended use, while knowing that those products and services had been designed to be addictive;

102

j.  Advertising their goods or services as safe for use by minors with the intent to sell them with addictive features built in;

k.  Using and employing deception, fraud, and false pretense in connection with the sale or advertisement of goods or services, particularly "microtransactions" within each Defendant's respective product;

l.  Concealing, suppressing, and omitting material facts regarding the gaming product and intending that others, including Harper Glasscock, rely upon the concealment, suppression, or omission in connection with the sale or advertisement of goods or services;

m.  Communicating the purported benefits and safety of using its respective products while failing to disclose the serious harms related to use, particularly to youth; and

n.  Otherwise failing to disclose the use of addictive-patented technology and unlawful gaming tactics or devices within each Defendant's respective products.

609.    Defendants have violated statutory and regulatory law, as identified above, and with each statutory violation, each Defendant proximately caused injury and damage to Harper Glasscock. This damage includes the injuries and harms to Plaintiff described above, including but not limited to Harper Glasscock's addiction to, or compulsive or excessive use of, Defendants' products, and a cascade of resulting negative effects, including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects, along with economic and financial loss, pain and suffering, mental anguish, loss of enjoyment of life, and a general degradation of their family life. Further, as a direct and proximate result of each of the Defendant's statutory violations, Harper Glasscock has

103

required and will require more healthcare and services and did incur medical, health, incidental, and related expenses.

610.     Harper Glasscock is within the class of persons that these statutes and regulations are intended to protect—and her injuries and damages are the type of harm that these statutes and regulations are intended to prevent—therefore, each Defendant is *per se* negligent for violating the MMPA.

**COUNT VIII**
**NEGLIGENCE - ORDINARY**
**(Against All Defendants)**

611.     Plaintiff realleges and incorporates by reference each of the preceding paragraphs as though set forth fully herein.

612.     At all relevant times, each Defendant was engaged in the business of designing, developing, managing, operating, testing, producing, manufacturing, labeling, marketing, advertising, promoting, controlling, suppling, leasing, selling, and otherwise distributing the video game products used by Harper Glasscock: Call of Duty: Modern Warfare, Call of Duty: Modern Warfare 3, WOW, Overwatch, Battle.net, Xbox 360, Xbox Live, and MSI's GP65 Leopard gaming laptop.

613.     Each of the Defendant's products are designed and intended to be gaming products and are marketed and advertised to the public for the personal use of the end-user/consumer.

614.     Each of the Defendant's respective products are also marketed and advertised to minors and young adults.

615.     Each Defendant owed Harper Glasscock a duty to act as a reasonably careful company would under the circumstances.

616.     Each Defendant has breached the duties owed to Harper Glasscock.

617.     A reasonably careful company would not create an unreasonable risk of harm from

104

and in the use of its products (including an unreasonable risk of addiction, compulsive use, sleep deprivation, anxiety, depression, or other physical or mental injuries); yet each Defendant did just that.

618.     A reasonably careful company would protect Harper Glasscock from unreasonable risk of injury from and in the use of its products; yet each Defendant did not do that.

619.     A reasonably careful company would not invite, encourage, or facilitate youth and young adults, such as Harper Glasscock, to engage in dangerous behavior through or as a reasonably foreseeable result of using its products; yet each Defendant did just that.

620.     A reasonably careful company would not fail to disclose the serious safety risks presented by its respective products; yet each Defendant did just that. More specifically:

    a.  The COD Defendants and Microsoft failed to disclose that the Call of Duty games were, and are, designed with addictive features to take advantage of the chemical reward system of a user's brain (especially a minor or neurodivergent person) to create addictive engagement, while knowing that abuse, addiction, and compulsive use by foreseeable users, i.e., minors and neurodivergent individuals, can lead to brain damage, abuse, compulsive use, addiction, and other injury, and, as such, the products pose significant risk of harm;

    b.  Activision, Blizzard, and Microsoft failed to disclose that WOW, Overwatch, and Battle.net products are designed to take advantage of the chemical reward system of a user's brain to create addictive engagement, while knowing that abuse, addiction, and compulsive use by foreseeable users, i.e., minors, young adults, and neurodivergent individuals, can lead to brain damage, abuse, compulsive use, addiction, and other injury, and, as such, the products pose significant risk of harm;

105

c. Microsoft failed to disclose that it designed Xbox 360 with addictive features and for use with addictive video game products, and designed Xbox Live with addictive features to be used with its Xbox consoles and as a product to house addictive video game products, to take advantage of the chemical reward system of users' brains and to purchase addictive video game products, while knowing that abuse, addiction, and compulsive use by foreseeable users, i.e., minors, young adults, and neurodivergent individuals, can lead to injury and, as such, the products pose significant risk of harm; and

d. MSI failed to disclose that it designed Plaintiff's GP65 Leopard gaming laptop with addictive features and for use with addictive video game products, including the MSI App Player—which also was designed by MSI and BlueStacks using addictive technologies and features—to take advantage of the chemical reward receptors in users' brains and to encourage users to purchase addictive video game products, while knowing that abuse, addiction, and compulsive use by youth, young adults, and neurodivergent individuals can lead to injury and, therefore, pose significant risk of harm to minor, young adults, and neurodivergent people.

621. Harper Glasscock was a foreseeable user of the Defendants' respective products.

622. Each Defendant invited, solicited, encouraged, or reasonably should have foreseen the fact, extent, and manner of Harper Glasscock's use of Defendants' respective products.

623. Each Defendant knew or, by the exercise of reasonable care, should have known, that the reasonably foreseeable use of its respective products (as developed, set up, managed, maintained, supervised, and operated by that Defendant) was dangerous, harmful, and injurious

106

when used by youth and young adults such as Harper Glasscock in a reasonably foreseeable manner. More specifically, each Defendant should have known this because each designed their respective gaming products with addictive features, while knowing that abuse, addiction, and compulsive use by youth, young adults, and neurodivergent people can lead to injury, including but not limited to dissociative behavior, physical damage to the brain, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects.

624.    At all relevant times, each Defendant knew or, by the exercise of reasonable care, should have known that its respective products (as developed, setup, managed, maintained, supervised, and operated by that Defendant) posed unreasonable risks of harm to youth and young adults such as Harper Glasscock, which risks were known and knowable, including in light of the internal information and knowledge each Defendant had regarding its products.

625.    Each Defendant knew, or by the exercise of reasonable care, should have known, that ordinary youth and young adults users of its respective video game products, such as Harper Glasscock, would not have realized the potential risks and dangers of using the product, including a risk of addiction, compulsive use, or excessive use, which foreseeably can lead to a cascade of negative effects, including but not limited to brain damage, dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects.

626.    Each Defendant's conduct was closely connected to Harper Glasscock's injuries and her damages, which were highly certain to occur.

627.    Each Defendant could have avoided Harper Glasscock's injuries with minimal cost, including, for example, by not including certain features, feedback loops, and patented technology as described herein in its respective products which harmed Harper Glasscock.

107

628.    Each Defendant also owes a duty to not to engage in any unlawful practice including any act, use or employment of any deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise in trade or commerce. *See* Mo. Rev. Stat. § 407.020.

629.    Each Defendant engaged in unlawful acts and practices as described in Mo. Rev. Stat. § 407.020.1 in connection with the design, development, publishing, marketing, and sale of their respective gaming products, as identified and described herein.

630.    Each of the Defendants owed a duty to all reasonably foreseeable users, including but not limited to minor users and their parents, to provide reasonable and adequate instructions about the risk of using Defendants' respective products that were known to each of the Defendants, or that each of the Defendants should have known through the exercise of reasonable care, and how to alter regular gameplay in order to avoid such risks.

631.    Each Defendant has breached its duties of care owed to Plaintiff through its malfeasance, actions, business decisions, and policies in the development, setup, management, maintenance, operation, marketing, advertising, promotion, supervision, and control of its respective products. Those breaches include:

    a.  Designing, patenting, and licensing features and technology that, as described above, unreasonably creates or increases the foreseeable risk of addiction to, compulsive use of, or overuse of the product by youth, including Harper Glasscock;

    b.  Designing, patenting, and licensing features and technology that, as described above, unreasonably creates or increases the foreseeable risk of harm to the physical and mental health and well-being of youth and young adult users, like

108

Harper Glasscock, including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects;

c. Designing, patenting, and licensing features and technology that, as described above, unreasonably creates or increases the foreseeable risk of overspending and/or gambling by youth, young adults, and neurodivergent people, including Harper Glasscock;

d. Including features and patented technology in their respective products that, as described above, are currently structured and operated in a manner that unreasonably creates or increases the foreseeable risk of addiction to, compulsive use of, or overuse of the product by youth, young adults, and neurodivergent people, including Harper Glasscock;

e. Including features and patented technology in their respective products that, as described above, are currently structured and operated in a manner that unreasonably creates or increases the foreseeable risk of harm to the physical and mental health and well-being of youth and young adult users, like Harper Glasscock, including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects;

f. Including features and patented technology in their respective products that, as described above, are currently structured and operated in a manner that unreasonably creates or increases the foreseeable risk of overspending and/or gambling by youth and young adults, including Harper Glasscock;

g. Developing, patenting, and licensing unreasonably dangerous features and algorithms for video game products after notice that such features and algorithms, as structured and operated, posed a foreseeable risk of harm to the physical and mental health and well-being of youth and young adult users, like Harper Glasscock;

h. Maintaining unreasonably dangerous features and algorithms in their respective products after notice that such features and algorithms, as structured and operated, posed a foreseeable risk of harm to the physical and mental health and well-being of youth users.

632. Each Defendant has breached its duties of care owed to Harper Glasscock through its non-feasance, failure to act, and omissions in the development, setup, management, maintenance, operation, marketing, advertising, promotion, supervision, and control of its respective products. Those breaches include:

a. Failing to implement effective parental controls;

b. Failing to implement reasonably available means to monitor for and limit or deter excessive frequency or duration of use of products by youth and young adults, including patterns, frequency, or duration of use that are indicative of addiction, compulsive use, or overuse;

c. Failing to implement reasonably available means to monitor for and limit or deter excessive overspending by youth and young adults on in-game downloadable content, product upgrades, and/or microtransactions;

d. Failing to implement reasonably available means to limit or deter use of products by youth and young adults during ordinary times for school or sleep; and

110

e. Failing to implement reasonably available means to set up and operate its products without features and patented addictive technology, discussed above, that rely on unreasonably dangerous methods as a means to engage youth and young adult users.

633. Each Defendant further breached the duty owed to recognize the safety risks posed to such users from interactive online products, such as Defendants' respective products, pursuant to 15 U.S.C. § 6501 *et seq.*

634. Each Defendant also breached its duty owed under Mo. Rev. Stat. § 407.020 *et seq.* not to engage in unlawful or deceptive business acts or practices.

635. A reasonable company under the same or similar circumstances as each Defendant would have developed, set up, managed, maintained, supervised, and operated its products in a manner that is safer for and more protective of youth and young adult users like Harper Glasscock; yet Defendants did not do this. This was a breach of duties owed to Plaintiff.

636. As a direct and proximate result of each Defendant's breach of one or more of its duties, Harper Glasscock has been injured and harmed. Such injuries and harms include addiction to, or compulsive or excessive use of, Defendants' products, and a cascade of resulting negative effects, including but not limited to brain damage, dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects, along with economic and financial loss, pain and suffering, mental anguish, loss of enjoyment of life, and a general degradation of their family life.

637. Each Defendant's breach of one or more of its duties is a proximate cause of Harper Glasscock's injuries and damages.

638. As a direct and proximate result of each of the Defendant's breach of duties, Harper Glasscock has required and will require more healthcare and services and did incur medical, health,

incidental, and related expenses.

639.    Each Defendant was negligent, and Plaintiff is entitled to damages in an amount to be proven at trial as compensation for the injuries, loss, and harm described herein.

## COUNT IX
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
### (Against All Defendants)

640.    Plaintiff realleges and incorporates by reference each of the preceding paragraphs above as though set forth fully herein.

641.    At all relevant times, each Defendant was engaged in the business of designing, developing, managing, operating, testing, producing, manufacturing, labeling, marketing, advertising, promoting, controlling, suppling, leasing, selling, and otherwise distributing the video game products used by Harper Glasscock: Call of Duty: Modern Warfare, Call of Duty: Modern Warfare 3, WOW, Overwatch, Battle.net, Xbox 360, Xbox Live, and MSI's GP65 Leopard gaming laptop.

642.    As described herein, each of the Defendants intentionally designed its respective products to addict minors and young adults who were particularly unable to appreciate the risks posed by the products and were particularly susceptible to harms from those products:

  a. The COD Defendants designed the Call of Duty games to be as addictive as possible and to include various addictive tactics, including but not limited to feedback loops, fast-paced play, and dopamine lifts from satisfying graphics and sounds, to keep users engaged with and spending money on the COD Defendants' video games;

  b. Activision and Blizzard designed the WOW game and Battle.net with psychologically addictive features, including but not limited to requiring players to continue to remain "in the game" with their team thereby extending

112

game play time and exposure to Activision and Blizzard's addictive products, using NPC to control product user's game experience, and requiring players to maintain a "level" to be on team raids, to gold farm, and to sell WOW tokens;

c. Blizzard and Activision designed the Overwatch games with psychologically addictive features and tactics to ensure players keep playing the game, including but not limited to familiar characters, varied gameplay, an inclusive multiplayer environment, and daily objectives;

d. Microsoft designed its Xbox 360 with addictive features and for use with addictive video game products, and designed Xbox Live, with addictive features to be used with its Xbox consoles and as a product to house addictive video game products, to take advantage of the chemical reward system of users' brains and to purchase addictive video game products, and these addictive features include but are not limited to an everchanging, constantly rotating library of games to ensure players keep coming back to finish games before they are removed or check for new and exciting game options to play and social aspects that allow users to play with and view the games played by friends and other users; and

e. MSI designed its MSI gaming computers, including Plaintiff's MSI GP65 Leopard, with addictive features and for use with addictive video game products, and, in an exclusive partnership with BlueStacks designed the MSI App Player with addictive features to be used with its MSI gaming computers and to house, purchase, and use addictive video game products that take advantage of the chemical reward system of users' brains—and these addictive features include but are not limited to engaging graphics, social aspects, and

113

rotating game libraries.

643.    Each Defendant intentionally designed its respective products to take advantage of the chemical reward system of users' brains (especially young users) to create addictive engagement, compulsive use, and additional mental and physical harm. In particular:

   a.    The COD Defendants designed the Call of Duty games in conjunction with psychologists, neuroscientists, and other behavioral experts to ensure the addiction of minors, young adults, and neurodivergent individuals;

   b.    Activision and Blizzard designed WOW, Overwatch, and Battle.net in conjunction with psychologists, neuroscientists, and other behavioral experts to ensure the addiction of minors, young adults, and neurodivergent individuals;

   c.    Microsoft designed Xbox 360 and Xbox Live in conjunction with psychologists, neuroscientists, and other behavioral experts to ensure the minor and young adult users continually purchase addictive video game products for play on Xbox consoles; and

   d.    MSI designed Plaintiff's MSI GP65 Leopard and, together with BlueStacks designed the MSI App Player in conjunction with psychologists, neuroscientists, and other behavioral experts to ensure that minors and young adult users continually use its video game products and continually purchase addictive video game products for play on MSI gaming laptops.

644.    Defendants intended for their products to be psychologically and neurologically addictive when used in their intended manner by their intended audience; and intended for minors and young adults, like Harper Glasscock, to use each Defendants' respective product and intended for users, like Harper Glasscock, to become addicted to the product, or should have known that users, particularly minors, would become addicted and experience emotional distress as a result of

114

Defendants' conduct and immoral tactics.

645. Each Defendant knew that extended use of video games, *i.e.,* their products, could cause addiction.

646. Each Defendant intentionally did not warn users, prospective users, or their parents/guardians of the addictive components of their games and gaming products.

647. Each Defendant's conduct in designing and developing its products to purposefully addict and harm users—especially minors, young adults, and neurodivergent individuals—was extreme and outrageous, and was beyond all possible bounds of decency, and was to be regarded as atrocious and utterly intolerable in a civilized community.

648. Each Defendant knew, like Harper Glasscock would become addicted to Defendants' respective products because each Defendant designed and developed their respective products to become more stimulative over time, to maximize young consumers' usage time, and to addict them so Defendants can continue to profit off users, including Harper Glasscock, after initial purchase or download.

649. Each Defendant knew that when users, like Harper Glasscock, became addicted to Defendants' respective products due to the addictive and defective qualities thereof, that product users, like Plaintiff, would be forced to deal with an uncontrollable video game addiction and the harmful effects of such addiction.

650. Each Defendant intended to inflict emotional distress (e.g., causing addiction) on users, like Harper Glasscock, and should have known product users and their families would suffer emotional distress as a result of Defendants' conduct.

651. Harper Glasscock has sustained severe emotional distress that has resulted in bodily harm, including but not limited to physical withdrawals, addiction, brain damage, and pain beyond what a reasonable person should be expected to endure because of each Defendant's conduct. More

specifically, Harper Glasscock has endured bouts of gamer's rage, depression, pain, suffering, and emotional disturbances which have required requires treatment, including but not limited to outpatient counseling from mental health professionals.

652.    Such conduct in intentionally creating products to addict and abuse children and young adults, and to cause them severe mental and physical harm is extreme and outrageous, beyond all possible bounds of decency, and utterly intolerable in a civilized community.

653.    No reasonable person would be expected to endure such emotional distress suffered by Plaintiff because of each Defendant's conduct.

654.    As a direct and proximate result of each of the Defendants' outrageous conduct and infliction of emotional distress, Harper Glasscock has experienced extreme emotional distress that has resulted in bodily harm and will require additional treatment for their mental health conditions proximately caused by Defendants' outrageous behavior.

655.    As a direct and proximate result of each Defendant's outrage, Harper Glasscock has been damaged. More specifically, each Defendant engaged in extremely outrageous conduct that proximately caused Plaintiff's severe emotional distress and injuries; therefore, Plaintiff is entitled to damages in an amount to be proven at trial as compensation for the injuries, loss, and harm, described herein.

656.    Further, each Defendant's outrageous conduct, as described above, was deliberate, intentional, willful, wanton, reckless, and malicious.  Each Defendant displayed flagrant disregard and an entire want of care to the consequences of their conduct, including to the health, safety, and welfare of their customers, and warrants an award of punitive damages in an amount—imposed by the jury at trial—sufficient to punish the Defendants and deter others from like conduct.

**COUNT X**
**NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS**
**(Against All Defendants)**
**(Alternative Pleading)**

657.    Plaintiff realleges and incorporates by reference each of the preceding paragraphs above as though set forth fully herein.

658.    Plaintiff pleads this in the alternative.

659.    At all relevant times, each Defendant was engaged in the business of designing, developing, managing, operating, testing, producing, manufacturing, labeling, marketing, advertising, promoting, controlling, suppling, leasing, selling, and otherwise distributing the video game products used by Harper Glasscock: Call of Duty: Modern Warfare, Call of Duty: Modern Warfare 3, WOW, Overwatch, Battle.net, Xbox 360, Xbox Live, and MSI's GP65 Leopard gaming laptop.

660.    Each Defendant owed Harper Glasscock a duty to act as a reasonably careful company would under the circumstances.

661.    A reasonably careful company would not create an unreasonable risk of harm from and in the use of its products (including an unreasonable risk of addiction, compulsive use, sleep deprivation, anxiety, depression, or other physical or mental injuries); yet each Defendant did just that.

662.    A reasonably careful company would protect Harper Glasscock from unreasonable risk of injury from and in the use of its products; yet each Defendant did not do that.

663.    A reasonably careful company would not invite, encourage, or facilitate youth and young adult product users, including Harper Glasscock, to engage in dangerous behavior through or as a reasonably foreseeable result of using its products; yet each Defendant did just that.

664.    A reasonably careful company would not fail to disclose the serious safety risks presented by its respective products; yet each Defendant defectively designed its respective products to be addictive to young adults and minors, including Harper Glasscock, who were particularly unable to appreciate the risks posed by the products and were particularly susceptible to harms from those products:

a.  The COD Defendants designed the Call of Duty games to be as addictive as possible and to include various addictive tactics, including but not limited to feedback loops, fast-paced play, and dopamine lifts from satisfying graphics and sounds, to keep users engaged with and spending money on the COD Defendants' video games;

b.  Activision and Blizzard designed WOW and Battle.net with psychologically addictive features, including but not limited to requiring players to continue to remain "in the game" with their team thereby extending game play time and exposure to Activision and Battle.net addictive products, using NPC to control product user's game experience, and requiring players to maintain a "level" to be on team raids, to gold farm, and to sell WOW tokens;

c.  Blizzard and Activision designed the Overwatch games with psychologically addictive features and tactics to ensure players keep playing the game, including but not limited to familiar characters, varied gameplay, an inclusive multiplayer environment, and daily objectives;

d.  Microsoft designed Xbox 360 with addictive features and for use with addictive video game products, and designed Xbox Live with addictive features to be used with its Xbox consoles and as a product to house addictive video game

118

products, to take advantage of the chemical reward system of users' brains and to purchase addictive video game products, and these addictive features include but are not limited to an everchanging, constantly rotating library of games to ensure players keep coming back to finish games before they are removed or check for new and exciting game options to play and social aspects that allow users to play with and view the games played by friends and other users; and

e. MSI designed its MSI gaming computers, including Plaintiff's MSI GP65 Leopard, with addictive features and for use with addictive video game products, and, in an exclusive partnership with BlueStacks designed the MSI App Player with addictive features to be used with its MSI gaming computers and to house, purchase, and use addictive video game products that take advantage of the chemical reward system of users' brains—and these addictive features include but are not limited to engaging graphics, social aspects, and rotating game libraries.

665. Each Defendant defectively designed its respective products to take advantage of the chemical reward system of users' brains (especially minors and young adult users including Harper Glasscock) to create addictive engagement, compulsive use, and additional mental and physical harm. In particular:

a. The COD Defendants designed the Call of Duty games in conjunction with psychologists, neuroscientists, and other behavioral experts to ensure the addiction of minors, young adults, and neurodivergent individuals;

b. Activision and Blizzard designed WOW, Overwatch, and Battle.net in conjunction with psychologists, neuroscientists, and other behavioral experts to ensure the addiction of minors, young adults, and neurodivergent individuals;

119

c.  Microsoft designed Xbox 360 and Xbox Live in conjunction with psychologists, neuroscientists, and other behavioral experts to ensure the minor and young adult users continually purchase addictive video game products for play on Xbox consoles; and

d.  MSI designed Plaintiff's MSI GP65 Leopard and, together with BlueStacks designed the MSI App Player in conjunction with psychologists, neuroscientists, and other behavioral experts to ensure that minors and young adult users continually use its video game products and continually purchase addictive video game products for play on MSI gaming laptops.

666.    Harper Glasscock was a foreseeable user of the Defendants' respective products.

667.    Each Defendant invited, solicited, encouraged, or reasonably should have foreseen the fact, extent, and manner of Harper Glasscock's use of Defendants' respective products.

668.    Defendants' video game products are psychologically and neurologically addictive when used in their intended manner by their intended audience; and Defendants reasonably should have known that when used as intend by minors and young adults, including Harper Glasscock, to use each Defendants' respective product and for users, like Harper Glasscock, to become addicted to the product, or should have known that users, particularly minors, would become addicted and experience emotional distress as a result of Defendants' conduct and immoral tactics.

669.    Each Defendant knew that users, including Harper Glasscock, would become addicted to Defendants' respective products because each Defendant designed and developed their respective products to become more stimulative over time, to maximize young consumers' usage time, and made them addictive to these vulnerable consumers so Defendants can continue to profit off of users, including Harper Glasscock, after initial purchase or download.

670. At all relevant times, each Defendant knew or, by the exercise of reasonable care, should have known that its respective products (as developed, setup, managed, maintained, supervised, and operated by that Defendant) posed unreasonable risks of harm to youth and young adults, including Harper Glasscock, which risks were known and knowable, including in light of the internal information and knowledge each Defendant had regarding its products.

671. Each Defendant knew, or by the exercise of reasonable care, should have known, that ordinary youth and young adult users of its respective products, including Harper Glasscock, would not have realized the potential risks and dangers of using the product, including a risk of addiction, compulsive use, or excessive use, which foreseeably can lead to a cascade of negative effects, including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects.

672. Each Defendant has breached the duties owed to Harper Glasscock.

673. Each Defendant has breached its duties of care owed to Plaintiff through its malfeasance, actions, business decisions, and policies in the development, setup, management, maintenance, operation, marketing, advertising, promotion, supervision, and control of its respective products. Those breaches include:

    a. Including features and patented technology in their respective products that, as described above, are currently structured and operated in a manner that unreasonably creates or increases the foreseeable risk of addiction to, compulsive use of, or overuse of the product by youth, young adults, and neurodivergent people, including Harper Glasscock;

    b. Including features and patented technology in their respective products that, as described above, are currently structured and operated in a manner that unreasonably creates or increases the foreseeable risk of harm to the physical

and mental health and well-being of youth, young adult, and neurodivergent users, including Harper Glasscock, including but not limited to brain damage, dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects;

c. Including features and patented technology in their respective products that, as described above, are currently structured and operated in a manner that unreasonably creates or increases the foreseeable risk of overspending and/or gambling by youth, young adults, and neurodivergent product users, including Harper Glasscock; and

d. Maintaining unreasonably dangerous features and algorithms in their respective products after notice that such features and algorithms, as structured and operated, posed a foreseeable risk of harm to the physical and mental health and well-being of youth and young adult users, including Harper Glasscock.

674. Each Defendant has breached its duties of care owed to Plaintiff through its non-feasance, failure to act, and omissions in the development, setup, management, maintenance, operation, marketing, advertising, promotion, supervision, and control of its respective products. Those breaches include:

a. Failing to implement effective parental controls;

b. Failing to implement reasonably available means to monitor for and limit or deter excessive frequency or duration of use of products by youth and young adults, including patterns, frequency, or duration of use that are indicative of addiction, compulsive use, or overuse;

c. Failing to implement reasonably available means to monitor for and limit or deter excessive overspending by youth and young adults on in-game

downloadable products and/or microtransactions;

d.  Failing to implement reasonably available means to limit or deter use of products by youth and young adults during ordinary times for school or sleep; and

e.  Failing to implement reasonably available means to set up and operate its products without features and patented addictive technology, discussed above, that rely on unreasonably dangerous methods as a means to engage youth and young adult users.

675.  A reasonable company under the same or similar circumstances as each Defendant would have developed, set up, managed, maintained, supervised, and operated its products in a manner that is safer for and more protective of youth and young adult product users, including Harper Glasscock; yet Defendants did not do this. This was a breach of duties owed to Plaintiff.

676.  Each Defendant's conduct was closely connected to Plaintiff's emotional distress, which was highly certain to occur.

677.  As a direct and proximate result of each Defendant's breach of one or more of its duties, Harper Glasscock has sustained emotional distress beyond what a reasonable person should be expected to endure because of each Defendant's conduct.

678.  As a direct and proximate result of each of the Defendants' negligent conduct and infliction of emotional distress, Harper Glasscock has experienced extreme emotional distress that is medically diagnosable and of sufficient severity to be medically significant, including IGD, depression, and anxiety, and is required (and will require) additional treatment for their mental health conditions proximately caused by Defendants' outrageous behavior.

679.  As a direct and proximate result of each Defendant's negligent infliction of emotional distress, Harper Glasscock has been damaged. More specifically, each Defendant

engaged in extremely outrageous conduct that proximately caused Plaintiff's severe emotional distress and injuries; therefore, Harper Glasscock is entitled to damages in an amount to be proven at trial as compensation for the injuries, loss, and harm, described herein.

## COUNT XI
## VIOLATION OF MISSOURI MERCHANDISING PRACTICES ACT
### MO. REV. STAT. § 407.010 *et seq.*
### (Against All Defendants)

680.    Plaintiff realleges and incorporates by reference each of the preceding paragraphs as though set forth fully herein.

681.    At all relevant times, each Defendant was engaged in the business of designing, developing, managing, operating, testing, producing, manufacturing, labeling, marketing, advertising, promoting, controlling, suppling, leasing, selling, and otherwise distributing the video game products used by Harper Glasscock: Call of Duty: Modern Warfare, Call of Duty: Modern Warfare 3, WOW, Overwatch, Battle.net, Xbox 360, Xbox Live, and MSI's GP65 Leopard gaming laptop.

682.    Each of the Defendant's products are designed and intended to be gaming products and are marketed and advertised to the public for the personal use of the end-user/consumer.

683.    Each of the Defendant's respective products are also marketed and advertised to minors and young adults.

684.    It is unlawful for any Defendant to engage in methods, acts, or practices that involve deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise in trade or commerce, in or from the state of Missouri, as these are unlawful practices under the Missouri Merchandising Practices Act ("MMPA"), Mo. Rev. Stat. 407.010 et seq.

124

685.     Each Defendant engaged in deceptive, unfair, and unlawful trade practices in connection with the sale and advertisements of its gaming product, identified herein. Those violations include but are not limited to the following:

a.     Knowingly making a false representation as to the characteristics, ingredients, uses, benefits, alterations, source, sponsorship, approval, or certification of each Defendant's respective products or services;

b.     Advertising the goods or services with the intent not to sell them as advertised;

c.     Employing bait-and-switch advertising consisting of an attractive but insincere offer to sell a product or service which the seller in truth does not intend or desire to sell;

d.     Knowingly taking advantage of consumers who is reasonably unable to protect their interest because of their age;

e.      Using and employing deception, fraud, and false pretense in connection with the sale or advertisement of goods or services, particularly "microtransactions" within each Defendant's respective product;

f.     Concealing, suppressing, and omitting material facts regarding the gaming product and intending that others, like Harper Glasscock, rely upon the concealment, suppression, or omission in connection with the sale or advertisement of goods or services;

g.     Using false and misleading representations, while omitting and concealing material facts, relating to the safety of each Defendant's respective products, specifically:

125

i. The COD Defendants designed the Call of Duty games with addictive features, while knowing that abuse, addiction, and compulsive use by youth and neurodivergent individuals can lead to brain damage and injury, but failed to inform the public, users, or parents, including Plaintiff, that its products pose significant risk of harm and addiction;,

ii. Activision and Blizzard designed WOW, Overwatch, and Battle.net with numerous psychological tricks to be as addictive as possible, while knowing that abuse, addiction, and compulsive use by youth, young adults, and neurodivergent individuals can lead to injury, but failed to inform the public, users, or parents, including Plaintiff, that its products pose significant risk of harm;

iii. Microsoft designed Xbox 360 and Xbox Live as products to house addictive gaming products and pushed users to make purchases of addictive video game products, while knowing that abuse, addiction, and compulsive use by youth, young adults and neurodivergent users—including Harper Glasscock—can lead to injury, but failed to inform the public or users, including Plaintiff, that its products pose significant risk of harm;

iv. MSI designed Plaintiff's GP65 Leopard gaming laptop with addictive features and for use with addictive video game products, including the MSI App Player—which also was designed by MSI and BlueStacks using addictive technologies and features—while knowing that abuse, addiction, and compulsive use by youth, young

adults, and neurodivergent individuals can lead to injury, but failed to inform the public or users, including Plaintiff, that its products pose significant risk of harm.

h.  Communicating the purported benefits and safety of using its respective products while failing to disclose the serious harms related to use, particularly to youth, young adults, and neurodivergent people, specifically:

   i.  The COD Defendants and Microsoft each knew the Call of Duty games contained an inherent risk of abuse, addiction, and compulsive use by youth and neurodivergent individuals, as well as the harms that arise therefrom, but do not disclose such harms anywhere and instead market its games as safe for use by these foreseeable users;

   ii.  Activision, Blizzard, and Microsoft knew that WOW and Battle.net contained an inherent risk of abuse, addiction, and compulsive use by youth and the harms that arise therefrom, but instead of disclosing such harms, these Defendants marketed WOW, Overwatch, and Battle.net without regard to age, addiction, or pre-existing neurodivergent issues users may have, and further marketed WOW, Overwatch, and Battle.net as safe for use by minors and young adults;

   iii.  Microsoft knew that Xbox 360 and Xbox Live contained an inherent risk of abuse, addiction, and compulsive use by youth, young adults, and neurodivergent users—including Harper Glasscock—and the harms that arise therefrom, but do not disclose such harms anywhere and instead market its products for play by such users; and

127

iv. MSI knew that Plaintiff's GP65 Leopard gaming laptop and the MSI App Player integrated into the computer—as well as the video games played thereon—contained an inherent risk of abuse, addiction, and compulsive use by youth, young adults, and neurodivergent users—including Harper Glasscock—and the harms that arise therefrom, but does not disclose such harms anywhere and instead markets its product as safe for use by minors and young adults.

i. Using dark patterns and other unfair and deceptive practices to entice minors and young adults, including Harper Glasscock, into in-game purchases and microtransactions, as described above;

j. Using dark patterns and other unfair and deceptive practices that allow or allowed minors and young adults to make in-game purchases and microtransactions without parental consent or account holder consent;

k. Knowingly making a false representation as to the characteristics, components, uses, benefits, alterations, source, sponsorship, approval, or certification of each Defendant's respective products or services as safe for their intended use, while knowing that those products and services had been designed to be addictive;

l. Advertising their goods or services as safe for use by minors with the intent to sell them with addictive features built in;

m. Using and employing deception, fraud, and false pretense in connection with the sale or advertisement of goods or services, particularly "microtransactions" within each Defendant's respective product;

n. Concealing, suppressing, and omitting material facts regarding the gaming product and intending that others, including Harper Glasscock, rely upon the

concealment, suppression, or omission in connection with the sale or advertisement of goods or services;

    o.  Communicating the purported benefits and safety of using its respective products while failing to disclose the serious harms related to use, particularly to youth, young adults, and neurodivergent individuals; and

    p.  Otherwise failing to disclose the use of addictive-patented technology and unlawful gaming tactics or devices within each Defendant's respective products.

686.    Each Defendant engaged in the aforementioned unlawful or deceptive trade practices in the in the course of business and in connection with the sale of goods or services to Missouri consumers, including Plaintiff.

687.    Each Defendant also violated the MMPA by offering misleading or deceptive prize promotions, including but not limited to:

    a.  Representing directly or by implication that players, including Harper Glasscock, will have an increased chance of receiving a prize by making multiple or duplicate purchases, payments, or donations, or by entering a game, drawing, sweepstakes, or other contest more than one time, unless the representation is true;

    b.  Representing directly or by implication that users, like Harper Glasscock, are being notified a second or final time of the opportunity to receive or compete for a prize unless the representation is true;

    c.  Representing directly or by implication that a prize notice is urgent, or otherwise convey an impression of the urgency by use of description, narrative copy, phrasing on an envelope, or similar method unless there is a limited time

period in which the recipient must take some action to claim or be eligible to receive a prize, and the date by which such action is required appears in immediate proximity to each representation of urgency and in the same type size and boldness as each representation of urgency; and

d.  Offering misleading or deceptive prize promotions through its respective games, including but not limited to, timed quests, battle passes or packs, and loot boxes, that encourage users like Harper Glasscock to continually keep making in-game purchases.

688.    Defendants' actions detailed herein constitute deceptive, unfair and unlawful acts and trade practices in violation of the MMPA and are actions that would mislead a reasonable consumer.

689.    Harper Glasscock acted as reasonable consumers would in light of all of the circumstances, purchasing and using the Defendants' products in the ways reasonably anticipated and expected by Defendants.

690.    Defendants' deceptive, unfair and unlawful acts as alleged herein are of the kind and nature that would cause a reasonable person to enter into the transactions that resulted in damages to Plaintiff.

691.    Harper Glasscock relied to her detriment on Defendant's deceptive and unconscionable acts, including Defendants' respective misrepresentations and deceptions, in deciding to use and how to use Defendants' gaming products.

692.    As a proximate result of each Defendant's deceptive, unfair and unlawful trade practices, described above, Harper Glasscock suffered actual and ascertainable financial loss. This loss includes but is not limited to, money spent on microtransactions and Harper Glasscock has unnecessarily paid and/or have become liable to pay and will continue to pay and/or be liable to

pay for medical aid, medical treatment, and medications.

693.     Had each Defendant not engaged in the respective unfair, deceptive, and abusive conduct described herein, Harper Glasscock would not have used each Defendant's respective products and would not have suffered financial loss.

694.     Each Defendant violated the MMPA in the manner described herein and, as a result of Defendants' countless violations of the MMPA, Harper Glasscock is entitled to damages in an amount to be proven at trial as compensation for their actual and ascertainable financial loss and reasonable attorney's fees incurred in connection with prosecuting this claim.

695.     Each Defendant engaged in unconscionable and deceptive trade practices, as described above, which was intentional, fraudulent, willful, wanton, reckless, malicious, oppressive, extreme, outrageous, unlawful, and displayed a flagrant disregard of, and an entire want of care and conscious and depraved indifference to, the consequences of its conduct, including to the health, safety, and welfare of its customers. This misconduct warrants an award of punitive damages in an amount—imposed by the jury at trial—sufficient to punish each Defendant and deter others from like conduct.

## COUNT XII
## DECEIT/FRAUDULENT MISREPRESENTATION
### (Against All Defendants)

696.     Plaintiff realleges and incorporates by reference each of the preceding paragraphs as though set forth fully herein.

697.     At all relevant times, each Defendant was engaged in the business of designing, developing, managing, operating, testing, producing, manufacturing, labeling, marketing, advertising, promoting, controlling, suppling, leasing, selling, and otherwise distributing the video game products used by Harper Glasscock: Call of Duty: Modern Warfare, Call of Duty: Modern Warfare 3, WOW, Overwatch, Battle.net, Xbox 360, Xbox Live, and MSI's GP65 Leopard gaming

131

laptop.

698.    As detailed herein, each Defendant knew about the defective conditions of its respective products and that the products posed serious health risks to users.

699.    Each Defendant made representations of material facts about their respective products, while knowing or believing those representations to be false and with the intent that Plaintiff (and the public) rely on those misrepresentations.

700.    These false representations involve misstatements about the safety of each Defendant's product identified herein and include, but are not limited to:

a.    The COD Defendants and Microsoft misrepresented the Call of Duty games as safe for extended, long-term play while knowing that abuse, addiction, and compulsive use by foreseeable users like youth and neurodivergent people can lead to injury, and knowing that they had designed and developed the Call of Duty games to be as addictive as possible;

b.    Activision, Blizzard, and Microsoft misrepresented WOW, Overwatch, and Battle.net as safe for use by minors, young adults, and neurodivergent individuals, including Harper Glasscock, while knowing that abuse, addiction, and compulsive use by such users can lead to brain damage and other injuries, and knowing that it had designed and developed WOW, Overwatch, and Battle.net to be as addictive as possible;

c.    Microsoft misrepresented that Xbox 360 and Xbox Live were safe for use by minors, young adults, and neurodivergent people, while knowing that it was designed and developed with addictive features to keep such users using Microsoft's video game products, playing video games, and purchasing addictive content, and while knowing that abuse, addiction, and compulsive use

by youth, young adults, and neurodivergent individuals can lead to brain damage and injury, such that Microsoft's video game products pose significant risk of harm to users, including Harper Glasscock; and

d.  MSI misrepresented that its MSI gaming computers and the MSI App Player, including Plaintiff's MSI GP 65 Leopard version, were safe for use by all, including minors, young adults, and neurodivergent individuals, while knowing that these products were designed and developed with addictive features to keep users using MSI's video game products, playing video games, and purchasing addictive video game products, and while knowing that abuse, addiction, and compulsive use by youth, young adults, and neurodivergent individuals can lead to brain damage, loss of function as a member of society and loss of ability to be an independent member of society and injury, such that its products pose significant risk of harm to users, like Plaintiff.

701.   Each Defendant knew their games posed risk to minors and young adults, like Harper Glasscock, based on internal research and external studies known in the industry and to each Defendant; yet each Defendant misrepresented the safety and value of their games for the purpose of inducing product users, like Harper Glasscock, to purchase/download the game and to continue using Defendants' products to the addiction knowingly caused by Defendants' products.

702.   Each Defendant also knowingly and recklessly misled the public—particularly product users and their families, including Plaintiff, into believing these products were safe or even beneficial for children and young adults to use. These misrepresentations of material fact include, but are not limited to:

a.  The COD Defendants and Microsoft marketed their Call of Duty games without warning of the addictive design and risk of injury associated with the products,

133

despite knowing that the Call of Duty games contained an inherent risk of abuse, addiction, and compulsive use by foreseeable users, including minors and neurodivergent individuals, and the harms that arise therefrom, and that have been experienced by Harper Glasscock;

b.  Activision, Blizzard, and Microsoft marketed WOW, Overwatch, and Battle.net as safe for use by minors and young adults despite knowing that these video game products contained an inherent risk of brain damage, abuse, addiction, and compulsive use by youth, young adults, and neurodivergent people, and the harms that arise therefrom and that have been experienced by Harper Glasscock;

c.  Microsoft knew that Xbox 360 and Xbox Live, as well as the COD game series, contained an inherent risk of abuse, addiction, and compulsive use by youth, young adults, and neurodivergent people, and the harms that arise therefrom, but intentionally marketed its products for use by such individuals and directed its misstatements towards users of COD and other games designed, developed and utilizing the patents and technology described herein; and

d.  MSI knew that its MSI gaming computers and the MSI App Player integrated therein, including Plaintiff's MSI GP 65 Leopard version, contained an inherent risk of abuse, addiction, and compulsive use by youth, young adults, and neurodivergent individuals, and the harms that arise therefrom, but intentionally marketed its products for use by such individuals and directed its misstatements towards users of MSI gaming computers and MSI app player

703.    At all relevant times, within their respective video game products, each Defendant included the ability for users, including Plaintiff, to purchase in-game downloadable products or

134

microtransactions.

704. Users of Defendants' products, including minors such as Harper Glasscock, were deceived by each Defendant in connection with these microtransactions through false representations and material misstatements built into each of the Defendants' products.

705. Defendants' methods of deceit include but are not limited to, using features and patented technology in each Defendant's product, including patented matchmaking technologies and algorithms to "put" players in certain game scenarios requiring additional purchases to advance, AI avatars or "friends" to encourage purchase, and disguised features of the Defendants' products, which misrepresent to users, like Harper Glasscock, that game-selected purchases would help them advance in the game or complete necessary missions.

706. Defendants made these false representations and material nondisclosures with intent that product users, like Harper Glasscock, spend money on microtransactions.

707. At the time each Defendant utilized these technologies to deceive Harper Glasscock, and each Defendant knew that the representations made through the game were false and existed only to entice Harper Glasscock to continue spending.

708. Each Defendant intended its fraudulent in-game microtransactions and psychological tactics to take advantage of users like Harper Glasscock.

709. At the same time, each Defendant knew that misrepresentations served only to increase users'—including Harper Glasscock's—inherent risk of danger, specifically a risk of abuse, addiction, and compulsive use by youth and young adults, which can lead to a cascade of harms. Those harms include, but are not limited to, brain damage, dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects.

710.    Harper Glasscock reasonably relied on Defendants' misrepresentations within each Defendant's product to make several in-game purchases that actually had little to no value to Harper Glasscock within the game.

711.    Had Plaintiff known that the representations in each Defendant's respective products regarding in-game purchases were false and fraudulent, and the result of Defendants' use of patented technologies, Harper Glasscock never would have purchased Defendants' video game products or spent money on additional in-game downloadable content or microtransactions built into the product design.

712.    Furthermore, as detailed herein, each Defendant knew about the defective conditions of its respective products and that the products posed serious health risks to users.

713.    Even though each Defendant knew of the risks based on its internal information and external studies known to each Defendant, each Defendant intentionally and knowingly misrepresented those findings to avoid losing revenue so that product users, like Harper Glasscock, would continue using each Defendant's respective products.

714.    Each Defendant knowingly and recklessly misled the public, users, and their parents and/or guardians, including Plaintiff, into believing their video game products were safe or even beneficial for children to use.

715.    Each Defendant intended its misrepresentations, concealment, misstatements, and omissions to induce the public, users, and parents, including Plaintiff, to purchase, download, play, continue to use, and/or purchase downloadable game content or in-game transactions in each Defendant's product.

716.    By intentionally making numerous material misrepresentations, downplaying any potential harm associated with its respective products, and reassuring the public, users, and parents, including Plaintiff, that its products were safe, each Defendant did fraudulently induce the public,

136

users, and parents, including Plaintiff, to purchase, download, play, continue to use, and/or purchase downloadable game content or in-game transactions in each Defendant's product..

717. Harper Glasscock was deceived and manipulated by Defendants into microtransactions resulting in thousands of dollars spent on in-game products or microtransactions.

718. Each Defendant knew that its concealment, misstatements, and omissions were material, and that users, like Harper Glasscock, would be induced into spending money that they would not spend on Defendants' products if they knew the truth.

719. A reasonable person, including Plaintiff, would find information that impacted the users' health, safety, and well-being—such as the serious adverse health risks associated with the use of Defendants' products—to be important when deciding whether to use, or continue to use, those products. Thus, Harper Glasscock justifiably relied on each Defendant's material misrepresentations that the products were safe when purchasing, downloading, playing, continuing to use, and/or purchasing downloadable game content or in-game product transactions in each Defendant's product.

720. As a direct and proximate result of each Defendant's fraudulent inducement, Harper Glasscock was not aware and could not have been aware of the facts that each Defendant concealed or misstated, and therefore justifiably and reasonably relied on Defendant's fraudulent conduct when purchasing, downloading, playing, and/or continuing to use each Defendant's respective products, and/or purchasing downloadable game content or in-game product transactions in each Defendant's product.

721. As a direct and proximate result of each of the Defendant's concealment of material information, Harper Glasscock has been financially and otherwise harmed through each of the Defendant's inducements to utilize their products, download and play their games, and/or

137

continuously spend funds through its products.

722.    By intentionally making numerous material misrepresentation, including, but not limited to, downplaying any potential harm associated with its respective products, and affirmative representations to the public, users, and parents, including Plaintiff, that its products were safe, each Defendant intended to mislead the public, users, and their parents, including Plaintiff, into believing Defendants' video game products were safe for children and young adults to use.

723.    Each Defendant knew that its misstatements and false representations, as identified herein, were material.

724.    The misrepresentations described herein were made to Plaintiff—particularly to Harper Glasscock—prior to her purchase of each Defendant's product and to Harper Glasscock while she was using Defendants' products as intended.

725.    Each Defendant intended its material misstatements and false representations to induce the public, users, and parents, including Plaintiff, to purchase, download, play, continue to use, and/or purchase downloadable game upgrades or in-game product transactions for use with each Defendant's product.

726.    Harper Glasscock relied on Defendants' material misstatements and false representations in deciding whether to use, or continue to use, each of Defendants' products; specifically, Call of Duty: Modern Warfare, Call of Duty: Modern Warfare 3, WOW, Overwatch, Battle.net, Xbox 360, Xbox Live, and MSI's GP65 Leopard gaming laptop.

727.    Harper Glasscock's reliance on each Defendant's material misrepresentations when purchasing, downloading, playing, continuing to use, and/or purchasing downloadable game content upgrades or in-game transactions in each Defendant's product was justifiable and reasonable under the circumstances.

728. As a direct and proximate result of each Defendant's material misrepresentations and false statements, i.e., Defendants' deceit, Harper Glasscock was not aware and could not have been aware of the material facts that each Defendant misrepresented or falsified, and therefore Plaintiff justifiably and reasonably had no reason to believe that each Defendant's products were unsafe for children and young adults to use.

729. As a direct and proximate result of each of the Defendant's material misrepresentations and false statements (e.g., Defendants' deceit), Plaintiff has been damaged. Such damage includes Harper Glasscock's physical and mental injuries (and the permanency thereof); pain and suffering; mental anguish; Harper Glasscock's inability earn, and the present value of any lost income; economic loss related to expenses incurred as a result of using Defendants' products; and necessary medical care, treatment, and service (including transportation, lodging, and board) expenses related to Harper Glasscock's physical and mental injuries. Harper Glasscock's injuries are permanent and will require more medical care, treatment, and services (including transportation, lodging, and board) in the future.

730. Each Defendant engaged in fraudulent misrepresentations and deceit that is a proximate cause of Plaintiff's injuries and losses; therefore, Harper Glasscock is entitled to damages in an amount to be proven at trial and in an amount a jury finds will fairly and justly compensate Plaintiff for the injuries, loss, and harm described herein.

731. Further, each Defendant's deceitful conduct and fraudulent misrepresentations, as described above, was intentional, willful, wanton, reckless, malicious, and displayed flagrant disregard for, and an entire want of care and a conscious and depraved indifference to, the consequences of their conduct, including to the health, safety, and welfare of their customers, and warrants an award of punitive damages in an amount—imposed by the jury at trial—sufficient to punish the Defendants and deter others from like conduct.

139

## COUNT XIII
## DECEIT/FRAUDULENT OMISSION OR NONDISCLOSURE
### (Against All Defendants)

732.     Plaintiff realleges and incorporates by reference each of the preceding paragraphs as though set forth fully herein.

733.     At all relevant times, each Defendant was engaged in the business of designing, developing, managing, operating, testing, producing, manufacturing, labeling, marketing, advertising, promoting, controlling, suppling, leasing, selling, and otherwise distributing the video game products used by Harper Glasscock: Call of Duty: Modern Warfare, Call of Duty: Modern Warfare 3, WOW, Overwatch, Battle.net, Xbox 360, Xbox Live, and MSI's GP65 Leopard gaming laptop.

734.     As detailed herein, each Defendant knew about the defective conditions of its respective products and that the products posed serious health risks to users.

735.     Each Defendant could have disclosed the defective condition of its respective products to the public and advised that the products posed serious health risks to users, particularly youth. No Defendant took such action; instead, each Defendant opted to omit the safety risks from any disclosures or marketing practices.

736.     Each Defendant intentionally and knowingly did not disclose the serious safety risks presented by its respective products.

737.     Each Defendant intentionally omitted or knowingly did not disclose material facts about their respective products, or their collective use of patents designed to addict players to Defendants' products. For instance,

      a.  The COD Defendants and Microsoft did not inform the public, users, or parents, including Plaintiff, that the Call of Duty games pose significant risk of harm due to the COD Defendants' decision to design the Call of Duty games to be as

140

addictive as possible, while knowing that abuse, compulsive use, and addiction in youth and neurodivergent people can lead to brain damage and injury;

b. Activision, Blizzard, and Microsoft did not inform the public, users, or parents, including Plaintiff, that WOW, Overwatch, and Battle.net pose a significant risk of harm due to Blizzard and Activision's decision to design their video game products to be as addictive as possible, while knowing that abuse, addiction, and compulsive use by youth, young adults, and neurodivergent individuals can lead to brain damage and injury;

c. Microsoft did not inform the public, users, or parents, including Plaintiff, that it designed Xbox 360 and Xbox Live with addictive features, or that these products could be used to download addictive games, despite knowing that abuse, addiction, and compulsive use by youth, young adults, and neurodivergent individuals can lead to brain damage and injury; and

d. MSI did not inform the public, users, or parents, esigned Plaintiff, that it designed GP65 Leopard gaming laptop with addictive features and for use with addictive video game products, including the MSI App Player—which also was designed by MSI and BlueStacks using addictive technologies and features— despite knowing that abuse, addiction, and compulsive use by youth, young adults, and neurodivergent individuals can lead to injury, including but not limited to brain damage, dissociative behavior, IGD, withdrawal symptoms, social isolation, cognitive impairment, and other harmful effects.

738. Each Defendant knew of the risks associated with their respective products based on internal research and external studies known to the industry and each Defendant; yet, intentionally omitted and failed to disclose those findings, to induce youth and young adults,

141

including Harper Glasscock, to continue using Defendants' respective products.

739. Each Defendant's silence and nondisclosures of material information about the risks associated with their products was made under facts and circumstances where each Defendant was under a duty to speak about those risks to Plaintiff and others, because Defendants had superior knowledge or information about their products and the risks of their products that was not reasonably available to Plaintiff or other consumers, because such information was kept or considered confidential by each Defendant.

740. Harper Glasscock used ordinary diligence in purchasing and using Defendants' products, but she could not, through ordinary diligence, have discovered the true facts known only to Defendants about the deceptive features of their products and the risks of using such products to Plaintiff. The undisclosed information detailed above was beyond the reasonable reach of Plaintiff and was not discoverable in the exercise of ordinary diligence.

741. Each Defendant knew that its omissions and nondisclosures were material.

742. A reasonable person, including Plaintiff, would find information that impacted the users' health, safety, and well-being—such as the serious adverse health risks associated with the use of Defendants' products—to be important when deciding whether to use, or continue to use, those products.

743. If Defendants had not omitted material facts regarding the safety of their products, Plaintiff would not have purchased, downloaded, played, continued to use, and/or purchased downloadable game or content upgrades or in-game transactions in each Defendant's product.

744. As a direct and proximate result of each Defendant's material omissions and intentional nondisclosures, Plaintiff had no reason to believe that each Defendant's products were unsafe for children to use.

142

745.     As a direct and proximate result of each Defendant's material omissions and nondisclosures, Harper Glasscock has been damaged. More specifically, each Defendant engaged in deceitful conduct through its fraudulent omissions and nondisclosure, and that deceitful conduct is a proximate cause of Plaintiff's injuries and losses; therefore, Harper Glasscock is entitled to damages in an amount to be proven at trial as compensation for the injuries, loss, harm, and damages described herein.

746.     Further, each Defendant's deceitful conduct and fraudulent misrepresentations, as described above, was intentional, willful, wanton, reckless, malicious, and displayed a deliberate and flagrant disregard of, and an entire want of care and a conscious and depraved indifference to the consequences of their conduct, including to the health, safety, and welfare of their customers, and warrants an award of punitive damages in an amount—imposed by the jury at trial—sufficient to punish the Defendants and deter others from like conduct.

## COUNT XIV
## FRAUDULENT CONCEALMENT
### (Against All Defendants)

747.     Plaintiff realleges and incorporates by reference each of the preceding paragraphs above as though set forth fully herein.

748.     At all relevant times, each Defendant was engaged in the business of designing, developing, managing, operating, testing, producing, manufacturing, labeling, marketing, advertising, promoting, controlling, suppling, leasing, selling, and otherwise distributing the video game products used by Harper Glasscock: Call of Duty: Modern Warfare, Call of Duty: Modern Warfare 3, WOW, Overwatch, Battle.net, Xbox 360, Xbox Live, and MSI's GP65 Leopard gaming laptop.

749.     As detailed herein, each Defendant knew about the defective conditions of its respective products and that the products posed serious health risks to users, particularly minora,

143

young adults, and neurodivergent product users.

750.     Each Defendant concealed the serious safety risks presented by its respective products. Defendants' acts of fraudulent concealment include, but are not limited to:

a.  The COD Defendants designed the Call of Duty games with numerous psychological tricks to take advantage of the chemical reward system of a user's brain (especially that of a minor or neurodivergent person) and to be as addictive as possible—while knowing that abuse, addiction, and compulsive use by youth and neurodivergent individuals can lead to brain damage and injury—but concealed this information from the publics and product users, including Plaintiff;

b.  Activision and Blizzard designed WOW, Overwatch, and Battle.net with numerous psychological tricks to take advantage of the chemical reward system of a user's brain (especially that of a minor, young adult, or neurodivergent person) and to be as addictive as possible—while knowing that abuse, addiction, and compulsive use by youth, young adults, and neurodivergent individuals can lead to brain damage and injury—but concealed this information from the public and product users, including Harper Glasscock;

c.  Microsoft designed Xbox 360 with addictive features and for use with addictive video game products, and designed Xbox Live with addictive features to be used with its Xbox consoles and as a product to house addictive video game products, to take advantage of the chemical reward system of users' brains and to purchase addictive video game products, while knowing that abuse, addiction, and compulsive use by youth can lead to injury, but concealed this information from the public, product users, and parents, including Harper

144

Glasscock; and

d.  MSI designed Plaintiff's GP65 Leopard gaming laptop with addictive features and for use with addictive video game products, including the MSI App Player—which also was designed by MSI and BlueStacks using addictive technologies and features—while knowing that abuse, addiction, and compulsive use by youth, young adults, and neurodivergent individuals can lead to injury and brain damage, but concealed this information from the public, product users, and parents, including Plaintiff.

751.    Each Defendant knew of the risks associated with use of their products based on internal research and external studies known within the industry and to each Defendant, and each Defendant intentionally concealed those findings to induce product users, including Harper Glasscock, to continue using its respective products and avoid losing users and revenue,.

752.    Each Defendant's silence and nondisclosures of material information about the risks associated with their products was made under facts and circumstances where each Defendant was under a duty to speak about those risks to Plaintiff and others, because Defendants had superior knowledge or information about their products and the risks of their products that was not reasonably available to Plaintiff or other consumers, because such information was kept or considered confidential by each Defendant.

753.    Harper Glasscock used ordinary diligence in purchasing and using Defendants' products, but she could not, through ordinary diligence, have discovered the true facts known only to Defendants about the deceptive features of their products and the risks of using such products to Plaintiff.

754.    Each Defendant knew that its concealment was material.

755.    Each Defendant intended its concealment to induce the public, users, and parents,

including Plaintiff, to purchase, download, play, continue to use, and/or purchase downloadable game content or in-game product transactions in each Defendant's product.

756.    A reasonable person, including Plaintiff, would find information that impacted the users' health, safety, and well-being—such as the serious adverse health risks associated with the use of Defendants' products—to be important when deciding whether to use, or continue to use, those products.

757.    If Defendants had not concealed material facts about the safety of their respective products, including but not limited to concealing that the products had been designed to be addictive, then Harper Glasscock would not have purchased, downloaded played, continued to use, and/or purchased downloadable video game products or in-game product transactions in each Defendant's product.

758.    As a direct and proximate result of each Defendant's concealment of material information, Plaintiff was not aware and could not have been aware of the facts that each Defendant concealed or misstated, and therefore justifiably and reasonably had no reason to believe that each Defendant's products were unsafe for children to use.

759.    As a direct and proximate result of each Defendant's concealment of material information, Harper Glasscock has been injured and has sustained damages, as described herein.

760.    Each Defendant took affirmative steps to conceal the true nature and risk posed by their respective products and each Defendant's fraudulent concealment constitutes intentional, willful, wanton, and reckless conduct displaying  an entire want of care and a conscious and depraved indifference to the consequences of their conduct, including to the health, safety, and welfare of their customers; therefore,  an award of punitive damages in an amount—imposed by the jury at trial—sufficient to punish the Defendants and deter others from like conduct is warranted.

761. Defendants' fraudulent concealment tolls any applicable statute of limitations.

## COUNT XV
## NEGLIGENT MISREPRESENTATION
### (Against All Defendants)
### (Pleaded in the Alternative)

762. Plaintiff realleges and incorporates by reference each of the preceding paragraphs as though set forth fully herein.

763. Plaintiff pleads this in the alternative.

764. At all relevant times, each Defendant was engaged in the business of designing, developing, managing, operating, testing, producing, manufacturing, labeling, marketing, advertising, promoting, controlling, suppling, leasing, selling, and otherwise distributing the video game products used by Harper Glasscock: Call of Duty: Modern Warfare, Call of Duty: Modern Warfare 3, WOW, Overwatch, Battle.net, Xbox 360, Xbox Live, and MSI's GP65 Leopard gaming laptop.

765. Each Defendant—and all designers, developers, manufacturers, publishers, and suppliers of video gaming products—had a duty to communicate accurate information and to make truthful statements of material fact to the public. This duty includes but is not limited to telling Plaintiff the truth about the addictive design and dangerous condition of Defendants' products and that those products posed serious health risks to users, particularly youth, young adults, and neurodivergent people.

766. As detailed herein, each Defendant designed and developed their products to be addictive and knew, or should have known, its respective products pose serious health risks to users, particularly minors and young adults, including Harper Glasscock; yet each Defendant made false statements of material fact relating to the educational and developmental value, along with the safety of daily, prolonged use and safety of use by minors due to age-based controls. More

147

specifically, each Defendant made numerous partial material representations to the public, users, and their parents, including Plaintiff, downplaying any potential harm associated with its products and reassuring the public, users, and Plaintiff that its products were safe or even beneficial for children, young adults, and neurodivergent individuals to use:

      a.  The COD Defendants and Microsoft misrepresented Call of Duty as safe for use by minors, young adults, and neurodivergent individuals, despite knowing that, due to the COD Defendants design and development of their products, the games contained an inherent risk of abuse, addiction, and compulsive use by such foreseeable users can lead to brain damage and injury;

      b.  Activision, Blizzard, and Microsoft misrepresented WOW, Overwatch, and Battle.net as safe for use by minors, young adults, and neurodivergent individuals, despite knowing that, due to its own design, the video game products contained an inherent risk of abuse, addiction, and compulsive user by such foreseeable users can lead to brain damage and injury;

      c.  Microsoft misrepresented that its Xbox 360 and Xbox Live, as well as Call of Duty: Modern Warfare and Call of Duty: Modern Warfare 3, as safe for use by minors, young adults, and neurodivergent individuals, even marketing the products toward such users, despite knowing that, due to their own design, Microsoft's video game products contain an inherent risk of abuse, addiction, and compulsive use by youth, young adults, and neurodivergent individuals that can lead to brain damage and injury; and

      d.  MSI misrepresented that its MSI gaming computers and the MSI App Player, including Plaintiff's MSI GP 65 Leopard version] were safe for use by all, including minors, young adults, and neurodivergent individuals, while knowing

148

that these products were designed and developed with addictive features to keep users using Sony's video game products, playing video games, and purchasing addictive video game products, and while knowing that abuse, addiction, and compulsive use by youth, young adults, and neurodivergent individuals can lead to brain damage, loss of function as a member of society and loss of ability to be an independent member of society and injury, such that its products pose significant risk of harm to users, like Plaintiff.

767.     Each Defendant made these false statements and misrepresentations with intent to induce Plaintiff (and the general public) to purchase and use their respective products believing them to be safe for use as intended, and to continue to use their product and make in-game purchases and microtransactions.

768.     Each Defendant knew, or should have known, that their product was addictive and poses safety risks to users based on its internal research and industry-trade secrets known to each Defendant and, therefore, were careless and negligent in ascertaining the truth of their statements prior to making them to Plaintiff and the public.

769.     Harper Glasscock relied on Defendants' false statements and misrepresentations in conjunction with in-game purchases and Defendants' deceptive microtransaction mechanisms, including but not limited to the use of operant conditioning tactics, fake "friends" and dark patterns to induce her into spending money on Defendants' video game products.

770.     Plaintiff's reliance on Defendants' false statements was justifiable and reasonable since each Defendant concealed or misstated the truth about the addictive-design of their products.

771.     Harper Glasscock has been damaged because of the false statements of each Defendant and her reliance on each Defendant's statements. This damage includes the injuries and

149

harms to Plaintiff, described above, including but not limited to Harper Glasscock's addiction to, or compulsive or excessive use of, Defendants' products, and a cascade of resulting negative effects, including but not limited to dissociative behavior, withdrawal symptoms, social isolation, negative consequences on cognitive processes, and other harmful effects, along with economic and financial loss, pain and suffering, mental anguish, loss of enjoyment of life, and a general degradation of their family life. Further, as a direct and proximate result of each of the Defendant's material misrepresentations, Harper Glasscock has required and will require more healthcare and services and did incur medical, health, incidental, and related expenses.

772.    Plaintiff would not have incurred these damages, injuries, and economic losses but for the addictive and harmful propensities of Defendants' gaming products.

## COUNT XVI
## CIVIL CONSPIRACY
### (Against All Defendants)

773.    Plaintiff realleges and incorporates by reference each of the preceding paragraphs as though set forth fully herein.

774.    A civil conspiracy occurs when two or more persons with an unlawful objective, after a meeting of the minds, commit at least one act in furtherance of the conspiracy and thereby damage another. Such a conspiracy occurred here.

775.    Defendants conspired to addict users, including Harper Glasscock, to Defendants' gaming products.

776.    As described herein and at all times material hereto, each Defendant intentionally targeted users, including minors and young adults like Harper Glasscock, with unfair and deceptive trade practices in order to maximize profits off of the addictive nature of their products—an addiction that each Defendant, individually and collectively, purposefully and specifically developed and designed their products to cause and that was experienced by Harper Glasscock and

other users.

777. Upon information and belief, each Defendant's decision to use the patented addictive technology described herein was the result of a licensing agreement between each of the Defendants to utilize the same patents to keep users, including minors and young adults like Harper Glasscock, addicted to Defendants' products.

778. More specifically, each Defendant entered into agreements to license patented technology to further the purpose of targeting users, including minors and young adults like Harper Glasscock, with unfair and deceptive trade practices in order to maximize profits off of the addictive nature of the products.

779. As described herein, the COD Defendants and Microsoft knowingly conspired and otherwise acted in concert with each other to design a video game product that is addictive and harmful to users; to violate the MMPA; to fraudulently and negligently misrepresent, omit, and conceal material information from Plaintiff; to violate Missouri's products liability and common law; and to otherwise engage in the wrongful, deceitful, and tortious acts, as identified herein, in an effort to increase Defendants' revenue at the expense of consumers, including Plaintiff.

780. In particular, the COD Defendants and Microsoft knowingly agreed to, coordinated their efforts, and carried out a shared plan and acts in furtherance of a common agreement to fraudulently and deceptively design, develop, manage, operate, test, produce, manufacture, label, market, advertise, promote, control, sell, supply, lease, distribute, and benefit from the harmful Call of Duty games that addicted and harmed Harper Glasscock.

781. As described herein, Activision, Blizzard, and Microsoft knowingly conspired and otherwise acted in concert with each other to design a video game product that is addictive and harmful to users; to violate the MMPA; to fraudulently and negligently misrepresent, omit, and conceal material information from Plaintiff; to violate Missouri's products liability and common

law; and to otherwise engage in the wrongful, deceitful, and tortious acts, as identified herein, in an effort to increase Defendants' revenue at the expense of consumers, including Plaintiff.

782. In particular, Activision, Blizzard, and Microsoft knowingly agreed to, coordinated their efforts, and carried out a shared plan and acts in furtherance of a common agreement to fraudulently and deceptively design, develop, manage, operate, test, produce, manufacture, label, market, advertise, promote, control, sell, supply, lease, distribute, and benefit from the harmful video game products—WOW, Overwatch, and Battle.net—that addicted and harmed Harper Glasscock.

783. As described herein, Microsoft conspired with and acted in concert with the COD Defendants to distribute, market, supply, and/or sell Call of Duty video games and all in-game downloadable products and in-game purchases contained therein through Xbox Live; to design their video game products to be addictive and which pose an unreasonable risk of harm to users, particularly minors, young adults, and neurodivergent individual; to violate the MMPA; to fraudulently and negligently misrepresent, omit, and conceal material information from Plaintiff; to violate Missouri's products liability and common law; and to otherwise engage in the wrongful, deceitful, and tortious acts, as identified herein, in an effort to increase Defendants' revenue at the expense of consumers, including Harper Glasscock.

784. In particularly, Microsoft and the COD Defendants knowingly agreed to, coordinated its efforts, and carried out a shared plan and acts in furtherance of a common agreement to fraudulently and deceptively distribute, market, supply, sell, and benefit from the COD Defendants and all in-game downloadable products and in-game purchases made available through the Xbox Live, and that addicted and harmed Harper Glasscock.

785. As described herein, MSI conspired with and acted in concert with BlueStacks, Microsoft, Activision, and Blizzard to distribute, market, supply, and/or sell the millions of video

games and all in-game downloadable products and in-game purchases contained therein through the MSI App Player; to design their video game products to be addictive; to violate the MMPA; to fraudulently and negligently misrepresent, omit, and conceal material information from Plaintiffs; to violated Missouri's products liability and common law, and to otherwise engage in the wrongful, deceitful, and tortious acts, as identified herein, in an effort to increase Defendants' revenue at the expense of consumers, including Plaintiff.

786.    In particularly, MSI, BlueStacks, Microsoft, Activision, and Blizzard knowingly agreed to, coordinated its efforts, and carried out a shared plan and acts in furtherance of a common agreement to fraudulently and deceptively distribute, market, supply, sell, and benefit from consumers' purchase and use of Defendants' video games, including WOW and Overwatch, and all in-game downloadable products and in-game purchases made available through Battle.net and the MSI App Player, and that addicted and harmed Plaintiff.

787.    Each Defendant made a conscious commitment to participate in the selling, lease, or otherwise distribution of its respective product to users, including Harper Glasscock, while knowing of the unreasonable risk of harms from their products (including an unreasonable risk of addiction, compulsive use, sleep deprivation, anxiety, depression, or other physical or mental injuries).

788.    Each Defendant shared a common purpose of fraudulently concealing the unreasonable risk of harm in its gaming product while continuing to market, sell, and otherwise distribute its product to users, including Harper Glasscock.

789.    These conspiracies allowed Defendants to maximize profits, all while causing significant harm to users, like Plaintiff.

790.    Harper Glasscock sustained injuries and damages, as described herein, as a direct and proximate result of the conspiracies described herein.

791.    Plaintiff's injuries cannot be wholly remedied by monetary relief and such remedies at law are inadequate.

792.    The nature of the fraudulent and unlawful acts that created safety concerns for Plaintiff are not the type of risks that are immediately apparent from using Defendants' products.

793.    As a proximate result of Defendants' conspiring to make their games addicting, Plaintiff continues to suffer injuries and damages as Harper Glasscock is unable to stop using Defendants' respective products as a result of her video game addiction, Defendants' defective product designs, and Defendants' failure to warn consumers, like Plaintiff, about the harmful and addictive qualities and components of those video game products.

## COUNT XVII
## IN-CONCERT LIABILITY
### (Against All Defendants)

794.    Plaintiff realleges and incorporates by reference each of the preceding paragraphs as though set forth fully herein.

795.    In-concert, or shared, liability arises where one party acts in concert with another tortfeasor.

796.    As described herein and at all times material hereto, each Defendant intentionally targeted users, including minors and young adults like Harper Glasscock, with unfair and deceptive trade practices to maximize profits off the addictive nature of their products—an addiction that each Defendant, individually and collectively, purposefully and specifically developed and designed their products to cause and that was experienced by Harper Glasscock and other users.

797.    Upon information and belief, each Defendant's decision to use the patented addictive technology described herein was the result of a licensing agreement between each of the Defendants to utilize the same patents to keep users, including minors and young adults like Harper Glasscock, addicted to Defendants' products.

154

798.    More specifically, each Defendant entered into agreements to license patented technology to further the purpose of targeting users, including minors and young adults like Harper Glasscock, with unfair and deceptive trade practices in order to maximize profits off of the addictive nature of the products.

799.    Each Defendant that licenses harmful patented technology from the creator, designer, developer, and/or manufacturer of said harmful technology is therefore liable for the harmful consequences arising from such technology.

800.    Each Defendant knew of the risk of abuse, addiction, and compulsive use by youth, young adults, and neurodivergent users, including Harper Glasscock, arising from the harmful technologies and tactics contained in the patents, but continued to enter into licensing agreements, develop additional patents for license, and encourage the other Defendants to do the same.

801.    Additionally, Microsoft, GSI, and BlueStacks acted in concert with the COD Defendants, Activision, and Blizzard to place addictive games and technology in its video game products and encourage the purchase and use of such products by minors, young adults, and neurodivergent individuals.

802.    Microsoft, GSI, Activision, and Blizzard do not place any restrictions on game developers collecting and tracking game playing behavior, game stimulus to trigger purchasing microtransactions, or amount of time a player, including minors and young adults, can spend playing games.

803.    Each Defendant thus assisted in continuing to fraudulently conceal the unreasonable risk of harm in its own gaming product, and in all others.

804.    Such concerted conduct allowed Defendants to maximize profits, all while causing significant harm to users, including Plaintiff.

805.    Harper Glasscock sustained injuries and damages, as described herein, as a direct and proximate result of the concerted conduct described herein.

806.    Plaintiff's injuries and damages cannot be wholly remedied by monetary relief and such remedies at law are inadequate.

807.    The nature of the fraudulent and unlawful acts that created safety concerns for Plaintiff are not the type of risks that are immediately apparent from using Defendants' products.

808.    As a proximate result of Defendants' conspiring to make their games addicting, Harper Glasscock continues to suffer injuries and is unable to stop using Defendants' respective products as a result of Harper Glasscock's addiction, Defendants' defective design and Defendants' failure to warn consumers, including Plaintiff, about the addictive qualities and components of those products.

809.    Each Defendant actively took part in the tortious, negligent, outrageous, fraudulent, deceptive, and malfeasance that proximately caused Harper Glasscock's addiction and damages, as described herein.

810.    For these reasons, Defendants have shared liability for Plaintiff's injuries and damages.

## VII.    <u>PRAYER FOR RELIEF</u>

Harper Glasscock respectfully request judgment in her favor and against each of the Defendants to the full extent of the law, as follows:

a.  For an award of compensatory damages for Harper Glasscock in an amount to be determined at trial on the following elements of damage:

     i.  The nature, extent, duration, and permanency of Harper Glasscock's injuries;

     ii.  The reasonable expense of all necessary medical care, treatment, and

services received including transportation and board and lodging expenses necessarily incurred in securing such care, treatment, and services;

iii. The present value of all necessary medical care, treatment, and services including transportation and board and lodging expenses necessarily incurred in securing such care reasonably certain to be required in the future;

iv. The pain, suffering, and mental anguish experienced in the past;

v. The pain, suffering, and mental anguish reasonably certain to be experienced in the future;

vi. Harper Glasscocks's inability to earn, and the present value of any loss of ability to earn in the future;

vii. Any scars, disfigurement, and visible results of Harper Glasscock's injuries;

viii. The reasonable expense of any necessary help in Harper Glasscock's home which has been required as a result of Harper Glasscock's injuries;

ix. The present value of any necessary help in Harper Glasscock's home reasonably certain to be required in the future;

x. Harper Glasscock's inability earn, and the present value of any lost income;

xi. Actual financial loss; and

xii. Any other actual pecuniary loss or future financial loss proximately caused by Defendants.

b. For an award of actual damages, including economic and pecuniary loss, in an amount to be determined at trial;

c. For an award of statutory damages in an amount to be determined at trial;

d. For an award of punitive damages in an amount to be proven at trial;

e. For an award of costs and attorneys' fees, as allowable by law;

157

f.   For pre-judgment and post-judgment interest, as allowable by law; and

g.   For such other and further relief as this Court may deem just and proper.

## VIII.    JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Respectfully submitted, this 13th day of March, 2024.

**WAGSTAFF & CARTMELL**

*/s/ Eric D. Barton*
Tyler W. Hudson    MO Bar # 53585
Eric D. Barton    MO Bar # 53619
Melody R. Dickson  MO Bar # 61865
4740 Grand Ave., Ste 300
Kansas City, MO 64112
Tel.: 816-701-1100
Fax: 816-531-2372
thudson@wcllp.com
ebarton@wcllp.com
mdickson@wcllp.com

**BULLOCK WARD MASON LLC**
Tina Bullock*    GA Bar # 121791
Danielle Ward Mason*    AL Bar # 6763L75M
Breean "BW" Walas*    AR Bar # 2006077
3350 Riverwood Pkwy, Suite 1900
Atlanta, Georgia 30339
(833) 296-5291
(833) 895-2022 (facsimile)
tina@bwmlaw.com
danielle@bwmlaw.com
bwalas@bwmlaw.com

**HAUSFELD LLP**
Steven B. Rotman*  MA Bar #558473
One Marina Park Drive, Suite 1410
Boston, MA 02210
Tel.: (617) 207-0600
Fax: (617) 830-8312
srotman@hausfeld.com

158

**NIGH GOLDENBERG RASO & VAUGHN, PLLC**
Ashleigh Raso*       MN Bar #0393353
60 S. 6th St., Ste. 2800
Minneapolis, MN 55402
T: 612-656-8002
Araso@Nighgoldenberg.com

*Attorneys for Plaintiff Harper Glasscock*

*\*Motions for Admission Pro Hac Vice Forthcoming*